## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CHAMPION ENTERPRISES, INC., *et al.*, | Case No. 09-14019 (KG) |
| Debtors, | (Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CHAMPION ENTERPRISES, INC., | |
| Plaintiffs. | Adv. No. 10-_____ (KG) |
| v. | |
| CREDIT SUISSE, CAYMAN ISLANDS BRANCH, INDIVIDUALLY AND AS AGENT AND CLASS REPRESENTATIVE FOR VARIOUS PARTICIPATING LENDERS IN THE DEBTORS' PREPETITION LENDING FACILITY; MAK CAPITAL FUND LP; and WELLS FARGO BANK, N.A., a nominal defendant, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff, the Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Champion

Enterprises, Inc., *et al.*, the above-captioned debtors and debtors-in-possession by and through its

undersigned counsel, hereby files this Complaint against Credit Suisse, Cayman Islands Branch

a/k/a Credit Suisse ("<u>Credit Suisse</u>"), individually and as agent and class representative for the

lenders who participated in the Debtors' prepetition credit facility, Credit Suisse Securities

(USA) LLC ("<u>Credit Suisse USA</u>") as Underwriter, the lenders, identified in Exhibit A attached

hereto (such lenders, together with Credit Suisse, lenders to be added later and all present and future lenders, the "Lending Group") and MAK Capital Fund LP ("MAK").

## PRELIMINARY STATEMENT

1.    The Committee brings this Complaint to: (i) equitably subordinate the Lending Group's claims and/or to avoid a series of pre-petition transfers that enabled the Lending Group to dramatically improve its collateral position; (ii) avoid certain transfers as preferences and fraudulent transfers and recover the value or property transferred to the benefit of the estate; and (iii) seek damages for breach of contract.

2.    Champion Home Builders Co. is a holding company for Champion Enterprises, Inc. and a number of subsidiaries ("Champion" or "Debtors"), who are leaders in the manufactured housing industry and are one of the largest modular homebuilders in North America.   In 2007, as its customers became unable to obtain financing to buy homes, Champion's business began to suffer and it was ultimately forced to file a Chapter 11 case on November 15, 2009.

3.    [REDACTED]

4.    Credit Suisse has been agent for the various participating lenders[1] in the prepetition senior secured credit facility (the "Prepetition Credit Facility") since 2005. The Prepetition Credit Facility as reflected in the Amended and Restated Credit Agreement, dated as of April 7, 2006 on a number of amendments (the "Credit Agreement").   Credit Suisse USA is the lead arranger and sole bookrunner under the Prepetition Credit Facility.

5.    [REDACTED]

6.    [REDACTED]

---

[1] The identity of the banks and other financial institutions and investment funds which participated in the Prepetition Credit Facility changed frequently during all relevant timeframes. A substantial amount of the prepetition debt outstanding under the Prepetition Credit Facility apparently is now held by distressed debt or hedge funds.

7.     [REDACTED]

8.     A further example of Credit Suisse's inequitable conduct is that the same individuals at Credit Suisse who managed the lending relationship with Champion in Credit Suisse's capacity as administrative agent for the Lending Group also directed and coordinated Credit Suisse's underwriting role for the Subordinated Notes. This created a conflict of interest that was not fully disclosed in the Prospectus or the investor presentations circulated in connection with issuance of the Subordinated Notes.

9.     Credit Suisse's conflicting role as both agent to the Lending Group and underwriter for Debtors accomplished its goal of improving the Lending Group's collateral position. The fact that Credit Suisse's conflicting role occurred in close proximity to Champion's deteriorating finances and its ultimate bankruptcy filing exacerbates the nature of conflict of interest and the benefits the Lending Group derived from the material non-disclosures and inherent conflict.

## PARTIES

10.     The Committee, plaintiff in this adversary proceeding, was appointed in these Bankruptcy cases by the Office of the United States Trustee on November 30, 2009. The Committee has authorized the filing of this Complaint.

11.     Defendant Credit Suisse, Cayman Islands Branch is on information and belief a Swiss corporation with a usual place of business in Zurich, Switzerland. Credit Suisse acted as agent for Participating Lenders under the Debtors' prepetition Credit Agreement since the 2006 execution of the Amended and Restated Credit Agreement (the "Prepetition Facility"). Defendant Credit Suisse Securities USA is an affiliate of Credit Suisse, and is controlled by or under common control with Credit Suisse.

