**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CHAMPION ENTERPRISES, INC., *et al.*, | Case No. 09-14019 (KG) |
| Debtors, | (Jointly Administered) |
| | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CHAMPION ENTERPRISES, INC., | |
| Plaintiff, | Adv. No. 10-50514 (KG) |
| v. | |
| CREDIT SUISSE, INDIVIDUALLY AND AS AGENT AND CLASS REPRESENTATIVE FOR VARIOUS PARTICIPATING LENDERS IN THE DEBTORS' PREPETITION LENDING FACILITY; CREDIT SUISSE SECURITIES (USA) LLC; THE LENDERS LISTED IN EXHIBIT A; MAK CAPITAL FUND LP; and WELLS FARGO BANK, N.A., as collateral agent pursuant to a collateral trust agreement dated October 31, 2005, | |
| Defendants. | |

## AMENDED COMPLAINT [REDACTED]

Plaintiff, the Official Committee of Unsecured Creditors (the "Committee") of Champion

Enterprises, Inc., *et al.*, the above-captioned debtors and debtors-in-possession, by and through

its undersigned counsel, hereby files its Amended Complaint against (a) Credit Suisse,

individually as lender, and as the Administrative Agent and class representative for the lenders

who participated in the Debtors' senior secured credit facility on and after July 1, 2007, (b)

Credit Suisse Securities (USA) LLC ("Credit Suisse USA"), (c) the lenders identified in Exhibit

A hereto (which lenders, together with Credit Suisse and Credit Suisse USA, are hereinafter collectively referred to as the "Lending Group"), (d) a defendant class, represented by Credit Suisse, consisting of the Lending Group, and (e) MAK Capital Fund LP ("MAK"), which is, in addition to being a member of the Lending Group, also an unsecured creditor of the Debtors herein.  The allegations set forth in this Complaint are alleged upon knowledge with respect to Plaintiff and its own acts, and upon information and belief, as to all other matters.

## PRELIMINARY STATEMENT

1.     The Committee brings this First Amended Complaint for a judgment: (a) equitably subordinating, the Lending Group's claims to the claims represented by the Committee; (b) equitably subrogating the holders of Champion Enterprises, Inc.'s 2.75% Convertible Senior Notes due 2037 ("the Subordinated Notes"), other than defendant MAK, to the position of the former holders of Champion's secured notes issued in 1999 and due to mature in 2009 (the "2009 Notes"); (c) equitably estopping Defendants from benefiting from their deceptive and inequitable acts in connection with the issuance of the Subordinated Notes; (d) avoiding certain transfers as preferences and fraudulent transfers and awarding the unsecured creditors judgment transferring the property or its value to the estate; (e) awarding the unsecured creditors damages for breach of contract, and unjust enrichment; and (f) disallowing claims of Defendants and granting related relief.

2.     Champion Enterprises, Inc., a holding company for Champion Home Builders Co. and a number of subsidiaries ("Champion" or "Debtors"), is a leader in the manufactured housing industry and is one of the largest modular homebuilders in North America.  In 2006, as its customers became unable to obtain financing to buy homes, Champion's business began to suffer and it was ultimately forced to file its Chapter 11 case on November 15, 2009.

3.     From 2006 on, Champion's survival became increasingly dependent on Champion's relationship with Credit Suisse and the other banks that composed the Lending Group. Those Defendants had provided Champion with a senior secured credit facility (the "Prepetition Credit Facility") in October 2005. Subsequently, the Prepetition Credit Facility became embodied in Champion's Amended and Restated Credit Agreement, dated as of April 7, 2006, and in a number of amendments thereto (the "Credit Agreement"). Over the next three years, oppressive, inequitable, and deceptive conduct by Credit Suisse and the Lending Group brought about a situation in which Champion went even more heavily into debt while the Lending Group drained over [REDACTED] in cash from its overleveraged client and induced it to take steps that greatly enhanced the Lending Group's advantage over other creditors in the event of an ultimate bankruptcy.

4.     At all relevant times, Credit Suisse has been the Agent for the Lending Group under the Credit Agreement, and Credit Suisse USA has been the lead arranger and sole bookrunner under the Credit Agreement. Credit Suisse was authorized by the members of the Lending Group to act on their behalf with respect to Champion, and played a major role in the administration of this credit and fronted the relationship with Champion. At the same time, Credit Suisse communicated actively and continuously with the Lending Group concerning all matters relevant to the Lending Group's relationship with Champion, and on strategic and policy decisions with respect to Champion, the Lending Group controlled and directed the actions of and had the power to control Credit Suisse.

5.     By the third quarter of 2007, Credit Suisse and the Lending Group were well aware that Champion was seriously overstretched on its financial obligations. Indeed, Champion had become insolvent as that term is defined in the Bankruptcy Code at least by December 31,

2006 and has been continuously insolvent since then. That fact was unknown to the investing public or to Champion's unsecured creditors, but Credit Suisse and the Lending Group knew or had ample information to apprise them of that fact.

6. In early 2007, Champion, which was in default or was on the verge of defaulting on the covenants contained in the Credit Agreement, was forced to amend the Credit Agreement twice to enable it to avoid a default. By no later than the fall of 2007, the Lending Group realized that it faced a serious credit risk, despite having granted these two amendments to the Credit Agreement, because the obligations under the Credit Agreement were undercollateralized and because Champion's business was declining. To deal with this credit risk, the Lending Group adopted a tripartite strategy of seeking (a) to reduce its debt, (b) to increase its collateral coverage and (c) to transfer its credit risk to other creditors — namely, the unsecured creditors now represented by the Committee.

7. Through activities of Credit Suisse that were under their control, the Lending Group inserted themselves into and exerted control over business and strategic decisions made by Champion — and thereby became insiders of Champion — with the result that, in November 2007, Champion engaged in a series of interrelated transactions in the course of which it raised $180,000,000 through an offering of the Subordinated Notes, paid back $22,000,000 on its outstanding debt to the Lending Group, and used over $79,000,000 of the offering proceeds to pay off the 2009 Notes. By virtue of those transactions, the Lending Group not only received $22,000,000 back on its debt, it also vastly improved its collateral position by eliminating almost all of the 2009 Notes which were secured by substantially all of Champion's assets on an equal and ratable *pari passu* basis with the Lending Group. The Lending Group benefitted greatly by

substituting in place of the secured 2009 Notes the unsecured obligations on the Subordinated Notes.

8.    In formulating and executing this strategy, Credit Suisse and the Lending Group acted in a manner that was highly inequitable to the investors who purchased the Subordinated Notes.  Credit Suisse was both the Agent for the Lending Group and the sole underwriter of the Subordinated Note offering.  In those capacities it was well aware of facts demonstrating that the offering materials were materially deceptive.   Among other things, the prospectus on the Subordinated Note offering and other offering materials disseminated for road show presentations misleadingly concealed (a)  the fact that Champion had repeatedly been in default or on the verge of defaulting on its bank debt, and that a series of amendments designed to give Champion some temporary relief from those covenants had not solved the problem; (b)  the fact that, at least from the end of 2006, Champion had been insolvent as that term is defined under the Bankruptcy Code; (c)   the fact that, [REDACTED], even after receiving the proceeds of the Subordinated Notes offering, Champion would still not have available cash to meet its debt obligations as they came due in the ordinary course; (d)  the fact that Champion intended to use over $90,000,000 of the proceeds from the sale of the Subordinated Notes to engage in an acquisition program that would include the acquisition of SRI Homes, Inc. ("SRI"), even though it was evident to the Lending Group that the purchase would leave Champion undercapitalized; and (e)  the fact that a principal objective of Credit Suisse and the Lending Group inducing Champion to issue the Subordinated Notes was to eliminate other secured creditors at a time when Champion's future viability was questionable.

9.    The series of interrelated transactions described above set the stage for Champion's decline and demise over the next two years, and greatly strengthened the Lending

Group's position in the event of an ultimate bankruptcy, to the detriment of unsecured creditors including the Subordinated Note holders. Unbeknownst to the investing public and the unsecured creditors, Champion emerged from that series of transactions insolvent, and, with the encouragement of Credit Suisse and the Lending Group, compounded that problem by devoting over $90,000,000 of the Subordinated Note offering proceeds to the purchase of SRI Homes, rather than maintaining those proceeds in a more liquid form as a cushion to help it address its over-leveraged position. Over the next two years, as Champion's business continued to decline, it was repeatedly unable to meet its obligations as they came due and it was repeatedly in default or close to defaulting on loan covenants. Moreover, the Lending Group repeatedly demanded substantial payments from Champion and additional amendments to the Credit Agreement which resulted in increases in collateral that were both preferences and fraudulent transfers. Over the two year period between the November 2007 transactions and Champion's bankruptcy filing, the Lending Group caused Champion to pay out more than [REDACTED] to its members in the form of various debt repayments, fees, and other items, thereby protecting their own interests to the prejudice of the unsecured creditors.

10. Ultimately, MAK and other members of the Lending Group were able to benefit from Champion's distressed condition and the Lending Group's prior inequitable conduct. They obtained ownership of Champion's assets at a fire sale price, at a time when the market value of those assets was at a low point and when they could thereby capture significant potential future upside.

11. In January 2009, MAK began acquiring what eventually became a substantial position within the Lending Group. Its activities were not primarily directed at protecting its position as a creditor. Rather, its strategy was to use its position as a secured creditor to force

Champion into a position in which it would have no viable alternative other than agreeing to sell its assets to MAK (and the other purchasers that joined with MAK) at the worst possible time to sell.

12. MAK received the cooperation of other members of the Lending Group in this regard. Among other things, Credit Suisse improperly transferred obligations of Champion under the Credit Agreement to MAK without obtaining Champion's consent as required by the Credit Agreement, and MAK worked with members of the Lending Group to block Lending Group approval of further extensions of time for Champion under the Credit Agreement, which extensions might have enabled Champion to sell assets after market prices had begun to rise.

13. By mid-2009, Champion recognized that, by virtue of its overleveraged position, it had become a captive of, and totally dependent on, the secured creditors in the Lending Group. [REDACTED]

14. By virtue of the inequitable and deceptive conduct alleged above, the unsecured creditors of the Debtors have been injured and are entitled to relief as requested in this Complaint.

## PARTIES

15.　The Committee was appointed in these Bankruptcy cases by the Office of the United States Trustee on November 30, 2009, and sues on behalf of the unsecured creditors of the Debtors (other than MAK and any other members of the Lending Group that are unsecured creditors).

16.　Credit Suisse is a corporation organized and existing under the laws of Switzerland, maintaining its principal place of business in Zurich, Switzerland, and maintaining its principal United States place of business at 11 Madison Avenue, New York, New York 10010. Credit Suisse has been, at all times, agent for the Lending Group. Credit Suisse USA is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at 11 Madison Avenue, New York, New York 10010, is an affiliate of Credit Suisse, and is controlled by or under common control with Credit Suisse.

17.　Defendants also include all lenders in the Lending Group that have been participating lenders at any time on or after July 1, 2007 (the "Participating Lenders"). Annexed hereto as Exhibit A, and incorporated herein and made a part hereof, is a list of all such present and former Participating Lenders in the Lending Group.

