# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- X

In re:                                              :   Chapter 11

CHAMPION ENTERPRISES, INC., et al.,                 :   Case No. 09-14019 (KG)

           Debtors,                         :   (Jointly Administered)

................................................................. X

THE OFFICIAL COMMITTEE OF                           :
UNSECURED CREDITORS OF CHAMPION
ENTERPRISES, INC.,                                  :

           Plaintiffs,                      :

           v.                               :

CREDIT SUISSE, INDIVIDUALLY AND AS                  :
AGENT AND CLASS REPRESENTATIVE
FOR VARIOUS PARTICIPATING                               Adv. Pro. No. 10-50514 (KG)
LENDERS IN THE DEBTORS'                             :
PREPETITION LENDING FACILITY;
CREDIT SUISSE SECURITIES (USA) LLC;                 :
THE LENDERS LISTED IN EXHIBIT A;
MAK CAPITAL FUND LP; and WELLS                      :
FARGO BANK, N.A., as collateral agent
pursuant to a collateral trust agreement dated      :
October 31, 2005,

           Defendants.                      :

                                                    :

--------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF CERTAIN
## FORMER LENDERS' JOINDER AND MOTION TO DISMISS

**Table of Contents**


**ARGUMENT**

1.      The lender acts complained of were simply typical creditor workout procedures….1


2.      The law broadly immunizes lenders from investor/trustee attack, even when the lenders suspect debtor fraud and benefit from concealing their knowledge………..3


        Conclusion………………….…...……………………………………………..7

The undersigned defendant-lenders that formerly held Champion debt ("Former Lenders") hereby move to dismiss and join various other defendants' filed motions to dismiss, incorporating the arguments made therein by reference.[1]  The Former Lenders further state:

The CS Brief points out that the complaint's allegations of lender wrongdoing are flatly contradicted by the very documents cited in the complaint (such as Champion's own publicly filed SEC Form 10-Ks).  In this submission, the Former Lenders further observe that even if the complaint's allegations of lender "wrongdoing" are taken entirely at face value, the complaint still fails to state an actionable claim.  The "wrongdoing" described is in fact just routine secured creditor activity.  See Point 1, below.  Moreover, under In re Sharp Int'l, 403 F.3d 43 (2d Cir. 2005) and other dispositive federal and state case law, arm's length commercial lenders are given wide latitude in protecting their legitimate secured interests.  This judicial immunity for loan enforcement activity covers lender acts far more aggressive than anything alleged in the complaint.  See Point 2, below.

## 1.    The lender acts complained of were simply typical creditor workout procedures.

Stripped of all the invective, the complaint itself depicts nothing more than lenders taking standard commercial actions to protect their secured position – actions no different from those routinely taken by institutional lenders in workout scenarios.

The amended complaint characterizes the lenders' conduct as "oppressive," "inequitable," and "deceptive." ¶ 3.  In the words of the complaint, Champion "was forced" to

---

[1] The Former Lenders join the motions to dismiss of (1) Credit Suisse ("CS") Defendants; (2) Sankaty Credit Opportunities and CCP Acquisition Holdings; (3) General Electric, Fraser Sullivan, Highland and Babson defendants ("GE Motion").  The Former Lenders would all constitute "Minority Lenders," as such term is used in the GE Motion and the arguments made therein accordingly apply to the Former Lenders.

amend the Credit Agreement (¶ 6); and the lending group sought to "transfer its credit risk to other creditors" by pressing for the partial repayment of their and other secured debt from the proceeds of Champion's subordinated debt offering.  Id.

These allegedly nefarious acts are in fact entirely unobjectionable.  As Champion's troubles worsened, it was in continuing jeopardy of falling into covenant default.  A similar drama unfolds in almost every bankruptcy involving a loan agreement.  In seven amendments, the parties did exactly what countless lenders and debtors have historically done: they negotiated changes designed to both give the company a chance to survive, while also protecting the lenders' position.  There is nothing remotely unusual, let alone illegal, about this kind of workout process.  Nor were the specifics of these Credit Agreement amendments (such as relaxed covenants in exchange for additional collateral) anything but routine.

