## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 09-14014 (KG) |
| CHAMPION ENTERPRISES, INC., *et al*., | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| THE OFFICIAL COMMITTEE OF UNSECURED | ) | |
| CREDITORS OF CHAMPION | ) | |
| ENTERPRISES, INC., | ) | Adv. No. 10-50514 (KG) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CREDIT SUISSE, INDIVIDUALLY AND AS | ) | |
| AGENT AND CLASS REPRESENTATIVE FOR | ) | |
| VARIOUS PARTICIPATING LENDERS IN | ) | |
| THE DEBTORS' PREPETITION LENDING | ) | |
| FACILITY; CREDIT SUISSE (USA) LLC; THE | ) | |
| LENDERS LISTED IN EXHIBIT A; MAK | ) | |
| CAPITAL FUND LP; and WELLS FARGO | ) | |
| BANK, N.A., as collateral agent pursuant to a | ) | |
| collateral trust agreement dated October 31, 2005, | ) | |
| | ) | Re Adv. Dkt Nos. 65, 67, 68, 73, 74, |
| | ) | 78, 82, 83, 84, 85, 87, 88, 89, 90, 92, |
| Defendants. | ) | 93, 94, & 117 |
| _____ | ) | |

### OPINION ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT[1]

The Official Committee of Unsecured Creditors (the "Committee") of Champion

Enterprises, Inc. and its affiliated debtors (the "Debtors" or "Champion")[2] brought this adversary

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 . . . ." Fed. R. Bankr. P. 7052(a)(3). Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[2] The Debtors include: Redman Homes, Inc., Champion Enterprises, Inc., Champion Home Builders Co., New Era Building Systems, Inc., North American Housing Corp., Homes of Merit, Inc., Western Homes Corp., Star Fleet Inc., Champion Enterprises Management Co.,

proceeding against multiple lenders to recover damages to the Debtors' estates allegedly arising out of several prepetition financing transactions.  The defendants in this adversary proceeding include: (i) Credit Suisse, Cayman Islands Branch ("Credit Suisse"), individually as a lender and as the Administrative Agent under the Prepetition Credit Agreement (as defined below); (ii) Credit Suisse (USA) LLC ("CS USA"); (iii) MAK Capital Fund, L.P. ("MAK"); (iv) approximately 100 other lenders that participated under the Prepetition Credit Agreement at any time on or after July 1, 2007 (the "Participating Lenders," and together with Credit Suisse, CS USA, and MAK, the "Lending Group" or the "Defendants");[3] and (v) Wells Fargo, as collateral agent under the Prepetition Credit Agreement.[4]

The Committee's amended complaint (the "Complaint") asserts thirteen counts against Defendants.  (Adv. D.I. 7).  Count I seeks equitable subordination of Defendants' secured claims. Count II seeks equitable subordination of MAK's secured and unsecured claims.  Count III seeks equitable subrogation of the purchasers of the Subordinated Notes (as defined below), other than MAK, to the holders of the 2009 Notes (as defined below).  Count IV seeks equitable relief due to Defendants' alleged unjust enrichment to the detriment of the purchasers of the Subordinated Notes.  Count V seeks equitable estoppel against Defendants based on their allegedly unfair conduct.  Count VI seeks damages against Defendants on account of a breach of contract claim related to the MAK Assignment (as defined below).  Count VII seeks avoidance of certain

---

Highland Manufacturing Company LLC, SSH Liquidating Corp., Champion Homes of Boaz, Inc., Iseman Corp., MHCDC, LLC, HomePride Finance Corp., and Champion Development Corp.

[3]  Following oral argument, the Committee voluntarily dismissed all claims against sixteen defendants and certain claims against other Defendants. (*See* Adv. D.I. 256).

[4]  Wells Fargo has not filed a motion to dismiss or other responsive pleadings in this case. Accordingly, this Opinion and its related Order do not expressly grant relief to Wells Fargo.

transfers on a constructive fraudulent transfer theory pursuant to Bankruptcy Code section 544(b) and sections 273-274 of the New York Debtor and Creditor Law.  Count VIII seeks avoidance of certain security interests in the Debtors' real property that Defendants allegedly failed to perfect. Count IX seeks avoidance of certain allegedly preferential transfers pursuant to Bankruptcy Code section 547(b).  Count X seeks recovery of avoided transfers pursuant to Bankruptcy Code section 550.  Counts XI and XII seek disallowance of any claims that were or could be asserted by Defendants against the Debtors.  Count XIII seeks turnover of assets of the Debtors' estates by the Lending Group and Wells Fargo pursuant to Bankruptcy Code sections 542, 550, and 551.

Members of the Lending Group filed motions (the "Motions") asserting that the Court should dismiss the Complaint for failure to state claims on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), applicable here pursuant to Federal Rule of Bankruptcy Procedure 7012.  In the alternative, certain Defendants request that the Court grant them summary judgment pursuant to Federal Rule of Civil Procedure 56, made applicable here by Federal Rule of Bankruptcy Procedure 7056.  The parties fully briefed the Motions and the Court heard oral argument on July 14, 2010.  For the following reasons, the Motions are granted in part and denied in part.

## I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motions constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (D), (E), (F), (H), (K) and (O).

## II. BACKGROUND

Prior to the sale of its businesses, Champion was an international manufacturer of factory-constructed housing and modular buildings, with operations in the United States, the

United Kingdom, and Canada.  (Compl. ¶ 41).  In October of 2005, the Debtors' principal operating company, Champion Home Builders Co. ("Champion OpCo"), obtained a senior secured credit facility (the "Prepetition Credit Facility") from the Lending Group.  (Compl. ¶¶ 2-3).  The Prepetition Credit Facility was memorialized in that certain Amended and Restated Credit Agreement, dated April 7, 2006 (the "Credit Agreement"), and consisted of two secured term loans (the "Term Loans"), a secured revolving line of credit, and a synthetic letter of credit, all maturing October 31, 2012.  (Compl. ¶¶ 45-46).  The Prepetition Credit Facility was secured by all of the assets of Champion OpCo equally and ratably with certain 7.625% Senior Notes due May 15, 2009 (the "2009 Notes"), issued by Champion Enterprises, Inc. ("Champion Inc.").  (Compl. ¶¶ 53-54).  Champion Inc. is a holding company with no assets other than ownership of its wholly-owned subsidiaries, including Champion OpCo.  (Compl. ¶¶ 2, 43).  Credit Suisse is the administrative agent for the Lending Group under the Credit Agreement and is authorized by the Lending Group to take certain actions on its behalf.  (Compl. ¶¶ 4, 48-49).  CS USA is the lead arranger and sole bookrunner under the Credit Agreement.  (Compl. ¶ 4).

Following the execution of the Credit Agreement, the Debtors' business began to suffer and by early 2007, Champion was in default or on the verge of defaulting on the covenants in the Credit Agreement.  (Compl. ¶ 6).  As a result, Champion began to negotiate amendments to the Credit Agreement with the Lending Group.  (Compl. ¶ 6).  The Credit Agreement was amended in March, June, and October of 2007, to relax covenants and avoid defaults.  (Compl. ¶ 37).  At the Lending Group's suggestion, the October amendment (the "Third Amendment") included a provision whereby Champion Inc. agreed to issue unsecured 2.75% Convertible Senior Notes due 2037 (the "Subordinated Notes").  Champion Inc. agreed to use the proceeds from the Subordinated Notes (the "Proceeds") to pay down 2009 Notes and the Prepetition Credit Facility.

4

(Compl. ¶ 37). The Third Amendment improved the Lending Group's collateral position under the Prepetition Credit Facility because after the payoff of the 2009 Notes, the Lending Group alone had a priority security interest in Champion OpCo's assets. (Compl. ¶ 90).

Prior to deciding to issue the Subordinated Notes, Champion's board of directors formed a special committee, engaged in days of heated discussions, and obtained a second opinion from an investment bank. (Compl. ¶¶ 70, 72-73). CS USA underwrote the Subordinated Notes offering and the same employees responsible for managing the Prepetition Credit Facility for Credit Suisse managed the Subordinated Notes issuance for CS USA. (Compl. ¶ 87). Based on the shared personnel, the Committee alleges that Credit Suisse and CS USA acted as a single economic entity with respect to the Subordinated Notes offering and the Prepetition Credit Facility. (Compl. ¶ 108).

In connection with the Subordinated Notes offering, Champion issued a prospectus and a supplemental prospectus (the "Prospectuses") describing its businesses and financial condition. (Compl. ¶ 37). The Committee alleges that the Prospectuses contained materially false and misleading disclosures and that Defendants knew that the Prospectuses were inaccurate due to their non-public access to Champion's books, records, and personnel in connection with the Prepetition Credit Facility. (Compl. ¶¶ 76-80, 82, 87). The Committee further alleges that Credit Suisse intentionally failed to take action to correct the inaccuracies to ensure that the Lending Group's collateral position under the Prepetition Credit Facility was improved by Champion using the Proceeds to eliminate the 2009 Notes. (*See* Compl. ¶¶ 82, 88-89).