12. Credit Suisse is named herein in its individual capacity; in its capacity as administrative agent for each Participating Lender in the Lending Group; and as class representative of those Participating Lenders comprising the Lending Group, an unincorporated association which can be treated as a class under Federal Rule of Civil Procedure Rule 23.2 (as incorporated in Rule 7032.2 of the Federal Rules of Bankruptcy Procedure). As class representative, Credit Suisse will fairly and adequately protect the interests of the Lending Group and each Participating Lender.

13. The Committee intends all present and former members of the Lending Group to be parties to this litigation or, alternatively, to be represented by Credit Suisse the reasons stated in paragraph 12 or by virtue of the provisions of the Final Order authorizing the DIP Financing (the "DIP Order").[2] The Committee has endeavored to obtain a complete list of such entities from Credit Suisse but has not yet obtained such a list. Exhibit A lists the names of such members of the Lending Group of which the Committee is aware, and the Committee shall add other members of the Lending Group as defendants when it learns the names of such parties.

14. Defendant MAK Capital Fund LP ("MAK") is an investment fund with a principal place of business in New York, New York.

15. Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), a nominal defendant, is a business entity with a principal place of business at 420 Montgomery Street, San Francisco, California, and names only in its capacity as the collateral agent for Credit Suisse holding title to certain real estate pursuant to a collateral trust agreement dated October 31, 2005.

---

[2] References to the DIP Order includes the Interim DIP Order which contains essentially the same provisions and language.

## JURISDICTION AND VENUE

16.     This is an adversary proceeding for the purpose of determining an actual controversy between the parties.  This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and Rule 7001 of the Federal Rules of Civil Procedure.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## STANDING TO FILE THIS COMPLAINT; FUTILITY OF DEMAND

17.     Pursuant to paragraph 21 of the DIP Order (as defined in Paragraph 13 above) the Committee has standing to file the instant causes of action on behalf of the Debtors against the Defendants.  The Committee has not made any demand on the Defendants.  Demand upon the Defendants would have been futile and is excused under the circumstances of this case for the reasons set forth at the hearing before this Court on January 6, 2010.

## PROCEDURAL BACKGROUND

18.     On November 15, 2009 (the "Petition Date"), the Debtors[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned cases in this Court.  By Order dated November 17, 2009, the cases of the Debtors were consolidated for procedural purposes.  The Debtors' estates have not been substantially consolidated.

19.     The Debtors continue to operate their businesses as leading producers of manufactured and modular housing, which the Debtors distribute through independent retailers,

---

[3] The Debtors are:  Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642).  The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

builders, and developers. The Debtors operations include foreign operations in the United Kingdom and Canada, but its foreign affiliates are not debtors in the United States or in any foreign insolvency proceedings.

20.     The Committee was appointed by the Office of the United States Trustee on November 30, 2009.

21.     On January 6, 2010, the Bankruptcy Court entered a Final Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Granting Related Relief [Docket No. 244].

22.     In the DIP Order, and as subsequently extended by this Court, the Bankruptcy Court granted standing to and authorized the Committee to assert the instant causes of action against Credit Suisse on an expedited basis, no later than February 18, 2010.

## FACTS

### A.      The Original and Restated Credit Agreements.

23.     On October 31, 2005, Champion Home Builders Co. and Champion Enterprises, Inc. entered into a series of loan agreements and related documents with Credit Suisse as agent for various participating lenders.

24.     On April 7, 2006, Champion and Credit Suisse entered into the Credit Agreement. In the Credit Agreement, the Administrative Agent was identified as "Credit Suisse" (with no further identifying information). The lead arranger and sole book runner in the Credit Agreement was identified as "Credit Suisse Securities (USA) LLC."

25.     In subsequent amendments to the Credit Agreement, beginning with a First Amendment executed on March 22, 2007, the Administrative Agent was identified as "Credit Suisse, Cayman Islands Branch."

26. Pursuant to Section 10.1 of the Credit Agreement, each Participating Lender appointed Credit Suisse as its Syndication Agent and Administrative Agent under and for purposes of each relevant loan document. Also in Section 10.1, each Participating Lender authorized Credit Suisse, as Administrative Agent, to act on behalf of such Participating Lender under each loan document and "to exercise such powers [under the loan documents] as are specifically delegated to or required of the Administrative Agent by the terms [of the loan documents], together with such powers as may be incidental thereto..."