18.　MAK is an investment fund maintaining its principal place of business at 590 Madison Avenue, New York, New York 10022.

19.　Wells Fargo Bank, N.A. ("Wells Fargo"), is a National Banking Association maintaining its principal place of business at 420 Montgomery Street, San Francisco, California 94163. Wells Fargo is a defendant in its capacity as the collateral agent pursuant to a Collateral Trust Agreement dated October 31, 2005. Pursuant to the terms and conditions of the Collateral Trust Agreement, Wells Fargo is the collateral trustee of the collateral provided by Champion to

the Lending Group which the Committee seeks to have released and transferred to Champion's estate. Wells Fargo, as Collateral Trustee, is an indispensible party to those turnover claims.

## JURISDICTION AND VENUE

20.    This adversary proceeding has been commenced for the purpose of determining an actual controversy between the parties.

21.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 7001 of the Federal Rules of Bankruptcy Procedure, and pursuant to the Standing Order of the United States District Court for the District of Delaware of Referral of Title 11 Proceedings to the Untied States Bankruptcy Judges for Delaware, dated September 6, 2001. This adversary proceeding relates to the above-captioned Chapter 11 bankruptcy case now pending before this Court. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

22.    Venue of this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## STANDING TO FILE THIS AMENDED COMPLAINT; FUTILITY OF DEMAND

23.    Pursuant to paragraph 21 of the Final Order (a) Authorizing Debtors (i) To Obtain Postpetition Financing Under 11 U.S.C. §§ 105, 361, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (ii) To Utilize Cash Collateral Under 11 U.S.C. § 363, (1) Granting Adequate Protection To Prepetition Secured Parties Under 11 U.S.C. §§ 361, 362, 363 and 364, and (2) Granting Related Relief, dated January 6, 2010 (the "DIP Order"), the Committee has standing to bring this Adversary Proceeding against the Defendants. The Committee has not made any demand on the Debtors because such demand would be futile and is excused in light of the fact that the Debtors have expressly waived the right to bring these claims, and the Court has expressly authorized the Committee to bring them pursuant to the terms of the DIP Order.

## CLASS ALLEGATIONS

24.     The Committee brings these claims against, *inter alia*, a defendant class consisting of each and all of the present and former members of the Lending Group that have been Participating Members at any time from July 1, 2007 to the Present.  Credit Suisse, the Administrative Agent for the Lending Group pursuant to the Credit Agreement, is the proposed class representative.

25.     The proposed class meets all of the requirements set forth in Rules 23(a), 23(b) and 23.2 of the Federal Rules of Civil Procedure.

26.     The members of the class are so numerous that joinder of all members of the class is impracticable.  The members of the class are, to the extent presently known to the Committee, set forth in Exhibit A to this Amended Complaint.  The class members listed in Exhibit A number 115.

27.     There are questions of law and fact common to the class.  For example:

a.     Should the claims of the class members be subordinated to the claims of Champion's unsecured creditors because the Lending Group, particularly through Credit Suisse, engaged in inequitable conduct;

b.     Did the inequitable conduct of the Lending Group injure either Champion's estate or Champion's unsecured creditors;

c.     Did the inequitable conduct of the Lending Group confer an unfair advantage on the Lending Group;

d.     Was the Lending Group and/or its administrative agent, Credit Suisse, an "insider" of Champion pursuant to 11 U.S.C. §101(31);

e.     Was the Prospectus for the issuance of Champion's Subordinated Notes materially false and misleading;

f.      Did the Lending Group know, at the time that the Prospectus for the issuance of Champion's Subordinated Notes was distributed to investors, that the Prospectus was materially false and misleading;

g.      Was Champion insolvent, as the term is defined under the Bankruptcy Code, from at least the date of the Subordinated Note offering to the date Champion filed in bankruptcy;

h.      Would it be inequitable for the Lending Group to continue to be unjustly enriched at the expense of Champion's unsecured lenders;

i.      Are each of the Fraudulent Transfers, as defined in paragraphs 223-229, *infra*, avoidable pursuant to Sections 273 and 274 of the New York Debtor and Creditor Law;

j.      Are each of the Fraudulent Transfers, as defined in paragraphs 223-229, *infra*, avoidable pursuant to 11 U.S.C. §544(b);

k.      Should the Lending Group's proofs of claim be disallowed pursuant to 11 U.S.C. §502(d);

l.      Should all liens and security interests of the Lending Group be declared to be null and void; and

m.      Should all of the property which is or was security for Champion's indebtedness to the Lending Group be released and/or transferred to Champion's estate and be administered by Champion for the benefit of all creditors.

28.      The defenses of Credit Suisse as a participating lender in the Lending Group are identical to the defenses of each and every participating lender in the Lending Group.

29.      Credit Suisse will fairly and adequately protect the interests of the class. [REDACTED].

30. Prosecuting separate actions against each member of the class would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards for the parties and class members herein.

31. Prosecuting separate actions against each member of the class would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impact or impede their ability to protect their interests.

32. The Lending Group acted as a unit, and therefore the declaratory and equitable relief sought in the Amended Complaint is appropriate respecting the class as a whole.

33. The questions of law and fact common to class members predominate over any questions affecting only individual members. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy. For example:

a. Upon information and belief, class members have no interest in controlling the defense of separate adversary proceedings;

b. Upon information and belief, no other litigation has been commenced anywhere concerning the issues raised in this adversary proceeding;

c. This controversy should be adjudicated in this Court where Champion's estate is being administered; and

d. The proposed class presents no management difficulties. In fact, prosecuting 115 individual adversary proceedings against the individual members of the Lending Group would present countless management headaches.

34.     Furthermore, the Lending Group is an unincorporated association and therefore this action may proceed as a defendant class action pursuant to Rule 23.2 of the Federal Rules of Civil Procedure.

## PROCEDURAL BACKGROUND

35.     On November 15, 2009 (the "Petition Date"), the Debtors[1] filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code in this Court.  By Order dated November 17, 2009, this Court consolidated Debtors' cases for procedural purposes.  The Debtors' estates have not been substantively consolidated.

36.     The Debtors continued to operate their businesses post petition as leading producers of manufactured and modular housing, which the Debtors distribute through independent retailers, builders, and developers.  The Debtors' operations include foreign operations in the United Kingdom and Canada, but its foreign affiliates are not debtors in the United States or in any foreign insolvency proceedings.  On or about March 2, 2010, this Court entered an order authorizing the sale of substantially all of the Debtor's operating assets were sold in a transaction pursuant to Section 363.

## FACTS

### A.     Overview

37.     Before turning to the specific events in detail, it is important briefly to outline the events that occurred and how the Lending Group used those events to control Champion and improve their position.  During the period from early 2007 until the Bankruptcy filing,

---

[1]  The Debtors are:  Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642).  The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

Champion's business and finances were declining rapidly and there was an overall decline in business activities, including activity in the manufactured homes industry. Champion was constantly either in default or in danger of being in default on its loan covenants. Loan covenant issues were consistently under discussion with Credit Suisse and the Lending Group, and prospective or actual defaults were waived, suspended, or eased by the Lending Groups on numerous occasions. The existence of actual or incipient defaults, together with the Lending Group's broad powers under the Credit Agreement, was used by the Lending Group to obtain control over Champion, and to use that control to obtain payments from Champion of more than [REDACTED] from mid-2007 until bankruptcy, to improve their collateral position, and to transfer risk to other creditors. Although the full story will be told at trial, some of the highlights of the decline and fall of Champion are set forth below chronologically:

- [REDACTED]

- [REDACTED]

- March 22, 2007: The First Amendment[2] revised covenants to avoid default.

- [REDACTED]

- June 20, 2007: The Second Amendment revised covenants to avoid default.

- [REDACTED]

- [REDACTED]

- October 13, 2007: After initial resistance, the Board approved the Third Amendment and Subordinated Note offering [REDACTED]

- [REDACTED]

---

[2] All references to numbered Amendments are to amendments to the Credit Agreement

- October 25, 2007: The Third Amendment required payments to the Lending Group, improved collateral coverage, and revised covenants to avoid default.

- October 29, 2007: The Prospectus on the Subordinated Note offering was disseminated, containing materially misleading omissions with respect to, without limitation, Champion's financial condition, history and status under its Loan Covenants, and plans for use of proceeds.

- [REDACTED]

- [REDACTED]

- December 21, 2007: Champion utilized over $90,000,000 of the offering proceeds and incurred additional debt to purchase SRI.

- [REDACTED]

- April 16, 2008: An earnings call reported net loss for the first quarter of $20.5 million, decline in capacity utilization and retail revenues, and that California and Arizona are "the continuing dark spot[s]."

- [REDACTED]

- [REDACTED]

- October 24, 2008: The Fourth Amendment required Champion to retain a financial consultant, required Champion to provide additional reports including a weekly rolling 13 week cash flow forecast, provided covenant relief, and suspended some covenants for various periods.

- November 5, 2008: An Analyst call reported a loss in Third Quarter of $167 million, and explained the Fourth Amendment as necessary to deal with the covenants issue.

- December 17, 2008: Champion received notice from the New York Stock Exchange of a potential delisting because the average closing price of Champion stock was less than $1 for 30 trading days.

- [REDACTED]

- February 19, 2009: Champion reported a $199.5 net loss in 2008.

- [REDACTED]

- March 20, 2009: A Champion Letter to Shareholders noted that the debt level, and especially the senior credit facility debt of $112 million, was increasingly burdensome with high interest rates and restrictive covenants, and that Champion needed to de-leverage.

- April 1, 2009: Champion's 10-Q reported that Champion's manufacturing segment plants were at only 21% of their maximum utilization capacity, as compared to 40% for the previous year.

- [REDACTED]

- [REDACTED]

- [REDACTED]

- [REDACTED]

- September 2, 2009: The Seventh Amendment granted a limited waiver of covenants and added a release to the Lending Group.

- [REDACTED]

- October 5, 2009: A Waiver and Forbearance agreement between Champion and the Lending Group waived covenant and payment defaults and compliance with covenants. On same day, Credit Suisse executed a fee letter for DIP financing and received a fee of [REDACTED] from Champion.

- [REDACTED]

- November 8, 2009: The Eighth Amendment dealt with letters of credit, granted release to the Lending Group and paid the Lending Group an amendment fee of 50 basis points.

- November 15, 2009: Bankruptcy filing.

38.     The strategy of the Lending Group was simple.  It used the actual and looming defaults to exert control over Champion through which it extracted as much cash as possible, improved its collateral coverage, and shifted the risks to other creditors.  The various amendments increased interest rates, required amendment fees, required prepayments, provided additional collateral, and effectively shifted credit risk to the holders of the Subordinated Notes and other creditors.

39.     Prior to the Third Amendment, the Lending Group had approximately [REDACTED] of Debt (plus outstanding letters of credit of [REDACTED]); an additional [REDACTED] was owed on the 2009 Notes which was secured *pari passu* with the Lending Group.  Total secured debt was thus more than [REDACTED].  The Lending Group was undercollateralized and its debt was seriously at risk.  By the bankruptcy filing, the Lending Group had received payments of more than [REDACTED], and still held outstanding debt of Champion in the amount of almost [REDACTED] (interest, fees, expenses and other costs being responsible for the other amounts).