The Committee tries to get mileage out of Champion's decision to sell $180 million of subordinated convertible notes in late 2007.  The proceeds were used to pay down third-party secured debt (the "2009 Notes"); prepay a relatively small portion of the lenders' debt; and acquire a new subsidiary, SRI Homes, Inc. ("SRI").  The complaint claims that the decision to issue the subordinated debt resulted from pressure from the lenders.  The complaint also says that the prospectus for the new debt contained "materially misleading omissions with respect to . . . Champion's financial condition, history and status under its Loan Covenants, and plans for use of proceeds."  ¶ 37 at page 15.

The CS Brief accurately describes how these allegations are belied by the very SEC filings referred to in the Complaint.  As stated in Champion's 2007 annual report, the sale of the convertible notes and retirement of the 2009 Notes enabled Champion to extend the maturities on its debt, repay secured debt, and reduce its overall cost of borrowing.  CS Brief ("Background,"

n. 6).  All these were desirable, garden-variety corporate objectives, certainly well within the

broad scope of the "business judgment" rule.  The CS Brief also notes that Champion's decision

to issue new subordinated debt, far from being rammed down Champion's throat by the lenders,

was a thoroughly considered business determination by the Champion board.  CS Brief, § I(A).

**2.      The law broadly immunizes lenders from investor/trustee attack, even when the lenders suspect debtor fraud and benefit from concealing their knowledge.**

Even if one were to accept at face value the most negative inferences drawn from the

complaint, the complaint still utterly fails to state a claim.  That is, assume that (1) the lenders

indeed heavily pressured Champion to issue the subordinated debt to protect their own position,

and (2) the lenders were somehow complicit in Champion's omission from the prospectus of

material, non-public facts that might have warned convertible debt buyers that Champion was in

bad shape.  Even under these assumptions, the complaint still has no merit.

The law is absolutely clear on this issue.[2]  In In re Sharp Int'l, 403 F.3d 43 (2d Cir. 2005),

a trustee brought a lawsuit against the bank lender, alleging both fraudulent conveyance and

breach of fiduciary duty claims under New York law.  The debtor's principals in that case had

committed a massive criminal fraud, which was detected by an officer at the bank.  The

complaint alleged that the bank (State Street Bank) then concealed its knowledge of the fraud

from other creditors, not returning their phone calls or responding to their inquiries.  The

complaint further claimed that State Street encouraged the fraudsters at the company to structure

and implement a private placement of new debt, which was then specifically used to take out the

bank.

---

[2] Section 12.9 of the Credit Agreement specifies the application of New York law.  Also, plaintiff is itself asserting that New York law applies, because the only state law it cites is the New York Debtor and Creditor law (See Count VII, fraudulent conveyance).

The Bankruptcy Court dismissed the complaint, and the dismissal was upheld all the way up to the Second Circuit. All the allegations in the complaint were assumed to be true, as required in a motion to dismiss – yet the <u>Sharp</u> trustee still was unable to state a claim. The Second Circuit's reasoning is instructive and equally applicable in this case:

> "The nub of the complaint is that State Street knew that there would likely be victims of the Spitzes' fraud, and arranged not to be among them. On the one hand, this seems repugnant; on the other hand, [the bank officer's] discovery that Sharp was rife with fraud was an asset of State Street, and State Street had a fiduciary duty to use that asset to protect its own shareholders, if it legally could. One could say that State Street failed to tell someone that his coat was on fire; or one could say that it simply grabbed a seat when it heard the music stop. The moral analysis contributes little.
>
> "Whatever [the bank officer] and State Street knew about the Spitzes' fraud, they had come by that information through diligent inquiries that any other lender could have made. Sharp fails to identify any duty on State Street's part to precipitate its own loss in order to protect lenders that were less diligent. All the allegations are in substance the same: that State Street was in a position to blow the whistle on the Spitzes' fraud, but did not; instead, State Street arranged to extricate itself from the risk." <u>Id</u>. at 52-53 [citations omitted]