By early November, 2007, the $180 million Subordinated Notes offering was fully subscribed, yielding $174.1 million in Proceeds, which the Complaint alleges were used in the following transactions: (i) over $90 million to purchase SRI Homes, Inc. ("SRI"); (ii)

approximately $79.7 million to redeem the 2009 Notes; (iii) approximately $8 million to prepay the Term Loans; and (iv) $14.5 million to prepay other portions of the Prepetition Credit Facility.[5] (Compl. ¶¶ 75, 98, 102). Based on the above, the Committee alleges that the Lending Group inequitably increased its position and transferred its credit risk to other creditors, namely, the purchasers of the Subordinated Notes. (Compl. ¶¶ 93, 147).

The Committee also alleges that the Lending Group's inequitable conduct was exacerbated by certain actions involving MAK. On or about January 30, 2009, MAK obtained its first assignment of Champion's debt obligations under the Prepetition Credit Facility from Bank of America, N.A. (the "MAK Assignment"). (Compl. ¶ 152). The MAK Assignment consisted of approximately $1 million in Term Loans and $1 million in synthetic deposits. (Compl. ¶ 152).

The Credit Agreement provides that the lenders thereunder may assign certain obligations to an "Eligible Assignee," which the Credit Agreement defines as an existing lender under the specific facility component, a person approved by Champion (unless an event of default has occurred and is continuing, in which case consent is not required), or in the case of an assignment of a Term Loan or synthetic deposit, an affiliate of an existing lender under the applicable facility component. *See* Credit Agreement §§ 1.1, 12.11.[6] If an entity is not already a lender under the Credit Agreement, or an affiliate thereof, then the Credit Agreement requires that Champion consent to such assignment "unless an Event of Default has occurred and is

---

[5]  The Complaint delineates the use and dollar amount of the expenditures which exceed the Proceeds by approximately $18 million.

[6]  The Credit Agreement is attached as Exhibit B to the Affidavit of James M. Shaughnessy, Esq., in Opposition to Defendants' Motions to Dismiss and for Summary Judgment (the "Shaughnessy Affidavit"). The Shaughnessy Affidavit states that the Credit Agreement was referred to, and relied upon, in the Complaint.

continuing . . . ." Credit Agreement § 1.1. Champion's consent, however, is presumed given if Champion fails to object within 10 days after a request occurs. Credit Agreement § 12.11(b).

The Committee alleges that Champion was not in default under the Credit Agreement at the time of the MAK Assignment in January of 2009 and that Champion's consent was required. (Compl. ¶¶ 154-55). It is undisputed that Credit Suisse did not request Champion's consent to the MAK Assignment until May of 2009. Champion never consented to the MAK Assignment, but rather, repeatedly objected to the assignment. (Compl. ¶ 155). The Committee alleges that MAK continued to acquire Champion secured debt through assignment and that the assignments were the initial phase of MAK's plan to push Champion into bankruptcy and compel Champion to sell itself to MAK at a depressed price. (Compl. ¶¶ 157, 163). As of October 13, 2009, the Committee alleges that MAK had acquired over $34 million of Champion secured debt under the Credit Agreement and an additional $28.5 million of the unsecured Subordinated Notes. (Compl. ¶ 160).

Throughout 2008 and 2009, Champion's financial condition continued to decline and the Credit Agreement was amended five more times. (Compl. ¶ 37). These additional amendments, *inter alia*, provided covenant relief, suspended covenants, required Champion to report more frequently to the Lending Group, increased the Lending Group's collateral position, and granted releases to the Lending Group. (Compl. ¶ 37). Despite the amendments, on November 15, 2009 (the "Petition Date"), the Debtors filed petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). As of the Petition Date, approximately $147 million was outstanding on the Prepetition Credit Facility. (*See* Aff. of Phyllis Knight in Support of First Day Motions ¶ 28) (D.I. 3).

## III. STANDARDS OF REVIEW

A.    **Rule 12(b)(6) Dismissal Standard**

Defendants seek dismissal of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A court's fundamental inquiry in the Rule 12(b)(6) context is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982).

To decide a motion to dismiss, a court "accept[s] all well-pleaded allegations in the complaint as true, and view[s] them in the light most favorable to the plaintiff." *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004); *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).[7] A court must draw all reasonable inferences in the plaintiff's favor. *Kost*, 1 F.3d at 183. However, allegations consisting of "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" are not entitled to a presumption of truth. *Twombly*, 550 U.S. at 555.

---

[7] On a motion to dismiss, in addition to the complaint's allegations, a court may consider documents integral to the complaint's allegations, documents subject to judicial notice, and documents referenced in, or relied upon by, a complaint. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[S]ources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss" include "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice."); *Angstadt v. Midd-West School Dist.*, 377 F.3d 338, 342 (3d Cir. 2004) ("[A]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss to one for summary judgment.").

Following the Supreme Court's recent rulings on Rule 12(b)(6) in *Twombly* and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Third Circuit recognized that reviewing a Rule 12(b)(6) motion requires a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Id.* at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a plausible claim for relief." *Id.* at 211 (internal quotations omitted). Put another way:

> [S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.

*Phillips*, 515 F.3d at 234 (internal quotations omitted) (citations omitted). Rule 12(b)(6) is complemented by Federal Rule of Civil Procedure 8 that requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## B.    Rule 56 Summary Judgment Standard

Certain Defendants alternatively request summary judgment in their favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides that the Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue of material fact is genuine only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On summary judgment, the facts must be viewed in the light most favorable to the non-moving party. *Id.*

The party moving for summary judgment bears the burden of establishing that no genuine issue of material fact exists. *Id.* at 242. Following such a showing, the burden shifts to the non-moving party to show that there is a genuine issue of material fact. *Id.* It is incumbent on the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). At the summary judgment stage, the court's role is not to assess credibility or weigh evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 587 (internal quotations removed).

## IV. **DISCUSSION**

**A.    The Complaint Does Not Adequately Allege Equitable**
**      Subordination Against the Lending Group**

Bankruptcy Code section 510(c)(1) provides that "the court may - under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." 11 U.S.C. § 510(c)(1). The Third Circuit has described equitable subordination as "a remedial rather than penal doctrine designed to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns)*, 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003) (internal quotations removed).

Equitable subordination requires: (i) inequitable conduct; (ii) resulting in injury to creditors or unfair advantage to the claimant; and (iii) an outcome that is not otherwise

inconsistent with the Bankruptcy Code. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998) (citing *In the Matter of Mobile Steel Co.*, 563 F.2d 692, 699-700 (5th Cir. 1977)). In addition, courts analyzing equitable subordination claims typically differentiate between insider and non-insider claimants and apply special scrutiny to the conduct of insiders. *In re M. Paoella & Sons, Inc.*, 161 B.R. 107, 117-18 (E.D.Pa. 1993), *aff'd*, 37 F.3d 1487 (3d Cir. 1994).

    1.   <u>Insider Status</u>

The Bankruptcy Code defines "insiders" of a debtor that is a corporation to include: (i) officers, directors, and general partners of the debtor; (ii) persons in control of the debtor; (iii) a partnership in which the debtor is a general partner; and (iv) a relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B). In addition, an entity may be a "non-statutory insider" based on the entity's relationship with, and level of control over, a debtor. *In re M. Paoella & Sons, Inc.*, 161 B.R. at 118. Here, the Complaint alleges that "the Lending Group and Credit Suisse were 'insiders' of Champion pursuant to 11 U.S.C. § 101(31) and applicable non-statutory law." (Compl. ¶ 174). The Committee's theory is that the Lending Group and Credit Suisse were able to coerce Champion's actions and, therefore, had sufficient control over Champion to merit statutory and non-statutory insider status.

In the context of a lender-defendant, courts have refused to apply insider status absent a showing of a high level of control by the lender. *See In re M. Paoella & Sons, Inc.*, 161 B.R. at 118-19 (affirming bankruptcy court determination that secured lender was not an insider because debtor's principal controlled debtor and made key decisions,); *In re Radnor Holdings Corp.*, 353 B.R. 820, 840-41 (Bankr. D. Del. 2006) (refusing to apply insider status to a shareholder/lender who did not exercise day-to-day control over the debtor's business). Control sufficient to merit

insider status may be established by facts showing that the lender dictated day-to-day management and operation of the debtor or made decisions for the debtor regarding replacement of management or filing for bankruptcy. *See Dixon v. Am. Comty. Bank & Trust (In re Gluth Bros. Const., Inc.)*, 424 B.R. 379, 392-93 (Bankr. N.D. Ill. 2009) (dismissing equitable subordination claim and noting that to be an insider "a person need not have legal or absolute control of the debtor, but it must exercise sufficient authority to dictate corporate policy and the disposition of corporate assets.") (internal quotations removed); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.)*, 299 B.R. 732, 743 (Bankr. D. Del. 2003) (finding that lenders may be insiders only "when exerting dominion and control, or, when they exercise sufficient authority over the corporate debtors so as to unquantifiably dictate corporate policy or disposition of assets.") (internal quotations removed).