27. Pursuant to section 12.11 of the Credit Agreement, a member of the Lending Group may assign various obligations to an Eligible Assignee. Under the definition of "Eligible Assignees" there is a right to assign to an existing lender and various other defined persons but, for other assignees, section (a) of the definition of Eligible Assignee required approval of the Debtors "unless an Event of Default has occurred and is continuing . . ." [REDACTED]

28. At all relevant times, the principal persons acting on behalf of Credit Suisse in its capacity as Agent for the Lending Group under the Prepetition Credit Facility were Tobias Jordan and Jared Felt. Messrs. Jordan and Felt were the principal conduit between the Lenders and Champion in all matters relating to the prepetition Credit Agreement. Without limiting the foregoing, Messrs. Jordan and Felt were the principal negotiators of amendments to the Prepetition Credit Facility.

**B.      The Structurally Subordinated Note Issuance.**

29. [REDACTED]

30. In 2007, at the control and direction of Credit Suisse, defendant Credit Suisse USA, an affiliate and/or alter-ago of Credit Suisse and the lead arranger and sole book runner for the prepetition Credit Agreement, acted as the sole underwriter for the issuance of the Subordinated Notes pursuant to an underwriting agreement with Debtors (the "Underwriting

Agreement") at the same time that Credit Suisse was acting as agent for the Lending Group. A prospectus was issued on October 29, 2007 (the "Prospectus"), orders were taken on October 31, 2007, and the closing was on November 2, 2007. On or about November 1, 2007, Champion completed an offering of $180,000,000 of the Subordinated Notes, at an interest rate of 2.75%, payable in 2037.

31.     Messrs. Jordan and Felt were the principal persons who coordinated with Champion in connection with the underwriting of the Subordinated Notes and arranged for the underwriting of the Subordinated Notes for Champion.

32.     Messrs. Jordan and Felt were included on communications between Champion and Credit Suisse and/or Credit Suisse USA concerning the Prospectus and the Underwriting Agreement for the Subordinated Notes.

33.     [REDACTED]

34.     [REDACTED]

35.     [REDACTED]

36.     [REDACTED]

37.     [REDACTED]

**C.     The Third Amendment.**

38.     [REDACTED]

39.     Credit Suisse and Champion entered into the Third Amendment in contemplation of the issuance of the Subordinated Notes and to require Champion to take steps that would permit the lending group to benefit from the issuance of the Subordinated Notes. The Third Amendment was entered into on October 25, 2007, just four days before the Preliminary Prospectus was issued in connection with the offering and the Underwriting Agreement was executed, and at a time when Champion's financial situation was deteriorating rapidly.

40.    The Third Amendment was not filed with the SEC until November 1, 2007, after trading had begun on the Subordinated Notes. Among other things, the Third Amendment provided the following: [REDACTED]

41.    [REDACTED]

42.    Messrs. Felt and Jordan were the principal representatives of Credit Suisse with respect to negotiating the terms of the Third Amendment to the Credit Facility.

### D.    Credit Suisse's Overlapping Roles.

43.    At the direction and control of Credit Suisse, Credit Suisse USA acted as the sole underwriter for the Subordinated Notes, notwithstanding the fact that Credit Suisse was also the agent for the Lending Group and that Credit Suisse USA was the lead arranger for the Credit Agreement.

44.    Messrs. Felt and Jordan were the principal persons managing and arranging the underwriting of the Subordinated Notes, while simultaneously negotiating the Third Amendment. By way of example only: [REDACTED]

45.    The various Credit Suisse personnel, groups, and affiliated entities operated as a single economic entity with respect to Credit Suisse's role as administrative agent for the Lending Group, negotiation of the Third Amendment, and underwriting of the Subordinated Notes.

46.    [REDACTED]

### E.    Credit Suisse's Dual Involvement Vastly Improves Collateral Position of Lending Group.

47.    The same individuals who were the primary actors on behalf of Credit Suisse as administrative agent for the Lending Group completely directed and controlled Credit Suisse's negotiation of the Third Amendment and underwriting for the Subordinated Notes.

48.     Credit Suisse's conflicting dual roles in connection with negotiation of the Third Amendment and underwriting of the Subordinated Notes was part of its strategy to benefit the Lending Group.