40.     When Champion's assets were ultimately sold to MAK and its purchasing group, they only resulted in payments of $40 million on secured debt.  But, overall, the strategy worked.  The Lending Group received an aggregate of more than 85% of Champion's debt to them notwithstanding the severe economic and business declines and liquidity issues. In short, an acceptable result under difficult circumstances.  In contrast, the Subordinated Note holders and

other creditors whose debts were not secured were left with nothing. When MAK came on the scene, the Lending Group used the Champion's distress situation to acquire its assets at a very low value and take the potential upside for themselves at the expense of the unsecured creditors.

**B.    Champion's Business**

41.    Champion is an international manufacturer of factory built homes and modular buildings, with operations in the United States, Canada, and the United Kingdom. Champion manufactures both single and multi-module units designed for either commercial or residential purposes. Champion products range from single module HUD-Code Homes to sophisticated commercial structures such as hotels and prisons.

42.    Champion's North American manufacturing operations consist of 22 homebuilding facilities in 13 states and three provinces in western Canada. Champion homes are sold through more than 1,400 independent sales centers, builders and developers across the United States and western Canada and also through Champion's retail segment which operates 14 sales offices in California.

43.    Champion Enterprises, Inc. currently controls eighteen operating affiliates in the United States, three operating affiliates in Canada and two operating affiliates in the United Kingdom.

**C.    The Credit Agreement**

44.    On October 31, 2005, Champion signed a series of loan agreements and related documents with Credit Suisse as agent for the Lending Group.

45.    On April 7, 2006, Champion and Credit Suisse signed the Credit Agreement. In the Credit Agreement, Credit Suisse is designated as the Administrative Agent and Credit Suisse USA is designated as the lead arranger and sole book runner.

46.     Pursuant to the Credit Agreement, the Prepetition Credit Facility was comprised of:

a.     a secured United States Dollar term loan, maturing October 31, 2012, the outstanding amount of which was approximately $45.4 million on the Petition Date;

b.     a secured British Pound Sterling term loan, maturing October 31, 2012, the outstanding amount of which was approximately $59.9 million on the Petition Date;

c.     a secured revolving line of credit in the amount of $40.0 million, maturing October 31, 2012, the outstanding amount of which was approximately $26.6 million on the Petition Date; and

d.     a synthetic letter of credit in the amount of $43.1 million, maturing October 31, 2012, which supported certain letters of credit and was an undrawn facility supported by cash funded to a Credit Suisse account.

47.     Pursuant to Sections 7.8 and 8.9 of the Credit Agreement, any entity acquired by Champion was required to execute a lien on all of its assets in favor of the Lending Group.

48.     Pursuant to Section 10.1 of the Credit Agreement, each Participating Lender appointed Credit Suisse as its Syndication Agent and Administrative Agent.  In practice, Credit Suisse represented the Lending Group in almost all day-to-day matters relating to the Credit Agreement, in administering the loans and collateral issues, in dealing with default issues and in preparing and negotiating amendments.  At the same time, Credit Suisse reported regularly to the Lending Group, its activities were fully disclosed to and ratified by the Lending Group, and the Lending Group had the power to control Credit Suisse and exercised actual control over Credit Suisse.  Without limiting the foregoing, the Lending Group was aware of and controlled the

development and implementation of the strategies described herein and, of course, the Lending Group received the payments, additional collateral and other benefits of that strategy.

49.     Also in Section 10.1, each Participating Lender authorized Credit Suisse, as Administrative Agent, to act on behalf of such Participating Lender and "to exercise such powers as are specifically delegated to or required of the Administrative Agent by the terms [of the loan documents], together with such powers as may be incidental thereto . . . ."

50.     Pursuant to Section 12.11 of the Credit Agreement, a member of the Lending Group was permitted to assign the credit to an Eligible Assignee which was defined as an existing lender and certain other defined persons.  Section (a) of the definition of Eligible Assignee required Champion's approval of any assignment to any person who was not an Eligible Assignee "unless an Event of Default has occurred and is continuing . . . ."

51.     Under the definition of Eligible Assignee, an assignment of any part of the credit to MAK required Champion's approval unless an Event of Default had occurred and was continuing.  Neither the Lending Group, nor Credit Suisse obtained Champion's approval of the assignment of the credits under the Credit Agreement to MAK.

52.     At all relevant times, the principal persons acting on behalf of Credit Suisse in its capacity as Agent for the Lending Group under the Credit Agreement were [REDACTED].  For example, [REDACTED] were the principal negotiators of amendments to the Credit Agreement, and played a key role in the selection of Credit Suisse USA as underwriter for the Subordinated Notes and in negotiating the terms of the offering and the contents of the offering documents.  Upon information and belief, [REDACTED] were employees of Credit Suisse USA and also participated in the due diligence activities conducted by Credit Suisse USA as underwriter in connection with the Subordinated Note offering.

**D. The 2009 Notes**

53. In or about May 1999, Champion Enterprises, Inc. issued $200,000,000 of $7^5/_8\%$ Senior Notes due to mature May 15, 2009, pursuant to a Purchase Agreement, dated April 28, 1999 (the "Purchase Agreement") and an Indenture dated May 3, 1999 (the "Indenture") (collectively the "2009 Notes").

54. Pursuant to Section 10.01 of the Indenture, the 2009 Notes issued by Champion Enterprises, Inc. were secured equally and ratably with the Lending Group by assets of its subsidiary and operating company, Champion Home Builders Company.

55. As discussed in greater detail below, the Lending Group prevailed upon Champion to issue the Subordinated Notes and to use the proceeds from the Subordinated Notes to redeem the 2009 Notes. As a result, virtually all of the security that the Lending Group formerly shared with the holders of the 2009 Notes became security for the Lending Group alone.

**E. Champion's Financial Difficulties Date Back at Least to 2006**

56. Following the execution of the Credit Agreement, Champion's financial performance began to decline rapidly.

57. By December 2006, and probably earlier, Champion was insolvent within the meaning of Section 101(32)(A) of the Bankruptcy Code. For example, after making the adjustments required for an insolvency analysis under the Bankruptcy Code, such as elimination of goodwill, by December 2006: (a) Champion had negative equity (balance sheet insolvency), (b) the amount due to Champion's creditors exceeded Champion's available cash by approximately [REDACTED] (cash flow insolvency), and (c) Champion's Quick Ratio (current assets-inventory divided by current liabilities) was [REDACTED].

58.     Champion has been continuously insolvent since at least December 2006 and became progressively more insolvent thereafter. [REDACTED]

59.     The facts alleged in paragraphs 57 and 58, *supra*, were known at all relevant times by the Lending Group but were neither disclosed to, nor known by the investing public or by Champion's unsecured creditors.

**F.      Champion Escapes Covenant Default through the First Amendment
to the Credit Agreement**

60.     [REDACTED]

61.     [REDACTED]

62.     As a result, the Lending Group and Champion entered into the First Amendment to the Credit Agreement on March 22, 2007 (just prior to the end of Q107) (the "First Amendment"). The First Amendment, *inter alia*:

        a.      changed the Leverage Ratio (total debt/EBITDA) for Q107 from 3.25:1 to 5:1, leaving the ratio for subsequent quarters unchanged at 3.25:1; and

        b.      changed the Interest Coverage Ratio (EBITDA/Interest Expense) for Q107 to 2.25:1 leaving the ratio for later quarters unchanged.

63.     Upon information and belief, Credit Suisse received fees, costs and expenses in connection with the First Amendment.

**G.      Champion Escapes Covenant Default Again Through the Second
Amendment to the Credit Agreement**

64.     Despite the covenant relief provided by First Amendment, by June 2007, Champion required further covenant relief. Thus, the Lending Group and Champion entered into the Second Amendment to the Credit Agreement on June 22, 2007 (just prior to the end of Q207) (the "Second Amendment"). The Second Amendment, *inter alia*:

a.      changed the Leverage Ratio (total debt/EBITDA) from 3.25:1 for Q207 and the third quarter of 2007 "("Q307") and 3.0:1 for the fourth quarter of 2007 to 5.0:1 for all quarters of 2007;

b.      changed the Interest Coverage Ratio (EBITDA/Interest Expense) from 3.0:1 for all quarters of 2007 to 2.25:1; and

c.      increased the Applicable Margin, which determines interest rates, by .25%.

65.      Upon information and belief, Credit Suisse received fees, costs and expenses in connection with the Second Amendment.

66.      The covenant relief sought and granted in the First and Second Amendments was unsuccessful in correcting Champion's insolvency, and Champion was in danger of defaulting under the Credit Agreement for a third straight quarter.  [REDACTED].

67.      Upon information and belief, commencing in 2007, and increasingly thereafter, the Lending Group became concerned as to whether Champion would have sufficient liquidity to repay its obligations under the Credit Agreement as they became due in light of Champion's worsening insolvency and a general decline in market conditions.

68.      By no later than 2007, the Lending Group knew that Champion's debts were undersecured in that the security for the obligations to the Lending Group was worth less than those obligations.  In making this determination, the Lending Group's knowledge reflected the fact that all collateral had to be shared *pari passu* with the holders of the 2009 notes.  Thus, the Lending Group acted to improve its secured position and to shift its risks to other creditors.

**H.**      **[REDACTED]**

69.      The Lending Group used Champion's covenant defaults to control Champion and to improve its collateral position to the detriment of Champion's unsecured creditors, without

providing new value to Champion in exchange for such collateral. To that end, the Lending Group prevailed upon Champion to issue the Subordinated Notes and to have Champion use the proceeds to, *inter alia*, redeem the secured 2009 Notes. [REDACTED].

70. [REDACTED]

71. [REDACTED]

72. [REDACTED]

**I.    [REDACTED] The Subordinated Notes are Issued**

73. [REDACTED]

74. [REDACTED] the Lending Group insisted on additional covenants from Champion that were more stringent than those imposed by the Credit Agreement or by the First and Second Amendments to the Credit Agreement.

**J.    The Materially False and Misleading Disclosures Concerning the Subordinated Note Offering**

75. Champion issued a prospectus supplement for the issuance of the Subordinated Notes on October 29, 2007 (the "Prospectus"), commenced taking orders on October 31, 2007, and, on or about November 2, 2007, Champion completed its offering of $180,000,000 of Subordinated Notes, at an interest rate of 2.75%, payable in 2037.

76. Despite Champion's net losses in Q1 & Q2 07, which had required Champion to enter into the First and Second Amendments to obtain relief from the Credit Agreement covenants, the Prospectus stated only:

> Our credit facilities require us to comply with certain financial ratios and covenants. These restrictions may interfere with our ability to obtain financing or to engage in other necessary or desirable business activities. As of September 29, 2007, we were in compliance with all financial and performance covenants on our credit facilities.

Prospectus Supplement dated October 29, 2007, page S-16. CS05441.