Citing precedent from both New York and other jurisdictions, the <u>Sharp</u> court went on to make short work of the trustee's fraudulent conveyance claim. The Court first observed that "antecedent debt" explicitly qualifies under the statute as "fair consideration." <u>Id</u> at 53. <u>See</u> N.Y. Debtor & Creditor Law § 272 and parallel provision in Bankruptcy Code § 548(d)(2)(A) ("antecedent debt" constitutes "value" for purposes of determining whether "fair equivalent value" has been received); CS Brief § III(A).

Under New York's version of the fraudulent conveyance statute, a transferee has a defense only if the payment is "in good faith." The <u>Sharp</u> Court made clear this requirement would be easily met here:

> "The decisive principle in this case is that a mere preference
> between creditors does not constitute bad faith: '[E]ven the
> preferential repayment of pre-existing debts to some creditors does
> not constitute a fraudulent conveyance, whether or not it prejudices
> other creditors, because '[t]he basic object of fraudulent
> conveyance law is to see that the debtor uses his limited assets to
> satisfy some of his creditors; it normally does not try to choose
> among them." Id. at 54 (citations omitted).[3]

Sharp also made clear that the trustee could not state a fraudulent conveyance cause of

action, even if the preferred creditor knew full well about the debtors insolvency and used that

secret knowledge for its own benefit:

> "Nor does it matter that the preferred creditor knows that the
> debtor is insolvent: '[A] conveyance which satisfies an antecedent
> debt made while the debtor is insolvent is neither fraudulent nor
> otherwise improper, even if its effect is to prefer one creditor over
> another. It is of no significance that the transferee has knowledge
> of such insolvency. Nor is the transfer subject to attack by reason
> of knowledge on the part of the transferee that the transferor is
> preferring him to other creditors, even by virtue of a secret
> agreement to that effect'." Id. at 54-5 (citations omitted).

The new Sharp lenders were also rebuffed in state court when they tried to bring their

claims against State Street Bank under an "aiding and abetting" fraud theory. See In Albion

Alliance Mezzanine Fund, L.P. v. State St. Bank & Trust Co., 8 Misc. 3d 264, 797 N.Y.S.2d 699

(Sup. Ct.) (Cahn, J.), aff'd 2 A.D.3d 162, 767 N.Y.S.2d 619 (App. Div. 1st Dep't 2003) (holding

that "State Street had no duty of disclosure to plaintiffs because it had no fiduciary duty or other

relationship with them, and did not even communicate with them in connection with [the loan]").

Courts in other jurisdictions have also regularly refused to entertain claims by borrowers'

investors against the borrowers' banks or other lenders, even when the complaint claimed the

lender had knowledge of or suspected a fraud. See e.g. Athey Prods. Corp. v. Harris Bank

---

[3] The Sharp opinion did not deal with voidable preferences. (The challenged repayment in that case occurred well outside the 90-day window.) Here, the committee's complaint states no preference claim for the reasons set forth in § III of the CS Brief.

Roselle, 89 F.3d 430, 435-7 (7th Cir. 1996) (plaintiff-creditor's fraud claims against bank unsupported, despite bank's failure to warn plaintiff about borrower's perilous finances and bank's continued lending to borrower when it knew borrower could not repay other creditors); Smith v. Am. Nat'l Bank & Trust Co., 982 F.2d 936, 942-5 (6th Cir. 1992) (plaintiff-investor's securities law claim for aiding and abetting fraud dismissed even though lender-defendant failed to disclose that borrower's check-kiting scheme created the need for the loan).

Here, the committee makes no allegation that the lenders helped conceal a fraud, because nobody has even intimated that Champion's demise was caused by fraud. Instead, the committee tries to substitute a far more tepid claim: that the lenders knew Champion was doomed and should have somehow broadcast that supposed "knowledge" to the world.