The Third Circuit recently discussed the concept of non-statutory insiders in *Schubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.)*, 554 F.3d 382, 395 (3d Cir. 2009). In *Winstar*, a chapter 11 trustee asserted preferential transfer, equitable subordination, and breach of contract claims against Lucent Technologies, Inc. ("Lucent"), a prepetition vendor, lender, and alleged "insider" of the debtor ("Winstar"). *Id.* The trustee alleged that Lucent's insider status was illustrated by its ability to coerce Winstar into taking actions that were only in Lucent's best interest, such as: (i) Winstar's purchase of unneeded Lucent inventory and unnecessary software that was never used and substantially over-priced; (ii) Lucent's treatment of Winstar as a captive buyer; and (iii) Lucent's ability to involve Winstar employees in improper transactions benefitting only Lucent. *Id.* at 397. These actions allowed Lucent to inflate its own revenue, but did not benefit Winstar. *Id.*

After trial, the bankruptcy court determined that Lucent was an insider of Winstar and found for the trustee on all counts. *Schubert v. Lucent Techs. Inc. (In re Winstar Commn'cs, Inc.)*, 348 B.R. 234 (Bankr. D. Del. 2005). In affirming the bankruptcy court's ruling on the issue of Lucent's insider status, the Third Circuit found that "it is not necessary that a nonstatutory insider have actual control; rather, the question is whether there is a close relationship [between the debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length." *Id.* at 396 (internal quotations removed).

The court noted that Lucent's argument that it was "merely driving a hard bargain and exercising its contractual rights" was directly refuted by the facts supporting the bankruptcy court's findings that Lucent had used "Winstar as a mere instrumentality to inflate Lucent's own revenues" and "that Lucent had the ability to coerce Winstar into a series of transactions that were not in Winstar's best interests . . . ." *Id.* at 399. Instead of demonstrating a normal lending relationship, the Third Circuit determined that the parties' "one-sided transactions refute any suggestion of arm's-length dealings." *Id.*

Here, the Complaint's allegations vary markedly from the facts of *Winstar*. Unlike in *Winstar*, where Lucent was the debtor's primary supplier, Defendants are traditional lenders. In addition, the Complaint does not allege that Defendants' economic survival depends on the Debtors' inventory purchases, business development, or general financial well-being. The Complaint does allege that the Defendants had access to and monitored Champion's financial information, exerted influence in negotiating amendments to the Credit Agreement, and received certain concessions in connection therewith. However, where a lender's influence on a debtor's actions merely arises by operating of bargained-for rights under a credit agreement, those

13

"reasonable financial controls negotiated at arms' length between a lender and a borrower do[ ] not transform a lender into an insider." *See In re Radnor Holdings Corp.*, 353 B.R. at 847.

With the exception of the MAK Assignment, the Committee does not allege that Defendants took any actions that were outside their rights under the Credit Agreement or normal lender behavior in a distressed loan situation. Importantly, the Complaint also does not point to any specific act by any Defendant that demonstrates how Defendants controlled Champion's day-to-day business. Instead, the Complaint details numerous occasions on which Champion managed its own affairs, and sometimes heartily disagreed with Defendants. For example, the Complaint alleges that Champion approached Defendants to negotiate for covenant relief. (Compl. ¶ 61). Similarly, with regard to the Subordinated Notes issuance, the Complaint alleges that Champion's board of directors did not simply acquiesce to Defendants' suggested course of action, but used their own judgment to decide whether to issue the notes. (Compl. ¶¶ 69-72). The fact that Champion's board ultimately agreed with Defendants does not allow the Court to draw the inference that Defendants exerted untoward control over Champion. Additionally, the Complaint describes Champion's spirited communications with Defendants regarding the MAK Assignment and Champion's ultimate refusal to consent to the MAK Assignment. (Compl. ¶ 155). These allegations show that Champion continued to make its own difficult decisions and contradict the Complaint's allegation that Defendants exerted total control over Champion.

In sum, the Complaint's allegations are indicative of nothing more than a normal distressed-borrower/lender relationship and do not provide a basis from which the Court could infer that Defendants' relationship or dealings with Champion merit applying insider status to

14

Defendants pursuant to 11 U.S.C. § 101(31)(B)(iii) or nonstatutory insider law.[8]    *See In re Radnor Holdings, Corp.* 853 B.R. at 840-41.

     2.    <u>Inequitable Conduct</u>

Courts generally find that where the defendant is not an insider, "the party seeking to apply equitable subordination bears a higher burden of proof in which he or she must show that the respondent engaged in egregious conduct such as fraud, spoliation, or overreaching." *Bank of New York v. Epic Resorts (In re Epic Capital Corp.)*, 307 B.R. 767, 772 (D. Del. 2004). Particularized fact pleading regarding the allegedly egregious behavior is required. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 554 (Bankr. D. Del. 2009). Here, the Committee has generally alleged three areas of inequitable conduct, including Defendants' actions related to: (i) amending the Credit Agreement; (ii) the Subordinated Notes offering and related Prospectuses' disclosures; and (iii) the MAK Assignment.

     a.    *The Credit Agreement Amendments*

The Committee first alleges that Defendants inequitably misused the process of amending the Credit Agreement to create unfair advantages for themselves. (Compl. ¶ 38). By the amendments, Defendants are alleged to have obtained increased interest rates, amendment fees, prepayments, and additional collateral, thereby improving Defendants' position and shifting

---

    [8]  The Committee's citation of *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs.)*, 299 B.R. 732 (Bankr. D. Del. 2003) is also unavailing. In *Exide*, the court denied a motion to dismiss equitable subordination claims against a debtor's "insider" lenders after determining that the complaint contained sufficient facts showing the lenders' control and inequitable conduct in utilizing their control. *Exide*, 299 B.R. at 743-46. The control allegations included that the lenders dictated when the debtor would file for bankruptcy and which of the debtor's affiliates would file, in an effort to prevent the avoidance of liens and guarantees held by the lender. *Id.* at 743. The debtor's bankruptcy petition was filed on the first business day following the 90-day period after the debtor made significant collateral grants to the lenders. *Id.* In addition, the lenders allegedly caused the debtor's board of directors to replace an officer with a lender-friendly individual. *Id.* The Complaint here does not contain comparable factual allegations and, accordingly, *Exide* is not controlling.

credit risk from Defendants to others. (Compl. ¶ 38). Defendants do not dispute the occurrence

of the amendments or the various concessions they obtained as a result of the amendments.

Instead, Defendants argue that, as a matter of law, no specific inequitable actions are alleged and

the circumstances surrounding the amendments do not constitute inequitable conduct. (*See*

Credit Suisse Br. 25-28) (Adv. D.I. 69).

The Court agrees with Defendants that inequitable conduct requires behavior far more

egregious than Defendants' actions related to amending the Credit Agreement. Importantly, the

Complaint does not allege that the amendments violated the Credit Agreement, applicable law,

or even that the terms of the amendments are beyond the scope of normal lender-borrower

agreements in distressed debt negotiations. Normal lender conduct does not amount to

inequitable conduct for equitable subordination purposes. *See In re M. Paolella & Sons, Inc.*,

161 B.R. at 120 ("Generally, a creditor does not act inequitably in exercising its contractual

rights."). Courts commonly recognize that a lender's goal 'to recoup the most amount of money

as possible on [its] . . . loans, [is] an understandable and permissible desire." *Id.* (quoting *In re

W.T. Grant*, 699 F.2d 599, 609 (2d Cir. 1983)) (internal quotations omitted).

The Complaint stops short of describing how the Lending Group's actions were

inconsistent with typical lender behavior in distressed debt situations or arm's length dealings.

Although the Lending Group may have forcefully negotiated, the fact that one party to a contract

has more leverage does not indicate that the dealings are not at arm's length. Moreover, use of

that leverage does not provide a basis for the Court to find inequitable conduct. Accordingly, the

Committee has failed to allege sufficient facts from which the Court could infer that Defendants'

actions in amending the Credit Agreement were egregious or inequitable. *See In re Auto

Specialties Mfg. Co.*, 153 B.R. 457, 495 (Bankr. W.D. Mich. 1993) ("[T]he court sees nothing

16

more than a creditor trying its level best to get out of a bad loan cleanly without either sacrificing its collateral or exposing itself to liability.").

      b.     *The Prospectuses' Disclosures*

The second area of misconduct relates to the Prospectuses.  The Committee alleges that the Prospectuses contained materially false and misleading disclosures because the Prospectuses failed to specifically identify the following: (i) Champion's difficulty in complying with its loan covenants; (ii) prior amendments to the Credit Agreement; (iii) Champion's intention to use the Proceeds to obtain covenant relief under the Credit Agreement, make acquisitions, and pay down the 2009 Notes and the Prepetition Credit Facility; (iv) Champion's insolvency; and (v) Credit Suisse's conflict of interest in connection with the offering.  (Compl. ¶¶ 76-80, 86-88).

The Committee alleges that Defendants knew that the Prospectuses were inaccurate due to their non-public access to Champion's books, records, and personnel.  (Compl. ¶¶ 82, 88). Despite such awareness, Defendants are alleged to have done nothing to require Champion to correct the Prospectuses or to alert the investing public of the inaccuracies.  (Compl. ¶ 82).  The Committee alleges that Credit Suisse intentionally took no action in order to ensure that the Lending Group's collateral position under the Prepetition Credit Facility was improved by Champion's use of the Proceeds to eliminate the 2009 Notes.  (Compl. ¶¶ 82, 87-89).