49.     The Lending Group benefited substantially from the issuance of the Subordinated Notes in the following respects: [REDACTED]

50.     The benefits to the Lending Group of the issuance of the Subordinated Notes were particularly pronounced given that the economic crisis suggested that Champion had a significant risk of a credit crisis, default and/or bankruptcy in the near future.

51.     Credit Suisse's conflict of interest in acting as both the agent for the Lending Group and underwriter for the Subordinated Notes was not fully disclosed in the Prospectus issued on October 29, 2007.

52.     Specifically, the Prospectus indicated that affiliates of Credit Suisse were acting as both the underwriter and the agent and that more than 10% of the proceeds from the issuance of the Subordinated Notes may be used to pay outstanding debt to the Lending Group, but the Prospectus did not inform the public that the Lending Group would vastly improve its collateral position by virtue of replacing the 2009 Secured Notes with Subordinated Notes which were unsecured, or that the proceeds from the sale would be used to acquire a Canadian company and that the Lending Group would obtain a lien on that company. The Prospectus also did not inform the public that Credit Suisse USA was the arranger and sole book runner for the Prepetition Credit Agreement. The Prospectus did not disclose that Champion intended to purchase SRI with the proceeds of the Subordinated Notes. Finally, the Prospectus did not disclose that Credit Suisse believed this was a high risk credit, that it was improving its collateral position, and that it was transferring its credit risk to the holders of the Subordinated Notes.

53.     The fact that Credit Suisse's conflicting role as underwriter and agent for the Lending Group occurred in close proximity to the financial distress of Champion, and its ultimate bankruptcy filing, exacerbates the nature of conflict of interest and the benefits the Lending Group derived from the material non-disclosures and inherent conflict.

54.     [REDACTED]

**F.      The Fourth Amendment to the Credit Facility.**

55.     On October 24, 2008, Credit Suisse and Champion entered into the Fourth Amendment to the Prepetition Credit Facility (the "Fourth Amendment").

56.     [REDACTED]

57.     [REDACTED]

58.     [REDACTED]

59.     [REDACTED]

60.     [REDACTED]

61.     [REDACTED]

62.     [REDACTED]

63.     [REDACTED]

64.     The fee letter in connection with the Fourth Amendment was signed by both Credit Suisse, Cayman Island Branch, and Credit Suisse USA.

**G.      The Seventh Amendment to the Prepetition Credit Facility.**

65.     On September 2, 2009, the Debtors executed the Seventh Amendment to the Prepetition Credit Facility (the "Seventh Amendment").

66.     [REDACTED]

**H.** **Credit Suisse and the Lending Group Exercised Significant Control Over Debtors.**

67.     The actions of Credit Suisse and the Lending Group demonstrated their concern with, and effects to mitigate the credit risks created by, the financial crisis.   Thus, in the Third, Fourth and Seventh Amendments, in addition to the payments and provisions discussed elsewhere, the Lending Group added new financial covenants, increased interest rates, limited availability and required payments of an amendment fee and amendment expenses.

68.     [REDACTED]

69.     [REDACTED]

70.     [REDACTED]

**I.** **The Assignment of a Lending Position to MAK.**

71.     [REDACTED]

72.     [REDACTED]

73.     [REDACTED]

74.     [REDACTED]

75.     [REDACTED]

76.     [REDACTED]

77.     [REDACTED]

78.     [REDACTED]

79.     [REDACTED]

**J.** **The Lenders Determine to Acquire the Assets Through a Credit Bid and to Deprive the Unsecured Creditors a Seat at the Table.**

80.     On information and belief, the Lending Group has pursued a Section 363 sale and credit bid as their desired outcome to acquire Debtors' assets.

81.     At all relevant times, Credit Suisse has employed a strategy to allow the Lenders to exclude the unsecured creditors from having a "seat at the table."

82.     [REDACTED]

**K.     10K and 10Q Reports Reveal That The Debtors' Deterioration Began Well Before the Petition Date and While the Above Actions Were Taking Place**

83.     Various 10-K and 10-Q reports paint a gloomy picture of the Debtors' prospects from 2007 to the Petition Date. The 10-K for 2007, for example described in some detail: (a) the Debtors' significant debt, which could require use of cash for debt service and prevent fulfillment of debt obligations, and if payments could not be made, could lead to an acceleration of debt and restrictions on operations; (b) the adverse impact of availability of financing for the Debtors and their customers; (c) the Debtors' significant contingent liabilities; (d) the effect of the downturn in the manufactured housing industry on the availability of capital; and (e) the effect of covenant restrictions on operations and financing, the risk of default, and the risk of triggering requirements for payments of excess cash flow. All or many of these factors were undoubtedly in place at the time of the Third Amendment just two months before the end of 2007.