77.     The foregoing statement was materially misleading.  Although it mentions the hypothetical possibility that the existence of financial ratios and covenants could have an adverse impact on Champion, it totally failed to disclose that, in fact, (a) Champion repeatedly had difficulties complying with its covenants under the Credit Agreement prior to offering of the Subordinated Notes; (b)  without the First and Second Amendments to the Credit Agreement, Champion would have been in default under the covenants contained in the Credit Agreement; (c)  Champion had entered into the First and Second Amendments to the Credit Agreement to obtain covenant relief in order to avoid defaulting on the Credit Agreement covenants; and (d) the Subordinated Notes were issued as part of an overall plan to give Champion relief from covenants with which it was unable to comply under the Credit Agreement.

78.     In addition, the Prospectus was materially misleading in failing to disclose that Champion had been insolvent as that term is defined under the Bankruptcy Code since at least December 2006 and continued to be increasingly insolvent.

79.     Furthermore, the Prospectus was also materially misleading because it failed to disclose the knowledge of Champion and the Lending Group that a very large portion of the offering proceeds would not be available as a cushion against further risk of defaults under the covenants, but rather would be spent on acquisitions, including SRI.  Indeed, the SRI acquisition closed on December 21, 2007, only seven weeks after the Subordinated Note offering closed.  In that transaction, Champion made cash payments totaling over $96 million from the proceeds of the Subordinated Note offering, issued a note payable in the amount of $24.5 million, and assumed the operating liabilities of SRI in order to acquire substantially all the assets and business of SRI.  In light of the magnitude of that transaction and the fact that Credit Suisse USA was performing due diligence as the sole underwriter of the Subordinated Note offering, it is

apparent that Champion and the Lending Group were aware that Champion was well advanced in its effort to purchase SRI and intended to expend a major portion of the proceeds from the Subordinated Note offering for that purchase.

80.     The Prospectus was also materially misleading in failing to disclose that the principal purpose behind the Subordinated Note offering was the Lending Group's objective to eliminate the secured claims that could be asserted by the holders of the 2009 notes, who would share *pari passu* in the Lending Group's collateral in the event that Champion's overstretched financial condition did ultimately result in a bankruptcy.

81.     In addition to the deceptive Prospectus, Credit Suisse and the Lending Group knew that Champion was utilizing additional offering materials entitled "Investor Presentation" during October 2007 in presentations to investors concerning the offering of the Subordinated Notes.  Those materials were materially misleading in the same respects as alleged above with respect to the Prospectus.

82.     Credit Suisse and certain other members of the Lending Group had complete non-public access to Champion, its books and records, and its officers.  As a result, the Lending Group knew the truth with respect to the facts alleged in paragraphs 75-81, *supra*, and knew that the Prospectus and the other offering materials were materially false and misleading.  Nevertheless, Credit Suisse made no effort to compel Champion to correct any of the offering materials or to disclose the truth to the investing public.  Of course, such disclosure would have jeopardized the offering and undermined the Lending Group's strategy to use the proceeds of the offering to materially improve its position.

83.     Indeed, in connection with its work evaluating Champion's ability to meet the requirements of its new, anticipated, financial covenants after the proceeds of the Subordinated

Note offering were received, Credit Suisse prepared written materials confirming that Champion would not have sufficient available cash to meet its debts as they came due.

84.     [REDACTED].

85.     Furthermore, as Credit Suisse and the Lending Group were well aware, Champion was poised to spend over $90 million in cash on an acquisition program, including the purchase of SRI, upon receipt of the offering proceeds. Therefore, the interrelated series of transactions including the Subordinated Note offering, the tender offer for the 2009 Notes and the pending acquisition program would exacerbate, rather than alleviate, Champion's ongoing insolvency.

86.     Furthermore, the failure to disclose in the Prospectus the anticipated use of a large portion of the proceeds for an acquisition program, including SRI, concealed the material risk that Champion would be incurring in making such acquisitions. Champion's industry had been in decline for a period of years. Although the Canadian market had been stronger and more profitable than the United States market, a risk existed that the Canadian portion of Champion's industry would also decline in light of the widespread recession that was impacting the home building industry. The Prospectus and the offering materials failed to disclose that Champion was planning to accept such a risk by devoting a large portion of the offering proceeds to the SRI acquisition.

87.     The offering materials also failed to adequately disclose Credit Suisse's conflict of interest in connection with its work on the offering. The same persons were acting on behalf of Credit Suisse USA as underwriters of the Subordinated Notes and on behalf of Credit Suisse under the Credit Agreement — namely, [REDACTED]. Although the Prospectus disclosed that Credit Suisse was both a creditor of Champion and the sole underwriter of the offering, and revealed that it would receive an underwriters fee, it misleadingly failed to disclose a much more

powerful motivation that Credit Suisse had for the offering: its financial interest in vastly improving its position as a secured creditor of Champion through the planned use of offering proceeds to eliminate the 2009 Notes.

88.     Credit Suisse USA, as the sole underwriter of the Subordinated Notes, performed due diligence on Champion.  As a result of that due diligence, Credit Suisse USA knew the truth with respect to the facts alleged in paragraphs 75-87, *supra*, and knew that the Prospectus and the other Offering Materials were materially false and misleading.  In fact, because Credit Suisse USA's underwriting of the Subordinated Notes was managed by [REDACTED] who had been managing the relationship between the Lending Group and Champion for Credit Suisse, Credit Suisse USA and the Lending Group were well aware of the facts alleged in paragraphs 75-87, *supra*, and knew that the Prospectus and the other Offering Materials were materially false and misleading even before Credit Suisse USA performed its due diligence.

89.     The Subordinated Notes and the Lending Group's requirement that Champion use part of the proceeds of the Subordinated Notes to redeem the 2009 Notes were the cornerstone of the Lending Group's strategy to improve its security at the expense of other creditors by having Champion swap debt for collateral transferring the credit risk to creditors other than the Lending Group.

90.     The result was that (a) unsecured debt — the Subordinated Notes — was substituted for secured debt — the 2009 Notes, (b) the collateral previously shared by the holders of the 2009 Notes and the Lending Group was largely released from the claims of the holders of the 2009 Notes to be used almost exclusively as collateral for the Lending Group, (c) the Lending Group received substantial prepayments, and (d) the Lending Group received new collateral.

**K.     The Third Amendment to the Credit Agreement**

91.     A crucial component of the Lending Group's strategy to increase the Lending Group's collateral while demoting the interests of the unsecured creditors was the Third Amendment to the Credit Agreement which was signed on October 25, 2007 (the "Third Amendment").

92.     The Third Amendment was signed just four days before (a) the Prospectus was issued for the offering of the Subordinated Notes and (b) the Underwriting Agreement was signed, at a time when Champion was, once again, on the verge of violating its covenants under the Credit Agreement.

93.     The Third Amendment was the first step in the implementation of the overall plan of the Lending Group to improve its lending position by (a) transferring risk to other creditors, (b) receiving substantial payments from Champion, and (c) increasing its collateral and improving its collateral position.  In fact, in the period between mid-2007 and the date of the petition, the Lending Group received payments of regular principal, principal prepayments, interest, fees, costs, expenses, and underwriting commissions aggregating more than [REDACTED].  Such payments were made at a time of rapidly declining business for Champion with predictions of further declines, and drained so much liquidity that it was impossible for Champion to pay its obligations

94.     Credit Suisse, on behalf of the Lending Group, and Champion signed the Third Amendment in contemplation of the issuance of the Subordinated Notes and other actions beneficial to the Lending Group.

95.     The Third Amendment raised the Applicable Margin by another .50% and changed Leverage Ratio to Senior Leverage Ratio thereby excluding the subordinated debt from the calculations of Leverage Ratio.  Pursuant to the Third Amendment, the Senior Leverage

ratios were 3.50/1 for the fourth quarter of 2007 ("Q407"), and 3.0/1 for all quarters in 2008 and most of 2009.

96.     In exchange for these provisions, the Lending Group demanded, and was granted, additional collateral and other concessions which gave it even greater control of Champion.

97.     The Lending Group also required Champion to deposit the remaining proceeds from the sale of the Subordinated Notes into a deposit account or Securities Account subject to an Account Control Agreement over which Credit Suisse had the power to sweep the account or to exercise other remedies upon default by Champion.

98.     From the proceeds of the issuance of the Subordinated Notes, the Lending Group required that:

    a.     at least $8,000,000 in aggregate principal of the Term Loans, together with accrued and unpaid interest, be prepaid;

    b.     approximately $79,700,000.00 be used to redeem the 2009 Notes; and

    c.     $14,500,000.00 be used to prepay debt owed to the Lending Group.

99.     Upon information and belief, Champion acquiesced in these requirements by prepaying at least $8,000,000 in aggregate principal of the Term Loans together with accrued and unpaid interest, utilizing approximately $79,700,000 to fund the redemption of the 2009 Notes, and prepaying $14,500,000 to the Lending Group.

100.    [REDACTED] were the principal representatives of Credit Suisse negotiating the terms of the Third Amendment to the Credit Agreement.

101.    Credit Suisse and the Lending Group received fees, costs and expenses in connection with the Third Amendment.  Indeed, during the period from the Subordinated Note offering to the Petition Date, combinations of Champion pay downs of debt, and other Champion

payments, plus increased collateral as described above, to the Lending Group improved the position of the Lending Group by more than $100,000,000, thus making the Lending Group the primary beneficiary of the note offering and its aftermath.

### L. SRI Homes

102.　On December 21, 2007, using over $90 million of the proceeds of the sale of the Subordinated Notes, Champion acquired substantially all of the assets and the business of SRI.

103.　Given Champion's rapid financial decline, the Lending Group was well aware that the program it imposed on Champion pursuant to which Champion spent in excess of the entire proceeds of the issuance of the Subordinated Notes to purchase SRI, to redeem the 2009 Notes, and to prepay $22.5 million to creditors, put Champion in peril of a severe liquidity crisis and potential bankruptcy. However, that program did materially improve the credit risk of the Lending Group. In fact, pursuant to Sections 7.8 and 8.9 of the Credit Agreement, the Lending Group received security interests in all of SRI's assets as further security.

104.　Following the SRI acquisition, Champion remained insolvent, and had a significantly increased debt burden. The Lending Group knew, at all relevant times, that the actions it required Champion to take as alleged in paragraphs 53 through 55 and 91 through 103, *supra*, would leave Champion not only insolvent but seriously under-capitalized.

105.　The Lending Group knew that the Subordinated Notes plus the plan for the related acquisition of SRI imposed unmanageable debt burdens on Champion. Nonetheless, the Lending Group participated in deceiving the Subordinated Note investors in this regard and to date have benefitted from this deception.

**M. Credit Suisse's Conflicting Roles**

106. Credit Suisse USA acted as the sole underwriter for the Subordinated Notes, notwithstanding the fact that Credit Suisse was the agent for the Lending Group and that Credit Suisse USA was the lead arranger under the Credit Agreement.

107. [REDACTED] negotiated the Third Amendment on behalf of Credit Suisse while, at the same time, managing and arranging the underwriting of the Subordinated Notes on behalf of Credit Suisse USA.