The committee is, of course, trying to exploit the well-documented psychological illusion of "hindsight bias" – the tendency to see events that have occurred as more predictable than they in fact were before they took place. Some prescient observers may have seen the 2007-2009 real estate collapse coming, but most industry participants and government regulators did not. The lenders obviously were hopeful that the enterprise could succeed. Otherwise, they would not likely have consented in 2007 to Champion's spending $90 million from the subordinated debt issue to buy SRI, a subsidiary that also depended on a robust real estate market.

The facts here compare extremely favorably with those found non-actionable in Sharp. State Street was presumed to know, or to have a well-grounded suspicion, that Sharp was riddled with fraud – a virtually guaranteed ticket to disaster for the new lenders. Here, the allegation is only that the lenders should have known that bankruptcy was likely for Champion and, in some undescribed way, conveyed that information to the prospective purchasers of the convertible debt.

Despite State Street Bank's having taken actions more ethically questionable than anything alleged against the lenders here, five separate courts – three federal and two state – dismissed complaints against State Street under both fraudulent conveyance and aiding and abetting fraud theories.  A fortiori, the far less troubling actions allegedly taken by the lenders here simply cannot be actionable.

## Conclusion

The complaint is 65 pages long and drafted with skill by good lawyers.  But no cause of action has been or can be stated.  Indeed, this high-visibility lawsuit has a larger public policy dimension.  If the lenders can be held liable for the garden-variety workout activity alleged here, no secured lending group could ever escape liability in an insolvency scenario.

This case is a desperate effort by out-of-the-money creditors to invert the statutory creditor priority structure.  The convertible noteholders contractually agreed to structurally subordinate to the lenders.  In exchange, they received an equity conversion right.  It turned out to be a poor investment for them.  But bad investment results are not an excuse to confiscate the returns obtained by creditors who negotiated to have a higher priority claim against the debtor's assets.

*[Remainder of Page Intentionally Left Blank]*

The Former Lenders ask that the Court step in and act as the gatekeeper here.  Otherwise, the parties will incur vast amounts of needless expense in discovery, motion practice and trial preparation – all for a meritless case that should never get out of the starting block.

Dated: May 14, 2010          Respectfully Submitted,

           **DRINKER BIDDLE & REATH LLP**

By:   /s/  Howard A. Cohen
        Howard A. Cohen (No. 4082)
        1100 N. Market Street, Suite 1000
        Wilmington, DE  19801-1254
        Telephone: (302) 467-4200
        Facsimile:  (302) 467-4201

          - and -

        P. Gregory Schwed
        Joshua Levin-Epstein
        **LOEB & LOEB LLP**
        345 Park Avenue
        New York, NY  10154-1895
        Telephone: (212) 407-4815
        Facsimile:  (212) 937-4689

        Attorneys for Defendants Archimedes Funding IV (Cayman) Ltd., Endurance CLO I Ltd., WG Horizons CLO I, Lonestar Partners, LP, Hewett's Island CLO III Ltd, WhiteHorse III Ltd., WhiteHorse IV Ltd., Black Diamond CLO 2005-2 Ltd., Pioneer Floating Rate Trust, Gulf Stream Compass CLO 2003-1 Ltd., Gulf Stream Compass CLO 2004-1 Ltd., Neptune Finance CCS Ltd., Canadian Imperial Bank of Commerce, Flagship CLO III, Flagship CLO IV, Flagship CLO V, Flagship CLO VI, Raven Credit Opportunities Master Fund

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------- X
```

In re:                                                                 :    Chapter 11

CHAMPION ENTERPRISES, INC., et al.,                 :    Case No. 09-14019 (KG)

              Debtors,                               :    (Jointly Administered)