Assuming *arguendo* that the Prospectuses issued by Champion contained materially misleading statements, Count I would still be dismissed as to Credit Suisse and the Participating Lenders because the Complaint's allegations regarding these Defendants' specific actions consist solely of factually unsupported conclusory statements.  The Complaint does not allege sufficient facts from which the Court could draw the inference that *Credit Suisse* or the *Participating Lenders* assisted Champion in making materially misleading disclosures or that these Defendants

had an independent disclosure duty.  To the extent that *CS USA* has any disclosure liability due

to its role as underwriter of the Subordinated Notes, it is important to recognize that CS USA is a

distinct legal entity from Credit Suisse and is not an agent of the Participating Lenders under the

Credit Agreement.  (Compl. ¶ 16).  Accordingly, for disclosure liability to plausibly attach to

Credit Suisse and the Participating Lenders, the Court would have to determine that the

Complaint adequately alleges facts to support the following: (i) Credit Suisse's corporate veil

should be pierced to allow liability for CS USA's actions to attach to Credit Suisse; and (ii)

liability should further attach to each of the Participating Lenders because Credit Suisse acted as

the administrative agent under the Credit Agreement.  *See Ins. Co. of N. Am. v. Cohn (In re

Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995) ("Well- established precedent holds that in order for

one company to be held responsible for the actions of a related company, it is necessary that

there be sufficient facts to pierce the corporate veil.").

     Piercing the corporate veil is a state law theory of liability that requires facts establishing

that a controlling entity ignored the separate legal status of, and dominated the affairs of, a

controlled entity.  *See e.g., Culbreth v. Amosa (Pty) Ltd.*, 898 F.2d 13, 15 (3d Cir. 1990)

(applying Pennsylvania and New Jersey veil-piercing law and finding that "the party seeking to

pierce the corporate veil on an alter-ego theory [must] establish[] that the controlling corporation

wholly ignored the separate status of the controlled corporation and so dominated and controlled

its affairs that its separate existence was a mere sham.").  The Complaint is conspicuously devoid

of facts showing domination and control of CS USA by Credit Suisse.  The only factual

allegation that tying together the two Credit Suisse entities' actions is that the same employees

managed the Credit Agreement and Subordinated Notes offering.  (Compl. ¶ 108).  The Court

cannot, however, infer domination and control by virtue of this single fact.  In addition, the

Complaint does not sufficiently allege that CS USA was an agent of the other Defendants when underwriting the Subordinated Notes. Therefore, the Court cannot attribute CS USA's conduct to the Defendants.[9]

In addition, courts commonly hold that equitable subordination must be based on the claimant's own acts. *See U.S. v. Noland*, 517 U.S. 535, 538 (1996) (observing that the doctrine of equitable subordination is "generally triggered by a showing that the creditor had engaged in 'some type of inequitable conduct.'"); *In re Winstar*, 348 F.3d at 283 (finding that for equitable subordination "a claimant must have engaged in some type of inequitable conduct."); *Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co., Inc.)*, 420 F.3d 53, 59-65 (1st Cir. 2005) (noting that "equitable subordination demands that the claimant be found to have engaged in inequitable conduct and rejecting "no-fault" equitable subordination for classes of claimants). The Committee has not sufficiently alleged specific inequitable conduct regarding the Prospectuses' disclosures by Credit Suisse or the Participating Lenders.

To the extent that CS USA could be liable for Champion's non-disclosures, a review of the Prospectuses shows that the Committee's non-disclosure allegations are contradicted by the Prospectuses themselves or otherwise unfounded. For example, it is undisputed that the Prospectuses contained the following provisions:

> (i)    Affiliates of the underwriter are lenders under our credit facility and an affiliate of the underwriter is the administrative agent under our credit facility. Because affiliates of the underwriter are lenders under our credit facility and may receive more than 10% of the net proceeds of this offering upon the repayment of amounts

---

[9]    In addition to failing to assert a claim against Credit Suisse and the Participating Lenders based on veil-piercing, the Complaint fails to assert a plausible theory of direct lender liability related to borrower disclosures in securities documents. Even if such theory was asserted and available, the Complaint fails to allege sufficient facts regarding specific actions of the Lending Group to support a direct liability theory and the Court need not further address the issue.

outstanding under our credit facility as described in 'Use of Proceeds,' this offering is being conducted in accordance with Rule 2710(h) of the Financial Industry Regulatory Authority, or FINRA. Supp. Prosp. at S-55.

(ii)    Approximately $97 million of the net proceeds from this offering will be used to:

- repurchase any and all of the 2009 notes tendered in the offer to purchase . . .
- repay no less than $8 million of the outstanding principle, plus accrued interest, under our term loan due 2012; and
- pay related fees and expenses.

The remaining proceeds will be used for general corporate purposes. Supp. Prosp. at S-7 and S-24.

(iii)    [T]he net proceeds from the sale of the securities will be used for general corporate purposes including: working capital; capital expenditures; acquisitions of or investments in businesses or assets; and redemption and repayment of short-    term or long-term borrowings. Prosp. at 3 (bullet points removed).

(iv)    Although the notes are referred to as "senior notes," the notes are effectively subordinated to the rights of our existing and future secured creditors and any liabilities of our subsidiaries. Supp. Prosp. at S-18.[10]

As is clear from these provisions, Champion disclosed the dual roles of Credit Suisse' entities, the intended use of the Proceeds to pay off the 2009 Notes and to pay down the Prepetition Credit Facility, and the potential that the Proceeds would be used for acquisitions. The Committee alleges that besides these facts, the Prospectuses also should have included specific conclusions regarding Champion's insolvency and Credit Suisse's conflicts of interest. (Compl. ¶¶ 78, 87).

Defendants argue that there is no obligation to include legal conclusions flowing from facts that are disclosed in a prospectus. (Credit Suisse Br. 25). Defendants contend that the

---

[10]  The Prospectuses are attached as Exhibit U to the Shaughnessy Affidavit, which states that the Prospectuses were referred to, and relied upon, in the Complaint.

Prospectuses and Champion's other public filings disclosed the salient facts from which conclusions regarding Champion's insolvency or Credit Suisse's conflicts of interest could be drawn, and that, as a matter of law, Champion's decision not to color the disclosed facts with legal conclusions does not constitute a failure to disclose.  (Credit Suisse Br. 25).

The Committee responds that "the law is well-established that investors cannot be required to cobble together piecemeal statements from different parts of a prospectus (let alone in previously filed and "available elsewhere" documents)."  (Comm. Resp. 41).  The Committee cites *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 773-74 (3d Cir. 1976) as its "well-established" law for this proposition.  In *Gould*, the Third Circuit partially upheld a trial court's summary judgment ruling regarding material deficiencies in a proxy statement.  *Id.* at 771-75. The proxy statements were alleged to be deficient, in part, due to inadequate disclosures related to conflicting interests of the issuer's directors who were also officers of the issuer's largest shareholders.  *Id.* at 773.  The Third Circuit concluded that the trial court did not err when determining that "the facts giving rise to the conflicting interests were so buried in the documents as not to constitute an adequate disclosure to shareholders . . . ."  *Id.*  The Third Circuit further noted that "many of the statements . . . are scattered through and rather buried in the lengthy proxy statement.  There is nowhere a statement giving emphasis to the conflicts of interest . . . ." *Id.* at 774.

Here, the Prospectuses disclose that affiliates of CS USA could receive substantial funds from the Proceeds in a single section titled "Underwriting."  The facts are not sprinkled throughout the Prospectuses, but are contained in a single paragraph under an appropriate heading.  This type of disclosure stands in stark contrast to the disclosures in *Gould*.  In addition, the issue in *Gould* was the liability of an issuer's directors who stood to benefit from approval of

the transaction that they negotiated. *Gould* does not speak to whether underwriter liability exists on account of an issuer's decision not to repeat already-disclosed facts or to characterize disclosed facts. The facts of this case and the clear provisions of the Prospectuses distinguish this case from *Gould*.

The Court agrees with Defendants that the Complaint's allegations regarding the Prospectuses' failure to characterize disclosed facts with labels and legal conclusions are insufficient to state a claim for non-disclosure. *See Prettner v. Aston*, 339 F. Supp. 273, 290 (D. Del. 1972) (finding no lack of disclosure in a proxy statement where critical facts were disclosed and "investors were left to evaluate th[e] fact for themselves."); *Klamberg v. Roth*, 473 F. Supp. 544, 551-52 (S.D.N.Y. 1979) (finding that "once the facts are disclosed, a failure to articulate adverse inferences from or pejorative descriptions of those facts is not materially deceptive: a reasonable person would not be deceived by their nondisclosure, since he would be able to draw whatever inferences and append whatever characterizations he believed appropriate.").

The Committee's remaining non-disclosure allegations are that the Prospectuses should have disclosed that Champion's difficulties in complying with its loan covenants and the attendant amendments to the Credit Agreement. (Compl. ¶ 77). The Complaint alleges that in addition to Champion's disclosure that "[a]s of September 29, 2007, we were in compliance with all financial and performance covenants on our credit facilities[,]" the Prospectuses should have disclosed Champion's difficulties in complying with the Credit Agreement's covenants. (Compl. ¶ 77). Defendants respond that such information was readily available from Champion's prior securities filings and that the failure to repeat such information does not constitute inequitable conduct. (*See* Credit Suisse Br. 22).