84.     The 10-K for 2009 was even more negative. It noted the effect of the global credit crisis on the Debtors' worldwide businesses, the significant debt, the possible adverse effects and the risk of default, fluctuations in operating results, covenant restrictions on operations and the risk of default, and some of the other factors mentioned in the 2007 10-K.

85.     In addition, the financial statements in the 2009 10-K themselves may be taken to establish insolvency under the Bankruptcy Code because liabilities exceed assets when good will and other intangibles are deleted from the balance sheet in accordance with the Bankruptcy Code definition of "insolvency." The statement of cash flows shows that cash from operations was a

more than a negative $16 million and payments on debt (presumably largely debt under the Credit Agreement exceeded) advances under the revolver by more than $36 million. The 10-K for the quarterly period through July 4, 2009 notes deteriorating operating results through 2009, noncompliance with covenants and likely future noncompliance the existence of discussions with various parties about asset sales and restructuring transactions and increases in interest rates for borrowings under the Credit Agreement and rate reductions if the Debtors made additional prepayments in the future.

### L.  Settlement and Compromise

86.  The DIP Agreement contains what amounts to a settlement and compromise and release, subject to the ability of the Committee to assert various claims pursuant to paragraph 21.

87.  The settlement and compromise, and the release are not authorized by the Bankruptcy Code, and are void, invalid and ineffective.

a.  Rule 9019 requires that the settlement and compromise be approved by the Court on Motion. The Motion seeking approval of the Postpetition Financing notes that it is brought pursuant to various sections of the Bankruptcy Code and Bankruptcy Rules, but did not refer to Rule 9019;

b.  The provisions of the DIP Order, including paragraph 4, do not purport to have complied with Bankruptcy Rule 9019 or the requirements for approving such settlements set forth in Protective Comm. For Independent Stockholders of *TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) and *Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996). There is no evidentiary basis for such settlements and compromises;

c.  The releases contained in the DIP Order include third party releases which do not comply with governing law on third party releases. *See Gillman v. Continental Airlines*

*(In re Continental Airlines)*, 203 F.3d 203, 211-14 (3d Cir. 2000). There is no evidentiary basis for such releases.

### M.    Inadequate Information

88.    The transactions involving Credit Suisse and the Lending Group are immensely complicated, involving numerous agreements and documents. The Committee has extremely limited time and resources available for investigation and discovery, and such time and resources were not adequate to permit full development of all the relevant facts and circumstances. Moreover, discovery was extremely limited and no documents were produced until on or about January 26 or 28, 2010, which was only 15-17 days before the deadline for objections in paragraph 21 of the DIP Order. Although the Committee believes it already has a strong basis for the relief sought herein, it also believes that more complete discovery will reveal not only additional information supporting the allegations here, but information which may give rise to other claims which may be asserted against Credit Suisse and the Lending Group. The Committee intends to pursue such discovery vigorously, and to amend this complaint as appropriate.

### COUNT I

### EQUITABLE SUBORDINATION AGAINST
### CREDIT SUISSE AND THE ENTIRE LENDING GROUP

89.    The allegations in Paragraphs 1-88 are incorporated herein by reference.

90.    The equities in this case dictate that the amounts owed to the Lending Group be equitably subordinated to the claims of the unsecured creditors.

91.    Credit Suisse was at all relevant times an "insider" of the Debtors under the definition set forth in 11 U.S.C. § 101(31) and under applicable non-statutory law.

92.     Pursuant to 11 U.S.C. §510(c), the Court may, "under principles of equitable subordination...subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim..." where "[t]he claimant...engaged in some type of inequitable misconduct; [t]he misconduct...resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant; and [e]quitable subordination of the claim [is] not consistent with the provisions of the Bankruptcy [Code]." *Shubert v. Lucent Tech. Inc (In Re Winstar Communications, Inc.)*, 554 F.3d 382, 411 (3d. Cir. 2009) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 546 F.2d 692, 699-700 (5th Cir. 1977)).