108. Credit Suisse and Credit Suisse USA operated as a single economic entity with respect to Credit Suisse's role as administrative agent for the Lending Group, Credit Suisse's negotiation of the Third Amendment, and Credit Suisse USA's underwriting of the Subordinated Notes.

109. Credit Suisse (USA) received underwriting fees in connection with the Subordinated Notes, while, at the same time, Credit Suisse received fees with respect to the Third Amendment.

**N. Champion's Business Continues its Downward Spiral in 2008**

110. [REDACTED]

111. By November 2008 Champion's management was acknowledging that credit market conditions and negatives in housing market trends were taking a "heavy toll" on its business and that it was "unrealistic" to think that condition would improve in the near future.

112. [REDACTED]

113. [REDACTED]

**O. The Fourth Amendment to the Credit Facility**

114. On October 24, 2008, the Lending Group and Champion entered into the Fourth Amendment to the Credit Agreement (the "Fourth Amendment").

115.     Section 3.7 of the Fourth Amendment obligated Champion to transfer $15,000,000 from deposit accounts owned by its foreign subsidiaries that were not subject to account control agreements into accounts in the United States that were subject to account control agreements.

116.     Sections 3.3 and 3.4 of the Fourth Amendment obligated Champion to prepay $23,500,000 of the Term Loan and to pay $10,000,000 of the Revolving Loan under the Credit Agreement.

117.     Section 2.9 of the Fourth Amendment obligated Champion to retain a financial consultant for three months.

118.     Section 2.1.2 of the Fourth Amendment required Champion to pay substantially higher interest.

119.     Section 2.11 of the Fourth Amendment restricted the amount of Champion's Capital Expenditures to $10,000,000 in 2009, which was reduced from the $30,000,000 that was permitted by the Credit Agreement.

120.     Section 3.6 of the Fourth Amendment required Champion to replace certain synthetic letters of credit with standby letters of credit, which had the effect of reducing Champion's available credit because the Credit Agreement classifies standby letters of credit as advances.

121.     The Lending Group did not extend any additional credit to Champion in the Fourth Amendment.

122.     At or around the time of the execution of the Fourth Amendment, the Lending Group required Champion to provide additional collateral to the Lending Group:   Western

Homes Corporation granted a lien to the Lending Group on certain real estate located at 301 North Smith Avenue, Corona, California.

123. The fee letter in connection with the Fourth Amendment was signed by both Credit Suisse and Credit Suisse USA.

124. Credit Suisse received fees and expenses in connection with the Fourth Amendment.

### P. The Fourth Quarter of 2008

125. Consistent with Champion's pervasively insolvent condition, on December 17, 2008, the New York Stock Exchange notified Champion that Champion Home Builders, Inc. was not in compliance with the Exchange's continued listing standard under Section 802.01C of the NYSE Listed Company Manual because the average closing share price of its common stock for a consecutive 30 trading-day period had fallen below $1.00.

126. Champion suffered net losses totaling $20.8 million, or $0.27 per diluted share in the fourth quarter of 2008 ("Q408") and its revenues declined by 42.3% from Q407.

127. In March 2009, Champion announced that its year-end 2008 debt totaling $313 million had become "increasingly burdensome, specifically the senior credit facility debt of $112 million which has high interest rates and restrictive covenants" and, as a result, it "clearly makes sense to de-leverage." In that vein, Champion stated its intention to begin divesting several assets that would allow it to "retire all or substantially all of our senior debt this year." (Letter, dated March 20, 2009, from William C. Griffiths, Champion's Chairman, President and CEO, to Shareholders, a copy of which was filed with the SEC on or about March 20, 2009, as an exhibit to Champion's Form 8K, dated March 20, 2009. )

128. Champion's "increasingly burdensome" debt level in Q109 led to yet another amendment of the Credit Agreement.

**Q.     The Fifth Amendment to the Credit Agreement**

129.    On May 20, 2009, Credit Suisse, on behalf of the Lending Group, and Champion executed the Fifth Amendment to the Credit Agreement (the "Fifth Amendment").

130.    Pursuant to the Fifth Amendment, the Lending Group waived the default under Section 9.1.5 of the Credit Agreement that resulted from Champion's failure to make a principal and interest payment on the 2009 Notes on May 15, 2009, in exchange for Champion's agreement to repay the entire outstanding remaining principal amount of the 2009 Notes before May 26, 2009 ($6,716,000 maximum).

131.    At this time, Champion paid [REDACTED] to the remaining holders of the 2009 Notes.    Upon information and belief, Credit Suisse received fees, costs and expenses in connection with the Fifth Amendment.

132.    [REDACTED]

133.    On August 12, 2009, Champion announced a net loss of $13.3 million and a 55% decline in revenues for Q209 as compared to Q208.

134.    Loughlin Meghji ("Loughlin"), a financial consultant retained by Willkie Farr & Gallagher LLP ("Willkie"), special restructuring counsel to Credit Suisse as Administrative Agent for the Lending Group, stated that Champion's liquidity would be tight in 2009 and that Champion could run out of liquidity by mid-September 2009.

**R.     The Sixth Amendment to the Credit Facility**

135.    On August 12, 2009, Champion and the Lending Group executed the Sixth Amendment to the Credit Agreement (the "Sixth Amendment").

136.    The Sixth Amendment added further reporting requirements to Section 7.1 of the Credit Agreement.    The amendment required Champion to provide monthly reports to Credit Suisse on behalf of the Lending Group and report on (a)  financial results by business segment,

(b) sales and backlog flash reports, (c) an adjusted 13-week cash flow forecast, and (d) an update on capital raising and restructuring efforts.

137. The Lending group agreed to waive for 30 days the requirements of Section 8.4(d) and (e) for the second fiscal quarter of 2009.

138. Pursuant to Section 7.8 of the Sixth Amendment, Champion generally released each member of the Lending group, including Credit Suisse, from everything "whether known or unknown, direct or derivative," "except for any obligations remaining to be respectively performed by the Lenders as expressly set forth in this Amendment, the Credit Agreement and the other loan Documents."

139. Upon information and belief, Champion paid the retainers of Willkie and Loughlin in the amounts of [REDACTED] and [REDACTED] respectively and also paid other amounts due to such firms which payments were for the benefit of the Lending Group.

140. For the first time, the Sixth Amendment contained a release of claims. Champion resisted but was compelled to include the release by Credit Suisse and the Lending Group.

**S.    The Seventh Amendment to the Credit Facility**

141. The Lending Group again asserted its control over Champion in connection with the Seventh Amendment and Waiver to the Credit Agreement, which was signed on September 2, 2009 (the "Seventh Amendment").

142. The Seventh Amendment, at Section 2.2, amended the Credit Facility to reduce, from $15,000,000 to $2,000,000, the amount of cash that could be held by Champion in accounts that were not subject to Account Control Agreements, thereby improving the Lending Group's collateral position by $13,000,000.

143. Pursuant to Section 4.4 of the Seventh Amendment, Champion was required to pay Willkie's fees.

144.     Pursuant to Section 7.8, the Seventh Amendment also required Champion to sign a release of the Lending Group.

145.     Credit Suisse received fees and expenses in connection with the Seventh Amendment.

146.     Champion paid the expenses and fees of both Willkie and Loughlin either to or for the benefit of Credit Suisse.

**T.      The Lending Group's Inequitable Conduct**

147.     Commencing at least in 2007 the Lending Group went far beyond activity that would be appropriate for creditors seeking to protect their position.  Rather, the Lending Group took a series of actions designed to prejudice and injure other creditors of Champion and to use that prejudice and those injuries to increase inequitably the position of the Lending Group at the expense of the other creditors of Champion.

148.     While not disclosing or compelling Champion to disclose either that Champion was insolvent or that Champion was unable to comply with the covenants in the Credit Agreement, the Lending Group used Champion's insolvency and inability to comply to prevail upon Champion to issue the unsecured Subordinated Notes and to redeem the secured 2009 Notes.  The Lending Group did this in full knowledge that Champion was planning to engage in a major acquisition program, including the purchase of SRI, and would therefore not be able to use the majority of the offering proceeds to address its ongoing insolvency.  Further, the Lending Group then forced Champion to use the proceeds of the sale of the unsecured Subordinated Notes to prepay certain indebtedness, including indebtedness to the Lending Group.

149.     The result was to increase materially the Lending Group's security for Champion's indebtedness to it.  Instead of sharing the security with the holders of the 2009 Notes, the Lending Group now was exclusively protected by that security.  Moreover, the

security was enhanced further by the assets of SRI which were also made available to the Lending Group as security. Over the two year period from the occurrence of the interrelated transactions in the Fall of 2007 to Champion's bankruptcy filing, the Lending Group used its heightened control over Champion to drain over [REDACTED] from their insolvent client to the manifest prejudice of the unsecured creditors.

      **U.**      **MAK's Successful Effort to Interfere With the Champion's Strategic Plan and to Obtain Possession of Champion's Assets in a Fire Sale at a Time When Their Market Value was Highly Depressed**

      150.    The Lending Group's inequitable conduct was compounded by MAK's inequitable efforts to acquire Champion at a time when, MAK knew, the market value of Champion's assets, and of its business generally, was extraordinarily depressed. MAK is a large, sophisticated private investment firm. MAK embarked on a course of acquiring Champion debt while simultaneously selling Champion equity in an effort to purchase Champion's assets at a highly favorable price.

      151.    As of April 2008, MAK and its affiliates owned 5.6% of all outstanding shares of Champion. By January 2009, MAK owned 2,108,753 shares of Champion common stock — ranking 9th among institutional investors. However, by April 2009 MAK's position had dwindled to 101,000 shares.

      152.    MAK obtained its first assignment of Champion's debt obligations on or about January 30, 2009, [REDACTED] (the "MAK Assignment"). [REDACTED]

      153.    This assignment was improper and a violation of the Credit Agreement. Pursuant to section 12.11 of the Credit Agreement, a member of the Lending Group may assign various obligations to an Eligible Assignee. However, section (a) of the definition of Eligible Assignee required Champion's approval of an assignment to anyone who was not an Eligible Assignee "unless an Event of Default has occurred and is continuing . . . ."

154.     MAK was not an Eligible Assignee.  Therefore, the assignment to MAK required Champion's approval unless an event of Default had occurred and was continuing.  According to Champion and the Leading Group, no such Default had occurred or was continuing.

155.     Although Champion was required to consent, [REDACTED].

156.     [REDACTED].

157.     MAK's motivation in acquiring Champion debt was not, ultimately, to be a creditor.  Rather, those acquisitions of debt were merely the first steps in MAK's plan to interfere with and influence Champion's formulation and implementation of its strategic business plan in a manner that would ultimately compel Champion to sell its business to MAK at a time when, MAK expressly recognized, the market value of Champion's business was unusually depressed.