```
----------------------------------------------------- X
```

THE OFFICIAL COMMITTEE OF                           :
UNSECURED CREDITORS OF CHAMPION
ENTERPRISES, INC.,                                          :

              Plaintiffs,                            :

              v.                                        :

CREDIT SUISSE, INDIVIDUALLY AND AS            :
AGENT AND CLASS REPRESENTATIVE
FOR VARIOUS PARTICIPATING                          :    Adv. Pro. No. 10-50514 (KG)
LENDERS IN THE DEBTORS'
PREPETITION LENDING FACILITY;                      :
CREDIT SUISSE SECURITIES (USA) LLC;
THE LENDERS LISTED IN EXHIBIT A;                   :
MAK CAPITAL FUND LP; and WELLS
FARGO BANK, N.A., as collateral agent                :
pursuant to a collateral trust agreement dated
October 31, 2005,                                             :

              Defendants.                           :

                                                         :

```
----------------------------------------------------- X
```

## CERTIFICATE OF SERVICE

    I, the undersigned, hereby certify that on the 14th day of May, 2010, I caused a true and

correct copy of the ***Memorandum of Law in Support of Certain Former Lenders' Joinder and***

***Motion to Dismiss*** to be served via CM/ECF and upon the parties listed below in the manner

indicated:

***Hand Delivery***
Laura Davis Jones, Esq.
Pachulski Stang Ziehl & Jones, LLP
919 Market Street, 17th Floor
Wilmington, DE 19801

***Hand Delivery***
Adam G. Landis, Esq.
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801

***Hand Delivery***
Richard Schepacarter, Esq.
Office of the United States Trustee
844 King Street, Room 2207, Lockbox #35
Wilmington, DE 19801

***Hand Delivery***
Donna L. Harris, Esq.
Pinckney, Harris & Weidinger, LLC
1220 N. Market Street, Suite 950
Wilmington, DE 19801

***Hand Delivery***
Gregory W. Werkheiser, Esq.
Morris Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801-1146

***Hand Delivery***
Christopher P. Simon, Esq.
Cross & Simon, LLC
913 North Market Street
Wilmington, DE 19801

***Hand Delivery***
Matthew B. Lunn, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

***Hand Delivery***
Christopher M. Samis, Esq.
Richards Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

***Hand Delivery***
David B. Stratton, Esq.
Evelyn J. Meltzer, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 North Market Street
Wilmington, DE 19801

***Hand Delivery***
Seth A. Niederman, Esq.
Fox Rothschild LLP
919 North Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899

***First Class Mail***
Michael B. de Leeuw, Esq.
Fried Frank
One New York Plaza
New York, NY 10004

***First Class Mail***
Joseph T. Baio, Esq.
Joanna Rotgers, Esq.
Willkie, Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY 10019

***First Class Mail***
David S. Elkind, Esq.
Ropes & Gray, LLP
1211 Avenue of the Americas
New York, NY 10036

*First Class Mail*
Michael E. Hastings, Esq.
LeClairRyan, A Professional Corporation
1800 Wachovia Tower, Drawer 1200
Roanoke, VA 24006

*First Class Mail*
Barbara S. Steiner, Esq.
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456

*First Class Mail*
Jonathan M. Landers, Esq.
Jerome M. Congress, Esq.
Anna C. Dover, Esq.
Jean Lee, Esq.
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119

*First Class Mail*
Lance Croffoot-Suede, Esq.
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105

Dated: May 14, 2010

**DRINKER BIDDLE & REATH LLP**

/s/ Howard A. Cohen
Howard A. Cohen (DE 4082)
Andrew J. Flame (DE 4398)
1100 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201

Attorneys for Defendants Archimedes Funding IV
(Cayman) Ltd., Endurance CLO I Ltd., WG
Horizons CLO I, Lonestar Partners, LP, Hewett's
Island CLO III Ltd, WhiteHorse III Ltd.,
WhiteHorse IV Ltd., Black Diamond CLO 2005-2
Ltd., Pioneer Floating Rate Trust, Gulf Stream
Compass CLO 2003-1 Ltd., Gulf Stream Compass
CLO 2004-1 Ltd., Neptune Finance CCS Ltd.,
Canadian Imperial Bank of Commerce, Flagship
CLO III, Flagship CLO IV, Flagship CLO V,
Flagship CLO VI, Raven Credit Opportunities
Master Fund