22

There is no dispute that the information was available in Champion's prior securities filings and this is not a case where the issuer is alleged to have falsified financial information. Rather the Complaint alleges a failure to re-disclose and characterize already-public information. The Court agrees with Defendants that such allegations do not provide a basis for the Court to infer that CS USA or the other Defendants engaged in inequitable conduct. *See Klamberg v. Roth*, 473 F. Supp. at 552 ("It is not therefore deceptive to fail to disclose information that was 'easily enough available by duly diligent inquiry.'").

      c.     *The MAK Assignment*

The final area of alleged misconduct relates to MAK's accumulation of Champion debt under the Prepetition Loan Facility. The Committee alleges that the Lending Group "actively supported and furthered MAK's efforts" to "forc[e] Champion into bankruptcy so that MAK could acquire all or a controlling interest in Champion's assets at a fire sale price . . . ." (Compl. ¶¶ 187, 189). The Lending Group, through the actions of its administrative agent, Credit Suisse, is alleged to have improperly facilitated the MAK Assignment without Champion's consent, in contravention of the terms of the Credit Agreement. (Compl. ¶¶ 177, 179). The Complaint and its documentation show that making the MAK Assignment without Champion's consent, was an "oversight" by Credit Suisse. (*See* Compl. ¶ 156). The Complaint further alleges that Champion repeatedly informed Credit Suisse that it had concerns regarding the MAK Assignment and did not consent to the MAK Assignment, but that Credit Suisse did not support Champion. (Compl. ¶¶ 155-56). As further explained below in connection with analysis of the breach of contract claim, the Complaint adequately alleges that the MAK Assignment was improper under the terms of the Credit Agreement.

Nevertheless, the Complaint stops short of supplying facts from which the Court could infer that Credit Suisse's actions regarding the MAK Assignment were egregious. Although Credit Suisse may not have fully complied with the terms of the Credit Agreement, the facts alleged only show a potential breach of contract claim stemming from an "oversight." Put another way, regardless whether Credit Suisse breached the Credit Agreement, the conduct does not rise to the level of inequitable behavior necessary for equitable subordination.

The remainder of the allegations regarding Credit Suisse's motivations and MAK's long-term plan are factually-unsupported conclusions.[11] Based on the foregoing, the Committee has failed to allege specific facts from which the Court could infer that Defendants engaged in inequitable conduct and the Court will dismiss the equitable subordination claims. [12]

---

[11] The Court has determined that the Complaint fails to sufficiently allege that Credit Suisse engaged in inequitable conduct. As a result, the Court will not consider the Committee's assertion that the Complaint need not assert specific actions on behalf of the Participating Lenders because Credit Suisse's actions can be imputed to the Participating Lenders via doctrines of actual agency and ratification.

[12] Although the Court will dismiss the equitable subordination claims for failure to adequately plead inequitable conduct, the Court notes that, to the extent the Complaint asserts claims against MAK based on its Subordinated Note holdings, the Committee does not have standing to assert such claims. The Order (the "DIP Order") (D.I. 244) authorizing the Debtors to obtain postpetition financing on a final basis provides that "the Committee shall have standing to pursue and seek to settle a Claim and Defense without further order of this Court." DIP Order ¶ 21. The DIP Order then specifically defines "Claims and Defenses" as actions related to the Prepetition Credit Facility, and does not reference the Subordinated Notes. See DIP Order ¶ 21. The Committee cites the DIP Order as the source of its standing to pursue the Complaint's claims. The DIP Order, however, did not confer standing on the Committee to pursue holders of Subordinated Notes. To the extent that the Committee asserts standing through demand futility, the Committee has failed to: (i) sufficiently allege that it made a demand on the Debtors; (ii) request standing from this Court; or (iii) particularly plead what demand efforts it took. See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 567-69 (3d Cir. 2003); Fed. R. Civ. P. 23.1. Accordingly, the Committee has not met its burden to show that it has standing to pursue MAK as a holder of Subordinated Notes.

3.    Bankruptcy Code Section 510 Does Not Allow
      Subordination of Claims to Interests

In addition, Bankruptcy Code section 510 does not permit the subordination requested by

the Committee. The *Winstar* court unequivocally found that, "§ 510(c)'s language plainly

provides that a creditor's claim can only be subordinated to the claims of other creditors, not

equity interests." *Winstar*, 55 F.3d at 414. In so finding, the court noted that the distinction in

section 510(c) between "claim" and "interest" corresponds to the distinction between creditors

and equity holders. *Id.*; *see also, Adelphia Recovery Trust v. Bank of Am., N.A.,* 390 B.R. 80, 99

(S.D.N.Y. 2008). Defendants argue that the holders of the unsecured Subordinated Notes are

creditors of Champion Inc., and that Defendants are secured creditors of Champion OpCo,

Champion Inc.'s wholly owned subsidiary. (Credit Suisse Br. 29-30). Defendants point out that

the holders of the Subordinated Notes may only assert a claim against Champion OpCo through

Champion Inc.'s equity stake. (Credit Suisse Br. 30). Therefore, argue Defendants, to the extent

that the holders of the Subordinated Notes have any rights with regard to Champion OpCo, those

rights are properly classified as equity interests. (Credit Suisse Br. 30). As a result, Defendants'

"claims" cannot be subordinated to the "interests" of the holders of the Subordinated Notes.

The Committee argues that section 510 does not require differentiation between claims

and interests where such distinctions reward inequitable conduct and where corporate structures

are not observed. (Committee Resp. 43-44). The language of section 510, however, is plain and

unqualified. The Court agrees with Defendants that interests cannot be subordinated to claims.

*Winstar*, 55 F.3d at 414. To the extent the Committee seeks to subordinate Defendants' claims

to the interests of the holders of the Subordinated Notes, the requested relief is outside the scope

of the Court's authority under Bankruptcy Code section 510. *See id.; In re Kaiser Group, Int'l,*

*Inc.*, 260 B.R. 684, 687 (Bankr. D. Del. 2001), *aff'd*, 2001 WL 34368405 (D. Del. 2001).

**B.**   **Equitable Subrogation**

Count III seeks equitable subrogation of the holders of the Subordinated Notes (the would-be subrogees) to the position of the fully-paid holders of the 2009 Notes (the would-be subrogors).   At bottom, the subrogation claim seeks to establish that the Subordinated Note holders' claims related to Champion OpCo's assets are *pari passu* with the Lending Group's claims.  Equitable subrogation allows one who has satisfied the debt of another to succeed to the position and rights of the satisfied creditor in certain circumstances.  *See Am. Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. 314, 317 (1941) (explaining equitable subrogation as follows: "one who has been compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other.").   Equitable subrogation generally requires a showing that: (i) payment was made by the subrogee to protect his or her own interest; (ii) the subrogee was not a volunteer; (iii) the subrogee was not primarily liable for the satisfied debt; (iv) the subrogee paid the entire debt; and (v) subrogation will not work injustice to the rights of others.  *See* 73 Am. Jur. 2d Subrogation §§ 5, 14; *SWE&C Liquidating Trust v. Saudi Arabian Oil Co. (In re Stone & Webster, Inc.)*, 373 B.R. 353, 363 (Bankr. D. Del. 2007).

The Complaint alleges that Champion acted as a mere conduit when redeeming the 2009 Notes with the Proceeds of the Subordinated Notes offering; therefore, the Court should view the Subordinated Notes purchasers, instead of Champion, as having directly satisfied the 2009 Notes. (Compl. ¶¶ 199-200).  The Complaint also asserts that the Subordinated Note purchasers were not "volunteers" because they were induced to contribute to the satisfaction of the 2009 Notes by the false and materially misleading Prospectuses.  (Compl. ¶ 201).   As further explained below, these allegations are insufficient to state a claim for equitable subrogation.

First, the Complaint does not allege that the Subordinated Notes purchasers made any direct payments to redeem the 2009 Notes. Instead, the Complaint states that the Proceeds of the Subordinated Notes were used *by Champion* in a number of transactions, including redemption of the 2009 Notes. (Compl. ¶¶ 99, 102-103). A fundamental element of subrogation is the payment of another's obligation by a third party. *In re Bill Heard Enter, Inc.*, 423 B.R. 771, 782 (Bankr. N.D. Ala. 2010) ("A party seeking equitable subrogation must show that it paid the debt of a third party."); *Am. Surety Co. v. Bethlehem Nat'l Bank*, 314 U.S. at 317. The Complaint fails to allege that such payment occurred here. The Committee's conduit theory is unprecedented and appears antithetical to the basic purpose of subrogation – to allow one who has paid another's debt to acquire the rights and claims attendant to the paid debt. In the absence of case law supporting such a theory or other equitable grounds for foregoing the direct payment aspect of subrogation, the Court cannot infer that subrogation is plausible.