93.     The conduct of Credit Suisse, as alleged above, constitutes inequitable conduct.

94.     Credit Suisse's inequitable conduct gave it an unfair advantage as a claimant in this Chapter 11 case.

95.     By reason of Credit Suisse's inequitable conduct:  (a) the Lending Group's collateral position substantially improved while the unsecured creditors were damaged;  (b) [REDACTED]

96.     Allowing the Lending Group to receive payment on claims it purports to assert prior to or with the general unsecured creditors would be unfair and inequitable.  In particular, allowing the Lending Group to be paid prior to or with the general unsecured creditors would allow Credit Suisse to reap the benefits of its inequitable conduct, as alleged herein.

97.     Credit Suisse's inequitable conduct was committed to benefit the entire Lending Group and each Participating Lender in the Lending Group is bound by and liable for the inequitable conduct of their agent, Credit Suisse.

98.     The excessive control Credit Suisse exerted over Champion suggests the Court should apply special scrutiny to Credit Suisse's conduct.

99.     Equitable subordination of the amounts owed to the Lending Group is consistent with the provisions of the Bankruptcy Code.

100.    Because of the inequitable conduct described herein, the Lending Group's claims should be equitably subordinated to all general unsecured claims pursuant to 11 U.S.C. § 510(c) and its heirs and security interests, and the priority they would provide, should be declared null and void.

## COUNT II

## EQUITABLE SUBORDINATION AGAINST MAK

101.    The Committee realleges Paragraphs 1-100 as if set forth herein in full.

102.    In addition to the remedy sought in Count I, the equities in this case dictate that MAK's unsecured debt be equitably subordinated should be equitably subordinated to all general unsecured claims pursuant to 11 U.S.C. § 510(c).

103.    [REDACTED]

104.    [REDACTED]

105.    [REDACTED]

106.    [REDACTED]

107.    [REDACTED]

108.    [REDACTED]

109.    [REDACTED]

110.    Because of the inequitable conduct described herein, the MAK's claims should be equitably subordinated to all general unsecured claims pursuant to 11 U.S.C. § 510(c) and it should not be permitted to credit bid its claims under 11 U.S.C. . § 363(k)

**BREACH OF CONTRACT AGAINST**
**CREDIT SUISSE AND THE ENTIRE LENDING GROUP**

111.     The Committee realleges Paragraphs 1-110 as if set forth herein in full.

112.     Credit Suisse and Champion executed the Credit Agreement on April 7, 2006.

113.     In Section 12.11 of the Credit Agreement, Champion and Credit Suisse agreed that unless Champion was in default, with certain exceptions not applicable here, Champion would have to consent to any change in lenders participating in the Lending Group.

114.     [REDACTED]

115.     At all material times, Champion was in compliance with all terms of the Amended and Restated Credit Facility and had the right to withhold consent to a change in the identity of the Participating Lenders.

116.     All conditions precedent to bringing this Action have been satisfied or excused.

117.     As a result of Credit Suisse's breach, the Debtors' estates have been damaged in an amount to be proved at trial.

**COUNT IV**

**FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548(a)(1)(B)**
**AGAINST CREDIT SUISSE AND WELLS-FARGO**

118.     The Committee realleges Paragraphs 1-117 as if set forth herein in full.

119.     At or around the time of the execution of the Third Amendment, the Debtors transferred: [REDACTED] (the "Third Amendment Transfers").

120.     At or around the time of the execution of the Fourth Amendment, the Debtors transferred to the Lending Group the following real property collateral: [REDACTED] (the "Fourth Amendment Transfer").

121.    In connection with the Seventh Amendment, a transfer was made to [REDACTED] All of these are referred to as the "Seventh Amendment Transfers".

122.    The Third, Fourth and Seventh Amendment Transfers are collectively referred to as the "Fraudulent Transfers." This Count is applicable to each of the Fraudulent Transfers which took place not more than two years prior to November 15, 2009.

123.    The Debtors received less than reasonably equivalent value and without a fair consideration in exchange for each of the Fraudulent Transfers.

124.    At the time each of the Fraudulent Transfers were made to the Lending Group and Credit Suisse, the Debtors were insolvent or became insolvent as a result of the Fraudulent Transfers within the meaning of 11 U.S.C. §101(32)(A).