158.     [REDACTED]

159.     [REDACTED]

160.     [REDACTED]

161.     Champion never consented to any assignment of any of its indebtedness to MAK.

162.     [REDACTED]

163.     [REDACTED]

164.     [REDACTED]

165.     Champion's reluctance to retroactively approve the improper assignment of Champion debt to MAK reflected a legitimate concern as to MAK's motivations in becoming a creditor.  That concern was heightened by MAK's effort to inject itself into Champion's conduct of its business activities and its formulation of its strategic business plan.

166.     [REDACTED]

167.     [REDACTED]

168.    [REDACTED]

169.    [REDACTED].  At the time the terms of the sale of Champion's business was approved by this Court, the market values of those assets were still extraordinarily depressed.  As a result, members of the Lending Group have acquired valuable assets which are virtually certain to substantially appreciate in value as the market improves while the unsecured creditors, most of whom were subjected to a knowing deception by Credit Suisse and the members of the Lending Group when they bought those Notes, are left holding the bag.

<u>COUNT I</u>

**EQUITABLE SUBORDINATION AGAINST
<u>THE ENTIRE LENDING GROUP</u>**

170.    The Committee repeats and realleges each and every allegation contained in paragraphs 1 - 169 of this Amended Complaint as if set forth herein at length.

171.    The equities dictate that the amounts owed to the Lending Group be equitably subordinated to the claims of Champion's unsecured creditors.

172.    Pursuant to Section 510(c), the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . ." where the claimant engaged in inequitable conduct which resulted in injury to creditors of the estate or conferred unfair advantage on the claimant.

173.    Special scrutiny is given to the conduct of "insiders" who bear a close relationship with the Debtor.

174.    At all relevant times the Lending Group and Credit Suisse were "insiders" of Champion pursuant to 11 U.S.C. § 101 (31) and applicable non-statutory law.

175.    The conduct of the Lending Group, as alleged above, was inequitable.

176. The Lending Group's inequitable conduct gave it an unfair advantage as a claimant over the unsecured lenders, in a context in which the Subordinated Note holders represent most of the dollar value of secured claims.

177. By reason of the Lending Group's inequitable conduct, (a) Champion's estate and its unsecured creditors were damaged; (b) the Lending Group's collateral position was substantially improved inequitably at the expense of Champion's unsecured creditors; (c) MAK was improperly permitted to purchase a portion of Champion's debt under the Credit Agreement; and (d) MAK and members of the Lending Group with which it joined, were permitted, indeed encouraged, to take advantage of prior inequitable conduct of the Lending Group, benefit from it by acquiring Champion's assets at a time when their market value was extraordinarily depressed.

178. Permitting the Lending Group to receive payment on its claims as secured creditors would be unfair and inequitable. Allowing the Lending Group to be paid prior to or with Champion's general unsecured creditors would allow the Lending Group to reap the benefits of its inequitable conduct.

179. The Lending Group's inequitable conduct was committed to benefit the entire Lending Group and each Participating Lender in the Lending Group is bound by and liable for the inequitable conduct of the Lending Group and of their agent, Credit Suisse.

180. Equitable subordination of the amounts owed to the Lending Group is consistent with the provisions of the Bankruptcy Code.

181. The Committee has no adequate remedy at law.

182. By reason of the foregoing, the Lending Group's claims should be equitably subordinated to the claims of all general unsecured creditors pursuant to Section 510 (c) and the Lending Group's security interests should be declared null and void.

## COUNT II

## EQUITABLE SUBORDINATION
## AGAINST MAK

183.     The Committee repeats and realleges each and every allegation contained in Paragraphs 1-182 of this Amended Complaint as if set forth herein at length.

184.     The conduct of MAK, as alleged above, was inequitable.

185.     MAK's inequitable conduct, as well as the inequitable conduct of the entire Lending Group, gave MAK an unfair advantage as a claimant.

186.     MAK's secured and unsecured debt should be equitably subordinated to all of Champion's general unsecured claims pursuant to 11 U.S.C. § 510(c).

187.     No later than the second quarter of 2009, MAK sought to purchase substantial amounts of Champion's obligations under the Credit Agreement with the objective of forcing Champion into bankruptcy so that MAK could acquire all or a controlling interest in Champion's assets at a fire sale price that was far below what could have been realized had the Lending Group not forced Champion to sell at a time when the market value of its assets was extraordinarily depressed and likely to rebound shortly to the advantage of MAK and its purchasing group.

188.     In 2009, Champion was pursuing a consensual out of court restructuring and informed Credit Suisse that MAK was taking positions inconsistent with Champion's business plans [REDACTED].

189.     MAK's actions were an attempt to use Champion's obligations not to maximize MAK's recovery as a creditor, but to enable MAK to purchase Champion's assets.  Credit Suisse and the other members of the Lending Group not only failed to resist MAK's efforts but, instead, actively supported and furthered MAK's efforts.

190. MAK's inequitable conduct gave it an unfair advantage as a claimant.

191. By reason of MAK's inequitable conduct, Champion's estate and unsecured creditors were damaged as alleged above.

192. Permitting MAK to receive payment on its claims prior to or with Champion's general unsecured creditors, would be unfair and inequitable.

193. Equitable subordination of the amounts owed to MAK is consistent with the provisions of the Bankruptcy Code.

194. The Committee has no adequate remedy at law.

195. By reason of the foregoing, MAK's secured and unsecured claims should be equitably subordinated to the claims of all general unsecured creditors pursuant to Section 510(c).

## COUNT III

## EQUITABLE SUBROGATION AGAINST
## THE ENTIRE LENDING GROUP

196. The Committee repeats and realleges each and every allegation contained in Paragraphs 1-195 of this Amended Complaint as if set forth herein at length.

197. Champion's Subordinated Note offering and the redemption of the secured 2009 Notes were part of one integrated transaction, in which one major purpose was to raise funds that would be used to repurchase the 2009 Notes.

198. The Lending Group, through the Third Amendment, required Champion to issue the Subordinated Notes and to use approximately $79,700,000 of the proceeds of the sale of the Subordinated Notes to fund the redemption of the 2009 Notes. Champion was forced to comply and to issue the Subordinated Notes.

199.    Champion acted as a conduit through which $79,700,000 paid by the Subordinated Notes purchasers was used to satisfy all of Champion's obligations under the 2009 Notes.

200.    Consequently, purchasers of the Subordinated Notes rather than Champion satisfied Champion's obligations to the holders of the 2009 Notes by funding the $79,700,000 redemption of the 2009 Notes.

201.    The purchasers of the Subordinated Notes were not "volunteers" in allowing their payments for Subordinated Notes to be used to retire Champion's obligation on the 2009 Notes because payment of the $79,700,000 was induced by Champion, the Lending Group and Credit Suisse though the distribution of false and misleading offering materials.  Furthermore, payment of the 2009 Notes from the offering proceeds was required by the Third Amendment.

202.    The holders of the Subordinated Notes were not liable on the 2009 Notes.

203.    The redemption of $79,700,000 of the 2009 Notes was made at the insistence of Credit Suisse and the Lending Group.  Through their continuing due diligence with respect to Champion's financial status, business plans and operations, and through Credit Suisse's knowledge developed in its due diligence activities as the underwriter on the Subordinated Note offering, the Lending Group and Credit Suisse were well aware that the prospectus and other offering materials for the issuance of the Subordinated Notes were materially false and misleading.

204.    Subrogation of the holders of the Subordinated Notes, other than MAK and any other members of the Lending Group that hold Subordinated Notes, to the rights of the holders of $79,700,000 of the 2009 Notes would not work any injustice to the rights of others including the

Lending Group because it knew of the deception and it shared the security *pari passu* with the holders of the 2009 Notes.

205.     The Committee has no adequate remedy at law.

## COUNT IV

**UNJUST ENRICHMENT AGAINST THE
ENTIRE LENDING GROUP AND CREDIT SUISSE**

206.     The Committee repeats and realleges each and every allegation contained in Paragraphs 1-205 of this Amended Complaint as if set forth herein at length.

207.     Unsuspecting investors purchased Champion's Subordinated Notes as a result of the materially false and misleading Offering Materials, including the materially false and misleading Prospectus.

208.     The Lending Group was, and continues to be, unjustly enriched by the elimination of the 2009 Notes.

209.     Holders of the Subordinated Notes were, and continue to be, impoverished by their purchase of the unsecured Subordinated Notes.

210.     It would be inequitable and unjust to permit the Lending Group to continue to be unjustly enriched at the expense of the holders of the Subordinated Notes and it would be inequitable and unjust for Lending Group to be allowed to maintain its enhanced security position to the detriment of the holders of the Subordinated Notes.

211.     The Committee has no adequate remedy at law.

## COUNT V

**EQUITABLE ESTOPPEL AGAINST THE ENTIRE LENDING GROUP**

212.     The Committee repeats and realleges each and every allegation contained in Paragraphs 1-211 of this Amended Complaint as if set forth herein at length.

213. The Lending Group, including, but not limited to, Credit Suisse, intended and expected purchasers of the Subordinated Notes to rely upon the Offering Materials.

214. The Lending Group, including, but not limited, to Credit Suisse, had actual knowledge that the Offering Materials were materially false or misleading.

215. The purchasers of the Subordinated Notes relied to their detriment upon the materially false and misleading statements and omissions in the Offering Materials including the Prospectus.

216. The Committee has no adequate remedy at law.

217. By reason of the foregoing, the Lending Group, including, but not limited to, Credit Suisse should be equitably estopped from benefiting from their inequitable conduct and the Court should enter an order that the holders of the Subordinated Notes have an equal or greater security interest than does the Lending Group.

**COUNT VI**

**BREACH OF CONTRACT AGAINST
CREDIT SUISSE AND THE ENTIRE LENDING GROUP**

218. The Committee repeats and realleges each and every allegation contained in Paragraphs 1-217 of this Amended Complaint as if set forth herein at length.

219. Credit Suisse breached the Credit Agreement by transferring some of its position in the Credit Facility and/or facilitating the transfer of other lenders' positions in the Credit Facility to MAK, thereby permitting MAK to become a member of the Lending Group, which was a proximate cause of Champion's bankruptcy and of Champion's being compelled to sell its assets and its business in a fire sale at values that reflected the unusually depressed market values of Champion's assets in the short term.

220. All conditions precedent to this Claim for Relief have been satisfied or excused.

221. As a result, Champion's estate has been damaged in an amount to be proven at trial.

## COUNT VII

### FRAUDULENT TRANSFERS UNDER
### N.Y. DEBT. & CRED. LAW §§ 273, 274 and 11 U.S.C. § 544(b)

222. The Committee repeats and realleges each and every allegation contained in Paragraphs 1-221 of this Amended Complaint as if set forth herein at length.

223. At or around the time of the execution of the Third Amendment, the Debtors transferred: (a) approximately $79,700,000.00 of the proceeds of the sale of the Subordinated Notes to redeem the 2009 Notes; (b) approximately $14,500,000.00 of the proceeds of the sale of the Subordinated Notes to prepay debt owed to the Lending Group; (c) approximately $8,000,000 of the proceeds of the sale of the Subordinated Notes to prepay the Term Loans together with accrued and unpaid interest on such prepaid amount; (d) [REDACTED] of the proceeds of the sale of the Subordinated Notes to acquire SRI; and (e) more than [REDACTED] of the proceeds of the sale of the Subordinated Notes, to Credit Suisse USA for underwriting commissions (the "Third Amendment Transfers").