Second, even if the conduit theory was viable, the Complaint fails to adequately allege that the purchasers of the Subordinated Notes were not volunteers. Parties may be considered "volunteers" in the subrogation context when "in making the payment, they have no interest of their own to protect, they act without any obligation, legal or moral, and they act without being requested to do so by the person liable on the original obligation." *Braunstein v. McCabe (In re McCabe Group)*, 424 B.R. 1, 14 (Bankr. D. Mass. 2010). The Complaint does not assert that the Subordinated Notes purchasers were protecting their own interests or fulfilling any personal obligations in purchasing the Subordinated Notes. *See In re McCabe Group*, 424 B.R. at 14. The Complaint also does not allege that Champion requested that the Subordinated Notes purchasers redeem the 2009 Notes. *See id.* Rather, the Complaint alleges that the purchasers are not volunteers because they were misled by the Prospectuses and because the Lending

27

Group, by the Third Amendment, required Champion to apply the Proceeds to pay down the 2009 Notes. (Compl. ¶ 201). The Court has already determined that (a) the Complaint fails to allege that the Prospectuses were materially misleading and (b) that the plain language of the Prospectuses disclosed that the Proceeds would be used to pay down the 2009 Notes. The Court has also already determined that the Complaint fails to allege that Defendants were insiders who controlled Champion. Instead, the Complaint alleges that Champion's board of directors continued to make independent decisions and manage Champion's affairs. These allegations contradict the Committee's unprecedented theory that Champion acted as a conduit and that the Subordinated Notes purchasers were not volunteers.

Although equitable subrogation is applied at the Court's discretion, a Complaint must contain more than labels and conclusions to withstand Rule 12(b)(6) scrutiny. *See Twombly*, 550 U.S. at 555. At bottom, the Complaint's equitable subrogation allegations are unsupported legal conclusions and accordingly, the Committee has failed to allege facts from which the Court could determine that equitable subrogation is plausible. The Court will dismiss Count III.[13]

---

[13] The Committee asserted Counts III, IV, V, and XIII for the first time in the amended Complaint, filed on March 22, 2010. The Committee's period to challenge Defendants' liens and claims related to the Prepetition Credit Facility expired on February 18, 2010, on which date the Committee filed the original complaint. It is not clear from the docket when the original complaint was served. It is clear, however, that the amended Complaint was filed 32-days after the original complaint and the expiration of the DIP Order Challenge period. The Committee did not seek leave of the Court to file the amended Complaint. Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading once within 21 days after (i) service of the pleading; or (ii) service of a required responsive pleading or a motion under Rule 12(b), (e), or (f). Fed. R. Civ. P. 15(a)(1). In other cases, a party may only amend its pleading with leave of the court or consent of the opposing party. Fed. R. Civ. P. 15(a)(2). The Committee's filing of the amended Complaint did not comply with Rule 15 or the deadlines set forth in the DIP Order. This procedurally-flawed amendment process provides an alternate ground to dismiss Count III. The same reasoning provides an alternative basis to dismiss Counts IV, V, and XIII.

**C.**    **Unjust Enrichment and Equitable Estoppel**

Counts IV and V assert equitable estoppel and unjust enrichment based on Defendants' allegedly inequitable conduct regarding the Subordinated Notes. These claims are a repackaging of the Committee's equitable subordination and subrogation claims and will be dismissed for similar reasons. Equitable estoppel may be invoked when one party detrimentally changes its position in reasonable reliance on the conduct of the party to be estopped. *See Key Properties Group, LLC v. City of Milford*, 995 A.2d 147, 153 (Del. Super. 2010). As discussed above, the Complaint does not adequately allege that Defendants engaged in inequitable conduct related to the Subordinated Notes. The Complaint also fails to allege sufficient reliance by the holders of the Subordinated Notes on Defendants for the doctrine of equitable estoppel to apply.

Unjust enrichment would require a showing that: i) Defendants were benefited; ii) at the expense of the Committee's constituency; and iii) circumstances exist showing that Defendants' retention of benefits is unconscionable or equity and good conscience require restitution. *See Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2010 WL 2605842 at *10 (S.D.N.Y.). The "benefits" Defendants obtained resulted from their position as the Debtors' secured creditors and the Debtors' inability to meet their contractual obligations. For the same reasons that the Court determined that the Complaint fails to allege inequitable conduct sufficient for equitable subordination, the Court also finds that the Complaint fails to adequately allege unconscionable consequences such that equity and good conscience require restitution. Accordingly, the Court will dismiss Counts IV and V.

**D.**    **Breach of Contract**

Count VI asserts that Credit Suisse breached the Credit Agreement by facilitating the MAK Assignment without Champion's consent as required under the Credit Agreement.

(Compl. ¶ 219).  The Committee alleges that this breach deprived Champion of its contract rights and was a proximate cause of the Debtors' bankruptcy filing and the sale of the Debtors' assets at a depressed price, thereby damaging Champion and its unsecured creditors.  (Compl. ¶ 219).

Under New York law, a plaintiff must adequately allege the following to survive a motion to dismiss on a breach of contract claim: (i) the formation of a valid contract; (ii) performance by the plaintiff; (iii) defendant's breach of an obligation under the contract; and (iv) damages to the plaintiff proximately caused by the breach.  *Flomenbaum v. New York Univ.*, 71 A.D.3d 80, 91 (N.Y. App. Div. 2009).[14]  The facts surrounding the MAK Assignment are discussed above in connection with the Committee's equitable subordination claim and are repeated here only to the extent necessary.

The Committee alleges that the Credit Agreement requires Credit Suisse to obtain Champion's consent prior to an assignment to a party who is not an "Eligible Assignee," unless Champion is in default under the Credit Agreement.  (Compl. ¶ 50).  The Committee also alleges that Champion did not waive its right to consent to the MAK Assignment and that Credit Suisse did not fulfill its obligation to seek Champion's consent to the MAK Assignment as required by the Credit Agreement.  (*See* Compl. ¶ 51).  The Complaint specifically alleges that Champion objected to the assignment, refused to provide its consent, and notified Credit Suisse that its actions regarding the MAK Assignment breached the Credit Agreement.  (Compl. ¶¶ 155, 161-62).  Defendants argue that the Complaint does not adequately allege that Champion objected to the MAK Assignment prior to the expiration of the contractual objection period or prior to the nullification of Champion's right to consent following its default under the Credit Agreement.  (*See* Credit Suisse Br. 32).  Defendants' arguments, however, raise defenses to the merits of

---

[14]  Section 12.9 of the Credit Agreement provides that it is governed by New York law and the parties appear to concede that New York law applies to the breach of contract claim.

Count VI. The sufficiency of Champion's objection to the MAK Assignment and the effect of Champion's post-assignment default under Credit Agreement are factual issues not properly resolved on a motion to dismiss.

The Committee asserts that the MAK Assignment was a proximate cause of the Debtors' bankruptcy filing and asset sale that allegedly damaged the Debtors and their creditors by forcing a sale of the Debtors' business at a depressed price. (Compl. ¶¶ 157, 163, 219). In addition, the Committee argues that Champion was harmed through the deprivation of its ability to exercise its bargained-for contract rights. (Compl. ¶ 155). Although causation and damages based on this theory may be difficult to prove at trial, the allegations are sufficient to surpass a motion to dismiss. The Court could infer from the facts alleged that Credit Suisse's failure to timely request Champion's consent to the MAK Assignment deprived Champion of its contractual rights and damaged Champion. In addition, the Court could infer that MAK's position as a lender under the Credit Agreement enabled it to pressure Champion into a bankruptcy sale process where its assets were sold at depressed prices, thereby damaging Champion and its unsecured creditors. Although these inferences may not be ultimately proven at trial, causation and damages are highly fact-intensive inquiries on which the Committee is entitled to discovery. Accordingly, the Court will not dismiss the Committee's breach of contract claim against Credit Suisse. Based on the foregoing, it is also clear that genuine issues of material fact exist and summary judgment on the breach of contract claim is not appropriate.

To the extent that Count VI asserts breach of contract claims against Defendants other than Credit Suisse, the Complaint fails to allege sufficient facts regarding the specific conduct of those Defendants to support a breach of contract claim based on direct liability or an agency theory. The Court will dismiss Count VI as to those parties.

E.    **Constructive Fraudulent Transfers**

Count VII alleges that Champion's transfers of certain cash, collateral, and other rights to

Defendants and related entities (the "Transfers")[15] are avoidable fraudulent transfers pursuant to

Bankruptcy Code section 544(b) and section 274 of the New York fraudulent conveyance statute

(the "Fraudulent Conveyance Act"), which states in pertinent part that:

> Every conveyance made without fair consideration when a person
> making it is engaged or is about to engage in a business transaction
> for which the property remaining in his hands after the conveyance
> is an unreasonably small capital, is fraudulent as to creditors and as
> to other persons who become creditors during the continuance of
> such business or transaction without regard to his actual intent.

N.Y. Debt. & Cred. § 274 (2010).  The Fraudulent Conveyance Act defines "conveyance" to

include "every payment of money, assignment, release, transfer, lease, mortgage or pledge of

tangible or intangible property, and also the creation of any lien or incumbrance." *Id.* at § 270.

The Fraudulent Conveyance Act further states that "fair consideration" is provided when in good

faith: (i) there is an exchange of property or obligations that are "fair equivalents;" (ii) the

conveyance satisfies an antecedent debt; or (iii) the conveyance is received to secure a present

advance or antecedent debt in an amount not disproportionately small in comparison to the

conveyed property or obligation. *See id.* at § 272.