125.    At the time the Fraudulent Transfers were made to the Lending Group and Credit Suisse, Debtors were engaged in business or transactions, or were about to engage in business or transactions, for which any property remaining was an unreasonably small capital.

126.    At the time the Fraudulent Transfers were made to the Lending Group and Credit Suisse, Debtors intended to incur, or believed that they would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

127.    As a result, the Fraudulent Transfers are avoidable pursuant to 11 U.S.C. §548(a)(1)(B).

## COUNT V

### FRAUDULENT TRANSFERS UNDER 11 U.S.C.
### § 544(b) AND N.Y. DEBT. & CRED. LAW §§ 273, 274

128.    The Committee realleges Paragraphs 1-127 as if set forth herein in full.

129.    The Fourth Amendment and the Seventh Amendment Transfers were made at a time when Debtors were insolvent, and all of the Fraudulent Transfers were made when the

Debtors were engaged in business or transactions, or were about to engage in business or transactions, for which any property remaining after the conveyance was an unreasonably small capital.

130.    At the time the Fraudulent Transfers were made to the Lending Group and Credit Suisse, Debtors intended to incur, or believed that they would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

131.    Pursuant to 11 U.S.C. § 544(b), the Committee, standing having been conferred upon it by the Final DIP Order, may avoid any transfer of an interest of the Debtors in property or any obligation incurred by the Debtors that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

132.    Creditors of the Debtor hold claims allowable under Section 502 of the Bankruptcy Code.

133.    The Fraudulent Transfers are all avoidable pursuant to N.Y. Debt. & Cred. §§ 273, 274.

## COUNT VI

### STRONG ARM POWERS UNDER 11 U.S.C. § 544(a)

134.    The Committee realleges Paragraphs 1-133 as if set forth herein in full.

135.    [REDACTED] As a result, pursuant to applicable law, such transfers are avoidable by a bona fide purchaser within the meaning of 11 U.S.C. § 544(a)(3).

136.    Pursuant to 11 U.S.C. § 544(a), the Committee, standing having been conferred upon it by the DIP Order, may avoid the security interest described above.

## COUNT VII

### AVOIDANCE OF PREFERENTIAL TRANSFERS UNDER 11 U.S.C. § 547(b)

137.    The Committee realleges Paragraphs 1-136 as if set forth herein in full.

138. Credit Suisse was at all relevant times an "insider" of the Debtors under the definition set forth in 11 U.S.C. § 101(31) and under applicable non-statutory law.

139. As described above, the Seventh Amendment of September 9, 2009 [REDACTED] These transfers all occurred within 90 days of the Petition Date.

140. [REDACTED]

141. [REDACTED]

142. The transfers described in paragraphs 139-141 are referred to as the "Preferential Transfers."

143. [REDACTED]

144. The Preferential Transfers was made for the benefit of the Lending Group via its agent Credit Suisse, an insider of Debtors, at a time when Debtors were insolvent within the meaning of 11 U.S.C. §101(32).

145. As a result of the Preferential Transfers, the Lending Group received more than it would have otherwise received if: (a) Debtors' Chapter 11 proceeding were a proceeding under Chapter 7 of the Bankruptcy Code; (b) if the Preferential Transfer had not been made, and (c) if the Lending Group had received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

## COUNT VIII

## TRANSFEREE LIABILITY UNDER 11 U.S.C. § 550(a)

146. The Committee realleges Paragraphs 1-145 as if set forth herein in full.

147. Pursuant to 11 U.S.C. §§ 544(b) and 548, the Fraudulent Transfers are avoidable as fraudulent transfers, and pursuant to 11 U.S.C. § 547 the Preferential Transfers are avoidable as preferences.

148. Accordingly, the Committee is entitled to recover the property transferred (or the value of such property) from the initial transferee, or any immediate or mediate transferee.

149. The property transferred to the Defendants (and the value of such property) equals the amount of cash paid to Credit Suisse, the value of the improvement in the Lending Group's collateral position resulting from the Fraudulent Transfers and the Preferential Transfers, and the value of the release, in an amount that will be proven at trial.

150. Credit Suisse was the initial transferee, and the Lending Group was an immediate or mediate transferee of the Fraudulent Transfers.

151. Accordingly, the Committee is entitled to recover the amounts and value of such transfers from Credit Suisse and/or the Lending Group pursuant to Bankruptcy Code § 550(a).