224. At or around the time of the execution of the Fourth Amendment, Champion transferred to the Lending Group the following real property collateral: Western Homes Corporation granted a lien to the Lending Group on certain real estate located at 301 North Smith Avenue, Corona California. (the "Fourth Amendment Transfer"). In addition, (a) the Synthetic Letter of Credit Facility was reduced to $43,500,000 from $60,000,000 which resulted in the transfer of $16,500,000 to or for the benefit of the Lending Group and there was a payment of $10,000,000 to the lenders, and (b) Champion agreed to make and made various additional payments including scheduled repayments and payments of insurance recoveries.

225. At or around the time of the execution of the Fifth Amendment Champion repaid the entire outstanding [REDACTED] principal amount of the 2009 Notes (the "Fifth Amendment Transfer"). This released collateral subject to the equal and ratable provision to the Lending Group and thus was a transfer to or for the benefit of the Lending Group.

226. In connection with the Sixth Amendment, Champion paid Willkie [REDACTED] and Loughlin [REDACTED], respectively, and paid other fees due to such entities, for the benefit of the Lending Group. More importantly, the Lending Group forced Champion generally to release each lender in the Lending Group, including Credit Suisse, from everything "whether known or unknown, direct or derivative," "except for any obligations remaining to be respectively performed by the Lenders as expressly set forth in this Amendment, the Credit Agreement and the other loan Documents." (The payments to Willkie and Loughlin and the release of the members of the Lending Group are collectively referred to herein as the "Sixth Amendment Transfers")

227. In connection with the Seventh Amendment, Champion transferred [REDACTED] to Credit Suisse for deposit in accounts subject to Account Control Agreements to be utilized as additional security for the Lending Group because the Seventh Amendment provided that the amount Champion was permitted to have in account not subject to Account Control Agreement was reduced from [REDACTED] to [REDACTED]. In addition, Champion paid the fees and expenses of Willkie and Loughlin and executed a release of the Lending Group and Credit Suisse. All of these are referred to as the "Seventh Amendment Transfers."

228. During the period from the execution of the Third Amendment to the date of the petition, both in connection with the various Amendments and otherwise, Champion transferred amounts in addition to those set forth above to Credit Suisse and the Lending Group. These

included principal payments (including, without limitation, [REDACTED] pre-payments in the 4th Quarter of 2008), interest, fees, expense reimbursement, and otherwise in an amount which is presently unknown but is believed to exceed [REDACTED] ("Cash Transfers").

229.     The Third, Fourth, Fifth, Sixth and Seventh Amendment Transfers and the Cash Transfers are collectively referred to herein as the "Fraudulent Transfers."  This claim for relief is applicable to each of the Fraudulent Transfers which took place not more than two years prior to November 15, 2009.

230.     Each of the Fraudulent Transfers is avoidable pursuant to New York Debtor and Creditor Law §§ 273, 274 and 11 U.S.C. §544(b).

231.     The Fraudulent Transfers were not made in exchange for property conveyed or an antecedent debt satisfied or secured in good faith within the meaning of Section 272 of the New York Debtor and Creditor Law.

232.     Each of the Fraudulent Transfers was made at a time when Champion was insolvent or was at least rendered insolvent by the transfer and each of the Fraudulent Transfers was made when Champion was engaged in business or transactions, or was about to engage in business or transactions, for which any property remaining after the conveyance was an unreasonably small capital within the meaning of Section 274 of the New York Debtor and Creditor Law.

233.     Champion received less than reasonably equivalent value and without a fair consideration in exchange for each of the Fraudulent Transfers.

234.     At the time that each of the Fraudulent Transfers was made, Champion intended to incur, or believed that it would incur, debts that would be beyond Champion's ability to pay as

such debts matured within the meaning of Section 274 of the New York Debtor and Creditor Law.

235.    The Committee has no adequate remedy at law.

236.    Pursuant to 11 U.S.C. § 544(b), the Committee, standing having been conferred upon it by the Final DIP Order, may avoid any transfer of an interest of the Debtors in property or any obligation incurred by the Debtors that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

237.    Creditors of the Debtor, within Sections 272, 274 and 275 of the New York Debtor and Creditor Law, hold claims allowable under Section 502 of the Bankruptcy Code.

238.    For the reasons stated herein, the Fraudulent Transfers should be avoided pursuant to 11 U.S.C. §544(b) and N.Y. Debt. & Cred. Law §§273, 274.

## COUNT VIII

## STRONG ARM POWERS UNDER 11 U.S.C. § 544(a)

239.    The Committee repeats and realleges each and every allegation contained in Paragraphs 1-238 of this Amended Complaint as if set forth herein at length.

240.    Upon information and belief, the Lending Group failed to properly perfect its security interest in the real estate collateral granted pursuant to the Fourth Amendment Transfer. As a result, such transfer is avoidable by a bona fide purchaser within the meaning of 11 U.S.C. § 544(a)(3).

241.    The Committee has no adequate remedy at law.

242.    Pursuant to 11 U.S.C. § 544(a), the Committee, standing having been conferred upon it by the DIP Order, may avoid the aforesaid security interest.

## COUNT IX

## AVOIDANCE OF PREFERENTIAL TRANSFERS UNDER 11 U.S.C. § 547(b)

243.    The Committee repeats and realleges each and every allegation contained in Paragraphs 1-242 of this Amended Complaint as if set forth herein at length.

244.    Section 547(b) of the Bankruptcy Code permits the avoidance as a preference of all transfers made to or for the benefit of a creditor on account of an antecedent debt, while the debtor was insolvent, within 90 days before the petition date (or up to one year before the petition date if such transfer was made to or for the benefit of a creditor who was an insider) which enables such creditor to receive more than such creditor would have received in a Chapter 7 liquidation if such transfer had not been made.

245.    The Lending Group was at all relevant times an "insider" of Champion pursuant to 11 U.S.C. §101(31) and pursuant to applicable non-statutory law, and Credit Suisse was the agent for each member of the Lending Group.  Each Member of the Lending Group, other than Credit Suisse, is (a) an insider of Champion based on Credit Suisse's status and/or (b) a party for whose benefit a transfer was made through Credit Suisse as an "insider."  Consequently, all of collateral pledged to the Lending Group by Champion should be deemed to have been for the benefit of an insider and a one (1) year avoidance period should apply.

246.    On and after October 16, 2008, Champion made significant payments on its obligations under the Credit Agreement including payments of principal, interest, fees and reimbursed expenses.  At all times after October 16, 2008, Credit Suisse and the Lending Group were undersecured, as a result of which each of these payments was a transfer on account of an antecedent debt pursuant to Section 547(b) of the Bankruptcy Code.  The Committee does not have complete information about the amount, source and timing of each payment, but alleges that the payments to or for the benefit of the Lending Group may exceed [REDACTED].

247.     Champion made significant transfers pursuant to the Fourth Amendment, dated October 29, 2008.  It is not clear exactly which transfers pursuant to such Amendment were transfers that occurred within one year of the Petition Date.  To the extent any transfer in connection with the Fourth Amendment, including those described in Count VII herein, was made after November 15, 2008, it was a transfer on account of an antecedent debt (*i.e.*, the obligations under the Credit Agreement).

248.     Pursuant to the Fifth Amendment, on or after May 26, 2009, Champion completed redemption of the 2009 Notes in the amount of approximately [REDACTED], which had the effect of transferring the collateral securing such notes to the Lending Group, and was a transfer for the benefit of the Lending Group, and each such transfers was on account of antecedent debt.

249.     Pursuant to the Sixth Amendment, Champion paid a total of [REDACTED] to Willkie and Loughlin and generally released the Lending Group and each member of it, including Credit Suisse.  Each such transfer was on account of antecedent debt.

250.     The Seventh Amendment, dated September 9, 2009, reduced the amounts Champion was permitted to keep in accounts other than Controlled Accounts from $15,000,000 to $2,000,000 and improved the collateral position of the Lending Group.  The Committee believes that $13,000,000 was transferred pursuant to the Seventh Amendment.  In addition, pursuant to the Seventh Amendment Champion paid the fees and expenses of Willkie and Loughlin and executed a release of the Lending Group, each of which was a transfer of value to Credit Suisse and the Lending Group on account of an antecedent debt (*i.e.*, Champion's obligations under the Credit Agreement).

251. The transfers described in paragraphs 246-250 each occurred within one year of the Petition Date and are transfers of value to Credit Suisse and the Lending Group on account of an antecedent debt (collectively "Preferential Transfers").

252. At all relevant times, the value of the collateral of the Lending Group was less than the amount of debt owed by Champion to the Lending Group. The Lending Group was a creditor of Champion at the time that each Preferential Transfer was made. Each Preferential Transfer was to or for the benefit of the Lending Group and was made on account of antecedent debt owed by Champion to the Lending Group before the Preferential Transfer was made. The Lending Group was undersecured at all times and the effect of each of the Preferential Transfers was to reduce the unsecured portion of the debt owed by Champion under the Credit Agreement.

253. Without limiting the foregoing, the value of the collateral on the date of the petition was $40 million, as established by the representations of counsel and the sale order and the Lending Group is estopped to deny such collateral value on the petition date.

254. The Preferential Transfers were made for the benefit of the Lending Group via its agent, Credit Suisse, all of whom were insiders of Champion, at a time when Champion was insolvent within the meaning of 11 U.S.C. §101 (32).

255. As a result of the Preferential Transfers, the Lending Group received more than it would have otherwise received if: (a) Debtors' Chapter 11 proceeding were a proceeding under Chapter 7 of the Bankruptcy Code; (b) the Preferential Transfer had not been made, and (c) the Lending Group had received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

256. Therefore, all security provided by Champion to the Lending Group on or after November 15, 2008, and all the transfers alleged to be preferential in this Count should be

avoided as preferential transfers under Section 547(b) of the Bankruptcy Code, and such assets, or the value thereof, should be recovered and preserved in their entirety for the benefit of Champion's estate and its unsecured creditors.

257.     The Committee has no adequate remedy at law.

## COUNT X

## TRANSFEREE LIABILITY UNDER 11 U.S.C. § 550(a)

258.     The Committee repeats and realleges each and every allegation contained in Paragraphs 1-257 of this Amended Complaint as if set forth herein at length.

259.     Pursuant to 11 U.S.C. §§ 544(b), the Fraudulent Transfers are avoidable as fraudulent transfers, and pursuant to 11 U.S.C. § 547 the Preferential Transfers are avoidable as preferences.

260.     Accordingly, the Committee is entitled to recover the property transferred (or the value of such property) from the initial transferee, or any immediate or mediate transferee.

261.     The property transferred to the Lending Group (and the value of such property) equals the amount of cash paid to Credit Suisse, the value of the improvement in the Lending Group's collateral position resulting from the Fraudulent Transfers and the Preferential Transfers, and the value of the releases, in an amount that will be proven at trial.