Defendants argue that the fraudulent transfer claim fails to adequately allege a lack of fair

consideration.  (*See* Credit Suisse Br. 34).  Specifically, Defendants argue that repayment of

outstanding indebtedness is a transfer for fair consideration.  (Credit Suisse Br. 34).  The Court

---

[15]   By approximate amount, the Transfers include: (i) $86.4 million to redeem the 2009 Notes; (ii) $14.5 million used to prepay the Prepetition Credit Facility; (iii) $8 million to prepay the Term Loans under the Prepetition Credit Facility; (iv) $6.7 million to acquire SRI; (v) $4 million in underwriting commissions; (vi) a $10 million payment, a lien on additional collateral, and a $16.5 million reduction in the limit on the synthetic letter of credit facility in connection with the fourth amendment to the Credit Agreement; (vii) $400,000 in payments to restructuring advisors; (viii) releases of the Lending Group by Champion; (ix) $13 million in additional security; and (x) additional payments fees, expenses, and releases.  (Compl. ¶¶ 223-228).

agrees with Defendants that generally under the Fraudulent Conveyance Act, satisfaction of an antecedent debt is "fair consideration" for a conveyance. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (applying the Fraudulent Conveyance Act and noting that "New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors."); *Pashaian v. Eccelston Prop., Ltd.*, 88 F.3d 77, 85 (2d Cir. 1996) ("In the context of determining fair consideration under § 273, the general rule is that the satisfaction of a preexisting debt qualifies as fair consideration . . . ."); *Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 323 B.R. 838, 842 (Bankr. S.D.N.Y. 2005).

*In re Sharp Int'l*, 403 F.3d 43 (2d Cir. 2005) is factually and procedurally on-point and is helpful to this Court's application of the Fraudulent Conveyance Act. In *Sharp*, a chapter 11 trustee brought an adversary proceeding against a debtor's former lender, State Street Bank and Trust Company ("State Street"), asserting, *inter alia*, constructive fraudulent conveyances under the Fraudulent Conveyance Act. *Sharp*, 403 F.3d at 46. The trustee's claims were based on State Street's awareness that the debtor's controlling shareholders were looting the company. *Id.* at 47. Specifically, the trustee alleged that after uncovering the fraud, State Street quietly demanded and obtained Sharp's agreement to secure alternate financing to pay off State Street's loan. *Id.* The trustee alleged that Sharp's repayment of State Street's loan from the proceeds of the new debt constituted a constructive fraudulent conveyance under the Fraudulent Conveyance Act. State Street moved to dismiss for failure to state a claim, the bankruptcy court granted the motion, and the district court affirmed. *Id.* at 48-49.

The Second Circuit reviewed the trustee's claims and New York Fraudulent Conveyance Act law and affirmed. *Id.* at 54. The crux of the trustee's argument was that good faith on the

33

part of the transferee, a statutory component of fair consideration, was missing because State Street kept quiet about the debtor's fraud. *Id.* Ultimately, the court found that the trustee failed to adequately allege lack of fair consideration because the payment at issue discharged an antecedent debt to an outsider and was therefore in good faith. *Id.* at 53-56.

The Committee attempts to distinguish *Sharp* by arguing that in *Sharp* there was no suggestion that the secured lender actually participated in, induced, or facilitated the debtor's fraudulent acts or attempts to obtain financing. (Committee Resp. 67). The Committee also asserts that the *Sharp* court noted that State Street was an outsider who extracted payment quickly; whereas, Defendants are allegedly insiders who obtained payments over a long period of time. (Committee Resp. 67).[16]    The Committee also cites case law and other authorities interpreting the concept of good faith in irrelevant contexts. (*See* Committee Resp. 64 (citing Third Circuit case law interpreting Washington state case law)).

The Committee's attempts to distinguish *Sharp* are not compelling. Although the actions of the *Sharp* debtor are distinct from the Debtors' actions in this case, the allegations regarding the lenders' actions are analogous to this case. The Lending Group, like State Street, is alleged to have orchestrated the issuance of new debt to better position itself and to quietly shift risk to other creditors. The lenders' actions in both cases are not alleged to have violated applicable law or the terms of the relevant loan documents. The focus of the fair consideration discussion in *Sharp* was on State Street's good faith in accepting the allegedly fraudulent transfers.[17]  *Sharp*,

---

[16]    The Court already determined that the Complaint fails to plead sufficiently that Defendants are insiders of the Debtors.

[17]    Whether the relevant payments were for a "fair equivalent," as required by the Fraudulent Conveyance Act, was not at issue in *Sharp* because the plaintiff there acknowledged that, as payments on account of an antecedent debt, the transfers at issue were for a "fair equivalent." *Sharp*, 403 F.3d at 54. The Committee alleges in a conclusory fashion that the

403 F.3d at 54.  Likewise here, the Committee focuses on Defendants' good faith in receiving transfers from Champion.

The *Sharp* court noted that "[g]ood faith is an elusive concept under New York's constructive fraud statute" but that "bad faith does not appear to be an articulable exception to the broad principle that 'the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property.'"  *Id.* (quoting *Pashaian*, 88 F.3d at 85).  The court went on to note that only "[o]ne exception has been recognized by the New York courts to the rule that repayment of an antecedent debt constitutes fair consideration: where the transferee is an officer, director or managing shareholder of the transferor."  *Id.* (internal quotations removed).  Defendants are not alleged to have held any of these positions with Champion.  Accordingly, *Sharp* informs the Court's conclusion that the Complaint fails to allege that the Transfers in satisfaction of the Prepetition Credit Facility lacked fair consideration.[18]

Likewise, the Complaint fails to sufficiently allege that the additional collateral provided to the Lending Group in connection with amendments to the Credit Agreement lacked fair consideration.  These Transfers are security interests granted by Champion in respect of an antecedent debt and, like repayment of antecedent debt, they are necessarily fair consideration under the Fraudulent Conveyance Act.  *See In re AppliedTheory Corp.*, 323 B.R. 838, 841-844

---

Transfers here were not for a fair equivalent.  (Compl. ¶ 231).  However, as the Court will determine that the Complaint fails to allege lack of good faith, which is a necessary element of a fraudulent transfer claim under the Fraudulent Conveyance Act, the distinction is without a difference and does not provide a basis to deny the Motions.

[18] This determination applies with equal force to the Transfers related to the repayment of the 2009 Notes, which also constitute antecedent debt.  In addition, the Complaint does not allege that Defendants received any direct transfers on account of the repayment of the 2009 Notes or through Champion's acquisition of SRI.  Although these events may have ultimately bolstered the Defendants' collateral pool, that effect is a result of the rights Defendants bargained for in connection with the Credit Agreement and does not constitute a new "transfer" for fraudulent conveyance purposes.

(Bankr. S.D.N.Y. 2005) (surveying cases and finding that "the granting of a security interest in respect of an antecedent debt constitutes reasonably equivalent value or fair consideration, at least in those cases where the antecedent debt is borrowed money that was actually received.").

The Committee argues that the Transfers were not for fair consideration because the Defendants were undersecured and the "transfers did not reduce the outstanding liens." (Committee Resp. 63). This argument misses the mark. The value of collateral securing antecedent debt, and the attendant determination as to whether a lender is undersecured, is irrelevant for fraudulent transfer purposes because the rights of a secured creditor are always limited to the amount of its debt. *See AppliedTheory Corp.*, 323 B.R. at 842. Additions of collateral do not enable lenders to receive anything more than what they have loaned and the debtor's liabilities are not increased as a result of the collateralization. *Id.* It is commonly recognized that although such transfers may be preferential, the Fraudulent Conveyance Act is not concerned with preferences:

> [T]he preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy some of his creditors; it normally does not try to choose among them."

*Sharp*, 403 F.3d at 53 (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995)).

In sum, the Complaint's allegations regarding the Transfers are insufficient to state a claim under the Fraudulent Conveyance Act. The Court will therefore dismiss Count VII.[19]

---

[19]   To the extent that the Court has not specifically addressed a particular transaction included in the Transfers, the Court has considered the transactions and finds that the Complaint fails to allege specific facts regarding the transactions from which the Court could infer that they are avoidable for lack of fair consideration or that the other requirements of the Fraudulent Conveyance Act are met.

**F.      Strong Arm**

Count VIII alleges that Defendants' security interest in certain real estate granted pursuant to the fourth amendment to the Credit Facility is avoidable due to Defendants' failure to properly perfect the security interest. The Complaint identifies the affected real property as "301 North Smith Avenue, Corona California," but contains no specific allegations regarding Defendants' failure to perfect. (*See* Compl. ¶¶ 224, 240). Accordingly, the Complaint contains no facts from which the Court could infer that the security interest is not perfected and the Court will dismiss Count VIII.

**G.      Preferential Transfers**

Count IX alleges that certain transfers to Defendants within the year preceding the Petition Date are avoidable preferences pursuant to section 547(b) of the Bankruptcy Code. The Committee alleges that the look-back period should be one year rather than 90-days because Defendants are insiders of Champion. (Compl. ¶ 245). The Court has already determined that the Committee failed to allege sufficient facts from which the Court could determine that the Defendants were "insiders" of the Debtors. As a result, the applicable period for preferential transfers is limited to the 90-days preceding the Petition Date (*i.e.*, August 15, 2009 through November 15, 2009).[20] The Complaint alleges that transfers relating to the seventh amendment of the Credit Agreement (the "Seventh Amendment Transfers") and a $400,000 payment to Credit Suisse on October 5, 2009 (the "$400,000 Transfer") occurred in the 90-day prepetition period. More specifically, the Complaint alleges that:

---

[20]   In its response, the Committee inexplicably includes transfers related to the sixth amendment to the Credit Agreement in its discussion of transfers within the 90-day prepetition period. The Complaint alleges that the sixth amendment was executed on August 12, 2009, and provides no other details regarding the dates of related transfers. (*See* Compl. ¶¶ 135-144). The Court will not consider such transfers as within the 90-day period for present purposes.