## COUNT IX

## DISALLOWANCE OF THE LENDING GROUP'S
## PROOF OF CLAIM PURSUANT TO 11 U.S.C. §502(D)

152. The Committee realleges Paragraphs 1-151 as if set forth herein in full.

153. Section 502(d) of the Bankruptcy Code provides that:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 742(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under Section 522(i), 542, 543, 550 or 553 of this title.

11 U.S.C. § 502(d)

154. Credit Suisse and the Lending Group are the beneficiaries and recipients of the recipient of the Preferential Transfers and the Fraudulent Transfers which are recoverable pursuant to 11 U.S.C. § 550.

155. The Lending Group has not returned the Preferential Transfers and the Fraudulent Transfers to Debtors, and, as such, any proof of claim that the Lending Group may file must be disallowed pursuant to 11 U.S.C. §502(d) pending payment in full.

## COUNT X

## DISALLOWANCE OF CLAIMS AND RELATED RELIEF

156. The Committee realleges Paragraphs 1-155 as if set forth herein in full.

157. Credit Suisse and the Lending Group have not filed a proof of claim and may assert that it does not have to file such a proof of claim by virtue of the DIP Order.

158. The Creditors' Committee hereby objects to any claim or proof of claim which has been or may be filed or asserted by Credit Suisse and the Lending Group whether such claim or proof of claim (a) has already has already been filed, (b) is filed after the filing of this Complaint, (c) is asserted to exist on the basis of any documents filed and orders entered in this case including, without limitation, the DIP Order. The basis of such objection is the allegations and various Counts in this complaint. For the same reasons, the Committee specifically challenges each of the findings contained in paragraph 4 of the DIP Order, asserts each of the Claims and Defenses as defined in paragraph 21 of the DIP Order, and asserts the invalidity of all claims, liens and security interests of Credit Suisse and the Lender Parties.

159. The Debtor has made a motion to conduct a sale of substantially all of its assets (the "Sale Property") and, in connection with such sale, to permit various Lending Parties, including MAK, to credit bid. In connection with such motion:

   a. The Committee asserts that the claims of Credit Suisse and all Lender Parties are in "bona fide dispute" within the meaning of section 363(f) of the Bankruptcy Code, and that the subject matter or the sale can be sold free and clear of the any interest of such

parties in the Sale Property with their interests, if any, to attach to the sales proceeds. The basis of dispute is the allegations and various Counts in this complaint; and

      b.    For the reasons stated in paragraph (a) and the allegations in and Counts of this Complaint, this Court should exercise its discretion to deny Credit Suisse and all Lending Parties the right to credit bid pursuant to the specific authority in section 363(k) for credit bidding to be permitted unless the Court "orders otherwise."

160.    [REDACTED]

161.    For the reasons stated in paragraph 87, setting aside and avoiding all compromises, settlements and releases contained in the DIP Order.

### PRAYERS FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment as follows:

1.    Equitably subordinate the Lending Group's claims under 11 U.S.C. § 510(c) to all claims of the unsecured creditors;

2.    Equitably subordinate MAK's unsecured claims to the claims of Debtors' other unsecured creditors;

3.    Award Plaintiff damages on account of Credit Suisse's breach of contract;

4.    Avoiding (a) all transfers in violation of sections 544(a), 544(b), 547 and 548, and (b) avoiding the unperfected security interest in certain real estate pursuant to section 544(a).

5.    Awarding judgment against Credit Suisse and/or the Lending Group pursuant to 11 U.S.C. § 550(a);

6.    Disallowing the Claims of Credit Suisse and the Lending Group as described in Count IX and X, and granting the relief sought in Count X, including denial of the right to credit bid; and

7. Awarding any such other and further relief, whether in law or equity, as the Court deems just.

Dated: February 18, 2010
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone:    (302) 467-4400
Facsimile:    (302) 467-4450

*Counsel for the Official Committee of Unsecured Creditors*

- and -

**MILBERG LLP**
Jonathan M. Landers
Matthew Gluck
Anna C. Dover
Lois Dix
One Pennsylvania Plaza
New York, New York 10119
Telephone:    (212) 594-5300
Facsimile:    (212) 868-1229

*Proposed Counsel for the Official Committee of Unsecured Creditors*