262.     Credit Suisse, and each other member of the Lending Group was either the initial transferee, a person for whose benefit the initial transfer was made, or an immediate or mediate transferee of the Fraudulent Transfers and Preferential Transfers.

263.     The Committee has no adequate remedy at law.

264.     Accordingly, the Committee is entitled to recover the amounts and value of such transfers from Credit Suisse and/or the Lending Group pursuant to § 550(a) of the Bankruptcy Code.

# COUNT XI

## DISALLOWANCE OF THE LENDING GROUP'S
## PROOF OF CLAIM PURSUANT TO 11 U.S.C. §502(D)

265. The Committee repeats and realleges each and every allegation contained in Paragraphs 1-264 of this Amended Complaint as if set forth herein at length.

266. Section 502(d) of the Bankruptcy Code provides that:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 742(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under Section 522(i), 542, 543, 550 or 553 of this title.

11 U.S.C. § 502(d).

267. The Lending Group, including, but not limited to, Credit Suisse, is the beneficiary and recipient of the Preferential Transfers and the Fraudulent Transfers which are recoverable pursuant to 11 U.S.C. § 550.

268. The Lending Group has not returned any of the Preferential Transfers and any of the Fraudulent Transfers to Champion, and, as such, any proof of claim that the Lending Group files or is deemed to have filed, any claim that purports to be otherwise allowed, and any payment of the sales proceeds to the Lending Group on account of alleged pre-petition debt whether or not a proof of claim has been filed, must be disallowed pursuant to 11 U.S.C. §502(d).

269. The Committee has no adequate remedy at law.

# COUNT XII

## DISALLOWANCE OF CLAIMS AND RELATED RELIEF

270. The Committee repeats and realleges each and every allegation contained in Paragraphs 1-269 of this Amended Complaint as if set forth herein at length.

271. Neither Credit Suisse nor the Lending Group has filed a proof of claim and each may assert that it does not have to file such a proof of claim by virtue of the DIP Order.

272. The Committee objects, on the basis of the allegations contained in this Amended Complaint, to any claim or proof of claim which has been or may be filed or asserted either by Credit Suisse or by the Lending Group whether such claim or proof of claim: (a) has already been filed, (b) is filed after the filing of this Amended Complaint; or (c) is asserted to exist on the basis of any documents filed and orders entered in this case including, without limitation, the DIP Order.  For the same reasons, the Committee specifically challenges each of the findings contained in paragraph 4 of the DIP Order, asserts each of its Claims and Defenses as defined in paragraph 21 of the DIP Order and asserts the invalidity of all claims, liens and security interests of the Lending Group and/or Credit Suisse.

273. The Committee has no adequate remedy at law.

274. For the reasons stated in this Complaint, the Court should declare all liens and security interests of the Lending Group and Credit Suisse to be null and void, and all such property should be administered in this bankruptcy case by Champion for the benefit of all creditors.

## COUNT XIII

### TURNOVER OF DEBTORS' ESTATE ASSETS
### PURSUANT TO 11 U.S.C. §§ 542, 550, & 551

275.    The Committee repeats and realleges each and every allegation contained in Paragraphs 1-274 of this Amended Complaint as if set forth herein at length.

276.    Because the Committee is entitled to avoid all of the Preferential Transfers and the Fraudulent Transfers, and is entitled to subordinate the Lending Group's claims, it is, in turn, entitled to the turnover of all Champion's assets transferred to or otherwise in the possession of the Lending Group, Credit Suisse or Wells Fargo on account of such transfers.

277.    The Committee has no adequate remedy at law.

## PRAYERS FOR RELIEF

The Committee respectfully requests that this Court enter judgment as follows:

- Equitably subordinating the Lending Group's claims under 11 U.S.C. § 510(c) to all claims of the unsecured creditors and ordering the repayment and/or turnover of the consideration paid to the Lending Group, Credit Suisse, Wells Fargo or any other person or entity on account of such claims, or the value of such consideration, for the benefit of the Champion's estate and unsecured creditors;

- Equitably subordinating MAK's secured and unsecured claims to the claims of Champion's other unsecured creditors and ordering the repayment and/or turnover of the consideration paid to MAK, the Lending Group, Credit Suisse, Wells Fargo or any other person or entity on account of such claims, or the value of such consideration, for the benefit of the Champion's estate and unsecured creditors;

- Equitable subrogating the holders of the Subordinated Notes to the position of the holders of the 2009 Notes;

- Awarding the Committee damages on account of Credit Suisse's unjust enrichment;

- Equitably estopping Defendants from benefiting from their deceptive acts by allowing holders of the Subordinated Notes to have an equal or greater security interest as the Lending Group pursuant to the Credit Agreement;

- Awarding the Committee damages on account of Credit Suisse's breach of contract;

- Avoiding all transfers in violation of Sections 273, 274 of the N.Y. Debtor and Creditor Law and Section 544(b) of the Bankruptcy Code and ordering the payment or the value thereof, for the benefit of the Champion's estate and unsecured creditors;

- Avoiding the unperfected security interest in certain real estate pursuant to section 544(a) of the Bankruptcy Code and ordering the repayment and/or turnover of the security interest in its entirety, or the value thereof, for the benefit of the Champion's estate and unsecured creditors;

- Avoiding each preferential transfer pursuant to Section 547(b) of the Bankruptcy Code and ordering the repayment and/or turnover of each security interest in its entirety, or the value thereof, for the benefit of the Champion's estate and unsecured creditors;

- Avoiding and ordering the repayment and/or turnover for the benefit of the Champion's estate of the professional fees and expenses paid by Champion for the benefit of Credit Suisse as set forth herein;

- Awarding the Committee judgment against Credit Suisse and/or the Lending Group pursuant to 11 U.S.C. § 550(a);

- Disallowing the Claims of Credit Suisse and the Lending Group as described in Counts XI and XII, and granting the relief sought in Count XIII;

- Awarding the Committee judgment compelling the turnover of all assets of the estates, or the value thereof, transferred to or otherwise in the possession of any the Lending Group, Credit Suisse or Wells Fargo as described in Count XIII;

- Awarding the Committee damages sustained in an amount to be determined at trial, together with prejudgment interest; and

•       Awarding the Committee any such other, further or different relief, whether at law

or in equity, as the Court deems just.

Dated: March 22, 2010          **MILBERG LLP**
       Wilmington, Delaware


                               /s/ Jonathan M. Landers
                               Jonathan M. Landers
                               Jerome M. Congress
                               Anna C. Dover
                               James M. Shaughnessy
                               Lois Dix
                               One Pennsylvania Plaza
                               New York, New York 10119
                               Telephone:     (212) 594-5300
                               Facsimile:     (212) 868-1229

                               *Proposed Counsel for the Official Committee of*
                               *Unsecured Creditors*

# EXHIBIT A – LIST OF PARTICIPATING LENDERS

Airlie CLO 2006-1 Ltd.

Alie Street Investments 18 Ltd

Apostle Loomis Sayles Credit Opportunities Fund

Apostle Loomis Sayles Senior Loan Fund

Archimedes Funding IV (Cay) Ltd

Atlas Loan Funding I LLC

Babson CLO Ltd 2003-I

Babson CLO Ltd 2004-I

Babson CLO Ltd 2004-II

Babson CLO Ltd 2005-I

Babson CLO Ltd 2005-II

Babson CLO Ltd 2005-III

Babson CLO Ltd 2006-I

Babson CLO Ltd 2006-II

Babson CLO Ltd 2007-I

Babson Mid-Market CLO Ltd 2007 II

Bank Of America NA

Barclays Bank PLC

Black Diamond CLO 2005-2 Ltd

BTL 21 LLC

Brentwood II CLO Ltd

Cadogan Square CLO II BV

Cadogan Square CLO III BV

Cadogan Square CLO IV BV

Canadian Imperial Bank Of Commerce

Canyon Capital CLO 2004-1 Ltd

Canyon Capital CLO 2006-1 Ltd

Castle Garden Funding

CCP Acquisition Holdings LLC

Charter One Bank National Asst

Comerica Bank

Confluent 4 Ltd

Credit Strategies Master Fund, Ltd

Credit Suisse Dollar Senior Loan Fund Ltd

Credit Suisse International (Trading Only)

Credit Suisse Loan Funding LLC

Credit Suisse Syndicated Loan

CS

CS Capital LLC

Cypresstree CLAIF Fund LLC

Eastland CLO, Ltd.

Emerald Orchard Limited

Employers Insurance Of Wausau

Endurance CLO I Ltd

FBR Capital Markets Lt Inc

Fifth Third Bank

Flagship CLO III

Flagship CLO IV

Flagship CLO V

Flagship CLO VI

Fraser Sullivan CLO I Ltd

Fraser Sullivan CLO II Ltd

Fraser Sullivan Credit Strategy

GE CFS Loan Holdings 2006 3

GE Commercial Loan Holdings

General Electric Capital Corp

Gleneagles CLO Ltd

Goldman Sachs Lending Partners LLC

Grand Central Asset Trust ARL

Grand Central Asset Trust Zen

Grayson CLO Ltd

Gulf Stream Compass CLO 2003-1

Gulf Stream Compass CLO 2004-I

Hewett's Island CLO III Ltd

Highland Capital Management LP A/C Loan Star State Trust

Highland Capital Management LP A/C Blue Square Funding Ltd Series 3

Highland Floating Rate

Highland Floating Rate Advantage

Highland Legacy Ltd

JP Morgan Chase Bank National Association

Kings Cross Asset Funding 12 SARL

Kings Cross Asset Funding 22 SARL

Liberty CLO Ltd

Liberty Mutual Fire Insurance

Liberty Mutual Insurance Co.

LL Lighthouse Funding LLC

Loan Strategies Funding LLC

Lonestar Partners LP

Loomis Sayles Cayman Leveraged

Loomis Sayles CLO I Ltd.

Loomis Sayles Senior Loan Fund

Loomis Sayles SNR Loan II

Madison Park Funding II, Ltd.

MAK Capital Fund LP

Maplewood (Cayman) Ltd.

Mariner Investment Group Inc A/C Mariner LDC

Massachusetts Mutual Life Insurance

National City Bank Of Kentucky

National City Bank Of The Midwest

Natixis Loomis Sayles Senior Loan Fund

Neptune Finance CES, Ltd.

Pacific Dunes Trading LLC A/C Z Capital

Pioneer Floating Rate Trust

Raven Credit Opp Master Fund

Riva Ridge Master Fund, Ltd

Rockwall CDO Ltd

Sankaty Credit Opportunity Offshore

Sankaty Credit Opportunity II LP

Sankaty Credit Opportunity III

Sankaty Credit Opportunity IV LP

Sapphire Valley CDO I

Simsbury CLO, Ltd.

Stratford CLO Ltd

Suffield CLO, Limited

Sycamore Opportunities Fund LP

Venture CDO 2002 Ltd

Venture II CLO 2002 Ltd

Venture IV CLO Ltd

Venture V CLO Ltd

Vista Leveraged Income Fund

Westchester CLO, Ltd.

WG Horizons CLO I

Whitehorse III Ltd

Whitehorse IV, Ltd.

Wind River CLO II Ltd - Tate