(i)  On and after October 16, 2008, Champion made significant payments on its obligations under the Credit Agreement including payments of principal, interest, fees and reimbursed expenses . . . The Committee does not have complete information about the amount, source and timing of each payment, but alleges that the payments to or for the benefit of the Lending Group exceed $20,000,000.  Such payments include . . . a $400,000 payment to Credit Suisse on or about October 5, 2009.

(ii)  In connection with the Seventh Amendment, Champion transferred $13,000,000 to Credit Suisse for deposit in accounts subject to Account Control Agreements to be utilized as additional security for the Lending Group because the Seventh Amendment provided that the amount Champion was permitted to have in account [sic] not subject to Account Control Agreement [sic] was reduced from $15,000,000 to $2,000,000.  In addition, Champion paid the fees and expenses of Willkie and Loughlin and executed a release of the Lending Group and Credit Suisse.

(Compl. ¶¶ 246, 227).

Defendants argue that the Committee has failed to allege sufficient facts about the specific transfers or how the transfers allowed Defendants to be paid more than they would otherwise have been entitled to under chapter 7 of the Bankruptcy Code.  (*See* Sankaty Br. 18) (Adv. D.I. 65).  Defendants also argue that Champion's movement of funds to control accounts did not change the Lending Group's collateral base because they already had a priority security interest in the transferred amounts.  (Credit Suisse Reply Br. 19) (Adv. D.I. 215).  In addition, Defendants argue that the Complaint itself pleads that the $400,000 Transfer in October of 2009 was the arrangement fee for the Debtors' DIP financing, which is not an avoidable preference. (*See* Credit Suisse Br. 36, Compl. ¶ 37).  Defendants argue that these pleading deficiencies require dismissal of Count IX.

The Committee acknowledges that it has limited information about the transfers, but argues that it is undisputed that substantial payments were made.  (Committee Resp. 59-60).  The Committee argues that a relaxed pleading standard should be applied because the information

related to the transfers is in the sole possession of the Debtors and Defendants, from whom the Committee has not had the benefit of discovery. (Committee Resp. 59-60). The Committee also contends that it may challenge the $400,000 Transfer as preferential whether or not the payment was related to the Debtors' DIP financing, because the payment was not cleansed by the DIP Order and is alleged to have been on account of an antecedent debt. (Committee Resp. 70). The Committee posits that there is no support for the Defendants' assertion that the funds transferred to control accounts pursuant to the seventh amendment to the Credit Agreement were already the Lending Group's collateral. (Committee Resp. 70). Finally, the Committee argues that the Complaint clearly alleges that the Lending Group was undersecured at all times and the preferential transfers allowed Defendants to receive more than they would have obtained under chapter 7 of the Bankruptcy Code. (Committee Resp. 71-72).

Courts in this Circuit generally find that preferential transfer claims require particularized facts including: (i) an identification of the nature and amount of each antecedent debt; and (ii) an identification of each alleged preferential transfer including date, name of debtor/transferor, name of transferee, and amount of transfer. *OHC Liquidation Trust v. Credit Suisse First Boston (In re Oakwood Homes Corp)*, 340 B.R. 510, 522-23 (Bankr. D. Del. 2006); *Valley Media v. Borders (In re Valley Media)*, 288 B.R. 189, 192 (Bankr. D. Del. 2003). *Contra Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apartments (In re The IT Group, Inc.)*, 313 B.R. 370, 373 (Bankr. D. Del. 2004) ("while the information identified by *Valley Media* might ultimately be necessary to adjudicate the preference claims, it does not follow that it must be pleaded on pain of dismissal.").

The totality of the Complaint's specific allegations regarding the $400,000 Transfer are that "a $400,000 payment [was made] to Credit Suisse on or about October 5, 2009"; and on

"October 5, 2009[,] . . . Credit Suisse executed a fee letter for DIP financing and received a fee of $400,000 from Champion." (Compl. ¶¶ 36, 246). The Complaint generally alleges that "the transfers described in paragraphs 246-250 each occurred within one year of the Petition Date and are transfers of value to Credit Suisse and the Lending Group on account of an antecedent debt." (Compl. ¶ 251). In its response, the Committee appears to concede that the $400,000 Transfer was in connection with the Debtors' DIP financing. (*See* Comm. Resp. 70). Further, the Complaint's allegation regarding an antecedent debt related to the $400,000 Transfer is conclusory and directly in conflict with the Complaint's other factual allegations. Accordingly, the Complaint fails to sufficiently allege that the $400,000 Transfer was preferential.

The Complaint's allegations regarding the Seventh Amendment Transfers fare no better. The Complaint fails to provide specific details regarding: (i) the payment of fees and expenses of Willkie Farr & Gallagher LLP and Loughlin Meghji & Company; and (ii) Champion's release of the Lending Group. As for the movement of funds to control accounts, the plain language of the Pledge and Collateral Agreement related to the Credit Agreement, a document relied upon in the Complaint, shows that the Lending Group already had a continuing priority security interest in the Debtors' accounts. (Pledge Agreement § 2.1).[21] The Complaint's conclusory allegation that the transfers permitted Defendants to receive more than they would have been entitled to receive under chapter 7 of the Bankruptcy Code is contradicted by the documents relied upon in the Complaint. Such allegations do not provide a basis from which the Court could infer that preferential transfers occurred.

---

[21] The Pledge Agreement is attached as Exhibit 2 to the Declaration of Matthew B. Lunn in Support of Motion to Dismiss (Adv. D.I. 70).

Accordingly, the Complaint fails to sufficiently allege preferential transfers pursuant to Bankruptcy Code section 547(b), and the Court will dismiss Count IX.

## H.    Remaining Counts (Counts X, XI, XII, and XIII)

Count X of the Complaint seeks to recover any avoided transfers pursuant to Bankruptcy Code section 550(a), which states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, . . . [or] 547. . . of this title, the trustee may recover, for the benefit of the estate, the property transferred . . . from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).    As the Court has determined that the Complaint fails to state claims pursuant to sections 544 and 547 of the Bankruptcy Code, the Complaint's section 550 claim likewise fails.    As a further result of these determinations, Count XI, which relies upon the Committee's section 544, 547, 550 claims, will be dismissed.[22]

Count XII seeks disallowance of any and all claims held by Defendants based on the Complaint's allegations.    As the Court has determined that the Complaint fails to state a claim on all counts other than the breach of contract claim against Credit Suisse, the Court will dismiss

---

[22]    Count XI seeks disallowance of proofs of claim filed by Defendants pursuant to Bankruptcy Code section 502(d), which states:
> [T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 544 [or] 547 of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 of this title.

11 U.S.C. § 502(d).

Count XII as to all Defendants other than Credit Suisse.[23]   The Court will deny summary judgment in Credit Suisse's favor on Count XII for the same reasons applicable to Count VI.

Count XIII seeks turnover by Defendants of the Debtors' estate property based on the Complaint's equitable subordination, preferential transfer, and fraudulent transfer claims.  As the Court has determined that the Complaint fails to sufficiently state these underlying claims, the Court will dismiss Count XIII.[24]

## V. CONCLUSION

The Court will grant the Motions in part and deny the Motions in part as described herein.[25]  An appropriate Order follows.

By the Court,

*(signature)* KEVIN GROSS, U.S.B.J.

Dated: Sept. 1, 2010

---

[23]  By this determination, the Court does not state an opinion regarding the availability of claims disallowance as a remedy for a breach of contract claim.  In the event that the breach of contract claim goes to trial, the issue will be decided at that time.

[24]  In addition, the requested relief is not appropriate.  An action for turnover must be based on a debtor's undisputed ownership interest and title to the property at issue in the relevant claims is clearly disputed.  *Stanziale v. Pepper Hamilton, LLP (In re Student Fin. Corp.)*, 335 B.R. 539, 554 (D. Del. 2005) ("Turnover actions cannot be used to demand assets whose title is in dispute."); *Giuliano v. Fairfield Grp. Health Care Ctrs., LP (In re Lexington Healthcare Grp., Inc.)*, 363 B.R. 713, (Bankr. D. Del. 2007) ("Where there is a legitimate dispute about the ownership of property a trustee seeks to recover, turnover under section 542 is not appropriate.").

[25]  As the Court will dismiss Counts I, II, III, IV, V, VII, VIII, IX, X, XI, and XIII as to all Defendants, the Court will not consider Defendants' requests for summary judgment on these counts.  The Court will dismiss the remaining counts (VI and XII) as to all Defendants other than Credit Suisse and will not consider the non-Credit Suisse Defendants' requests for summary judgment.  The Court will deny Credit Suisse's requests for dismissal or summary judgment on Counts VI and XII.