# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| CHAMPION ENTERPRISES, INC., et al., | : | Case No. 09-14019(KG) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| _____ | : | |
| THE OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS OF | : | |
| CHAMPION ENTERPRISES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No. 10-50514(KG) |
| | : | |
| CREDIT SUISSE, individually and as agent | : | |
| and class representative for various | : | |
| participating lenders in the Debtors' | : | |
| prepetition lending facility; CREDIT SUISSE | : | |
| (USA) LLC; MAK CAPITAL FUND LP; | : | |
| & WELLS FARGO BANK, N.A., as collateral | : | |
| agent pursuant to a collateral trust | : | |
| agreement dated October 31, 2005. | : | |
| | : | |
| Defendants. | : | **Re Dkt Nos. 346 & 351** |
| _____ | : | |

**OPINION DENYING MOTIONS FOR SUMMARY JUDGMENT**

The Court has before it Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion") (D.I. 351) and Defendant Credit Suisse's Motion for Summary Judgment ("Defendant's Motion") (D.I. 346). The parties have submitted briefs ("Plaintiff's Brief" and "Defendant's Brief") and supporting exhibits, and, following oral argument on June 8, 2011, the Motions are ripe for decision. For the reasons which follow, the Court denies both Plaintiff's Motion and Defendant's Motion.

## Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core-proceeding under 28 U.S.C. § 157(b)(2).

## Factual/Procedural Background

I.   **The Prepetition Credit Facility and Credit Agreement**[1]

In October 2005, Champion Home Builders Co. ("Champion"), the principal operating company for its holding company Champion Enterprises, Inc. and subsidiaries (together, with Champion the "Debtors"), obtained a senior secured credit facility (the "Prepetition Credit Facility") from a participating group of lenders (the "Lending Group"). The Prepetition Credit Facility was memorialized in an Amended and Restated Credit Agreement, dated April 7, 2006, and was secured by substantially all of Champion's assets. (Declaration of Matthew Lunn, hereinafter "Lunn Decl."), Exs. 3 and 23 at § 2.1). By early 2007, the Debtors' business began to suffer, creating a risk that the Debtors would default under the Amended and Restated Credit Agreement. As a result, the Debtors and the Lending Group executed a

---

[1] This Opinion provides a brief summary of the parties' financial arrangements  A more extensive discussion of such arrangements is provided in the Court's Opinion on Motions to Dismiss and for Summary Judgment dated September 1, 2010. *Champion Enterprises Inc. v. Credit Suisse (In re Champion Enterprises, Inc.)*, 2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010).

2

series of amendments[2] (together, with the Amended and Restated Credit Agreement, the "Credit Agreement") to relax covenants and avoid defaults.

Pursuant to section 12.11 of the Credit Agreement, an existing lender may, with the consent of the Administrative Agent, assign all or part of its rights to an "Eligible Assignee." The Credit Agreement defined an Eligible Assignee to include existing lenders, certain other defined persons, and "any other Person approved, unless an Event of Default has occurred and is continuing, by [Champion]." (Credit Agreement § 1.1). The Credit Agreement also designated Credit Suisse as the Administrative Agent. (Credit Agreement § 10.1). As Administrative Agent, the Credit Agreement charged Credit Suisse with the responsibility of reviewing the documentation for assignments of interest in Champion's debt under the Prepetition Credit Facility. (Deposition of Philip Ibsen, hereinafter Ibsen Dep., at 8-9). The Credit Agreement further obligated Credit Suisse to notify Champion of an assignment to an entity other than an Eligible Assignee, which required Champion's consent and enabled Champion to expressly refuse consent, thereby preventing the assignment. Champion's consent was presumed given if it failed to object within 10 days after receiving such notice. (Credit Agreement § 12.11(b)).

Prior to January 30, 2009, 197 assignments of interest in Champion's debt were executed without consent. Credit Suisse's Statement of Material Facts, "SOMF", ¶ 24; Lunn

---

[2] Ultimately, the parties entered into eight amendments, the first executed on March 22, 2007, and the last on November 8, 2009, one week before Debtors filed for bankruptcy relief.

Decl. Ex. 5. On or about January 30, 2009, Credit Suisse facilitated the transfer of certain of Champion's debt obligations under the Prepetition Credit Facility from Bank of America, N.A. to MAK, which previously owned over two million shares of Champion's securities, SOMF ¶¶ 27-28.. This initial assignment consisted of $1,040,807.28 of Champion's debt under the U.S. Term Loan, and $1 million in synthetic deposits under the Credit Agreement. On January 30, 2009, Credit Suisse facilitated the transfer from Bank America, N.A. to MAK of certain of Champion's debt obligations under the Credit Agreement. SOMF ¶ 28.

On February 2, 2009, three days following the execution of the MAK Assignment, Karl Jablinskey of Credit Suisse sent an email to Phyllis Knight, Champion's CFO, attaching "a variance analysis overview document and a detailed variance analysis spreadsheet that compares the holdings of Lenders as to February 2, 2009 to December 16, 2008." (Lunn Decl. Ex. 6). The MAK Assignment was reflected on the spreadsheet through the inclusion of MAK in a list of new loan holders.

Further assignments to MAK followed on April 17, 2009, and May 14, 2009 (together, with the January 30, 2009 assignment, the "MAK Assignments"). Around this same time, the Debtors' financial condition continued to decline. (Lunn Decl. Ex. 11). In June 2009, Champion failed to comply with the minimum liquidity and certain other covenants and went into default under the terms of the Credit Agreement.(Lunn Decl. Ex. 4 at 165). Following an unsuccessful attempt to amend the Credit Agreement, Champion began to attempt to sell some of its operating assets. (Lunn Decl. Ex. 2). MAK sent a letter to Champion requesting

4

that Champion explore alternative strategies, rather than sell its assets. (Lunn Decl. Ex. 13). Champion questioned the validity of the MAK Assignments.(Lunn Decl. Ex. 17). Champion denies providing consent to any of the MAK assignments. On June 20, 2009, Champion informed Credit Suisse that it breached the Credit Agreement.

On November 15, 2009, the Debtors filed petitions for relief under chapter 11 of title 11. As of the Petition Date, approximately $147,000,000 remained outstanding on the Prepetition Credit Facility. (*See* Aff. of P. Knight in Support of First Day Motions, ¶ 28)(D.I. 3). As of October 13, 2009, MAK had acquired over $34 million of Champion secured debt under the Credit Agreement, which represented 18.7% of Champion's total debt obligation to the Lending Group and MAK also owned $28,500,000 (15.8%) of the Subordinated Notes. On March 2, 2010, after receiving approval from the Court, Champion sold substantially all of its assets.

## II. The Adversary Proceeding

On February 18, 2010, the Official Committee of Unsecured Creditors of Champion Enterprises, Inc. (the "Committee")[3] commenced this adversary proceeding by filing a

---

[3] The Committee consists of Redman Homes, Inc.; Champion Enterprises, Inc.; Champion Home Builders Co.; New Era Building Systems, Inc.; North American Housing Corp.; Homes of Merit, Inc.; Western Homes Corp.; Start Fleet, Inc.; Champion Enterprises Management Co.; Highland Manufacturing Company LLC; SSH Liquidating Corp.; Champion Homes of Boaz, Inc.; Iseman Corp.; MHCDC, LLC; HomePride Finance Corp.; and Champion Development Corp.

complaint asserting 13 counts against multiple lenders[4] (the "Defendants") and Wells Fargo, as collateral agent under the Prepetition Credit Agreement to recover damages allegedly arising out of several financing transactions. The Defendants moved to dismiss the complaint under Rule 12(b)(6) and certain of the Defendants alternatively requested partial summary judgment.

### III. The Motions to Dismiss

The Court held oral argument on the Motions to Dismiss on July 14, 2010, and issued its Opinion and Order on September 1, 2010 granting in part, and denying in part, the motions to dismiss. *Champion Enterprises*, 2010 WL 3522132 at *19. The Court dismissed all of the claims against all defendants <u>except</u> Count VI (alleging breach of contract,) and Count XII (seeking the disallowance of claims and related relief based on the alleged breach of contract) against the sole remaining defendant, Credit Suisse.

The Committee alleges in Count VI the breach of contract claim, that Credit Suisse "improperly transferred obligations of Champion under the Credit Agreement to MAK without obtaining Champion's consent as required by the Credit Agreement." (Amended Compl. ¶¶ 12 and 219). The Committee requests in Count XII that the Court disallow any and all claims held by Credit Suisse, because Credit Suisse breached the Credit Agreement.

---

[4] Defendants included Credit Suisse, Cayman Islands Branch ("Credit Suisse"), individually as a lender and as the Administrative Agent Under the Prepetition Credit Agreement; (Credit Suisse (USA) LLC ("CS USA"); MAK Capital Fund, L.P. ("MAK"), an investment fund; approximately 100 other lenders that participated in the Prepetition Credit Agreement on or after July 1, 2007.

6

**IV.    The Motions for Summary Judgment**

Credit Suisse seeks summary judgment of the breach of contract claims. The Committee seeks summary judgment on the breach of contract claim, and requests further hearing for the determination of damages. The Court held oral argument on the Motions on June 8, 2011.

**Standard of Review**

**I.    Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56(a), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is genuine "when reasonable minds could disagree on the result" *Delta Mills, Inc. v. GMAC Comm. Fin., Inc. (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009). The moving party bears the burden of demonstrating an entitlement to summary judgment. *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp.2d 132, 141 (E.D.N.Y. 2009).

Summary judgment serves to "isolate and dispose of factually unsupported claims or defenses" and avoid unnecessary trial where the facts are settled. *Delta Mills*, 404 B.R. at 104 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Thus, at the summary judgment

stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Pearson v. Component Tech. Corp.*, 247 F.3d 471 (3d Cir. 2001) (citing *Celotex*, 477 U.S. at 317); *see also* Fed. R. Civ. P. 56(c). In making this determination, the court must view all facts in the light most favorable to the non-movant and must draw all reasonable inferences from the underlying facts in favor of the non-movant. *McAnaney*, 665 F. Supp.2d at 141; *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). Any doubt must also be construed in the non-moving party's favor. *Delta Mills*, 404 B.R. at 105.

Once the moving party provides sufficient evidence, the burden shifts to the non-moving party to rebut the evidence. *Delta Mills*, 404 B.R. at 105. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *McAnaney*, 665 F. Supp.2d at 141 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)). "[T]he mere existence of some alleged factual dispute between the parties" cannot defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 247-48. The dispute must relate to a genuine issue of material fact. *Delta Mills*, 404 B.R. at 105. Thus, a non-moving party cannot defeat a summary judgment motion based on conclusory allegations and denials, but instead must provide supportive arguments or facts that show the necessity of a trial. *McAnaney*, 665 F. Supp.2d at 141.

Summary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## II. Breach of Contract Standard Under New York Law

The parties cross-moved for summary judgment on the breach of contract claim based on a contract governed by New York law. Under New York law, proof of a breach of contract claim requires a showing of "(1) a contract (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *McAnaney*, 665 F. Supp.2d at 172 (quoting *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994)); *Delta Mills*, 404 B.R. at 105.

A court's interpretation of a contract should be practical and give fair meaning to the language of the contract so that the parties' expectations may be realized. *Delta Mills*, 404 B.R. at 106. Although summary judgment is appropriate where the contract language is unambiguous, the grant of summary judgment for ambiguous contract language requires that "extrinsic evidence supports a single interpretation [of the contract] ... almost as if the language had been unambiguous in the first place." *Delta Mills*, 404 B.R. at 106 (quoting *Faulkner v. Nat'l Geographic Soc'y*, 452 F.Supp.2d 369, 375 (S.D.N.Y. 2006)). Such evidence must be "so one-sided that it does not create a genuine issue of material fact." *Delta Mills*, 404 B.R. at 108 (quoting *Faulkner*, 452 F.Supp.2d at 377). Although the meaning of

a contract is generally a question of law, where the contract language is ambiguous and its interpretation relies on "extrinsic evidence of the parties' intent, then the issue become one for the trier of fact and not one to be determined in the context of a pretrial motion." *MPEG LA, LLC v. Audiovox Electronics Corp.*, — N.Y.S.2d — , 2011 WL 3169208 *12 (N.Y.Sup. July 27, 2011).

Extrinsic evidence may establish a course of dealing which "may be used to interpret or supplement an agreement, or may supply an omitted term." *Delta Mills*, 404 B.R. at 110. However, the course of dealing analysis requires common knowledge and understanding between the parties which "is especially critical where a party is deemed to have ratified terms by failing to object." *Delta Mills*, 404 B.R. at 110. "An inference of the parties' common knowledge that is based upon a prior course of dealings is [a] question of fact." *Delta Mills*, 404 B.R. at 110 (quoting *New Moon Shipping Co. v. MAN B&W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997)).

## Discussion

The Committee moves for summary judgment arguing that Credit Suisse breached its obligation to provide notice and seek consent for the MAK Transfers. Credit Suisse's motion for summary judgment argues that Champion waived the consent requirement through the parties' course of dealing; Champion consented to the MAK Assignments in February 2009; Champion's default under the Credit Agreement extinguished its right to consent; and the Committee cannot prove damages and causation.

Thus, in deciding the Motions, the Court must consider the existence of any general disputes of material fact as to: (1) whether Credit Suisse provided the required notice to Champion; (2) whether Champion consented to the transfer or waived its right to consent to the transfer through prior course of dealing; (3) the effect of Champion's alleged default in July 2009 on the notice and consent requirements; (4) whether Champion waived its claims against Credit Suisse based on the Credit Agreement's sixth amendment and (5) Champion's entitlement to damages.

## I. Notice Issue

The Committee alleges that Credit Suisse breached the Credit Agreement by not providing Champion with the required notice of the MAK Assignment. Credit Suisse counters that it did provide notice of the MAK Assignment as required by the Credit Agreement by attaching the spreadsheet of assignments to the email sent on February 2, 2009.

The Credit Agreement fails to define the notice requirement and provides no guidelines regarding the proper timing, form of notice, or form of consent. Because the Credit Agreement is not explicit on when notice must be given and in what form, deciding the breach of contract claim requires an evaluation of the clear meaning of notice and the intent of the parties in creating the notice provision.

The Court need not evaluate the meaning and intent of the Credit Agreement's notice provision at the summary judgment stage. As both parties have raised legitimate arguments as to the proper timing and form of notice under the Credit Agreement, it is clear that genuine issues of material fact exist. Accordingly, the parties must establish the adequacy or inadequacy of the notice Credit Suisse provided at trial. Therefore, summary judgment is denied as to the notice issue.

**II. Consent Issue**

A. <u>Deemed Consent</u>

Credit Suisse argues that Champion consented to the assignment because Credit Suisse provided notice and Champion's failure to object within ten days of the notice constituted consent. Credit Suisse submitted a series of emails between one of its employee's and Champion's CFO, claiming they indicate an awareness of the MAK Transfers. The Committee argues that because the spreadsheet is not proper notice, the ten-day notice period was not triggered and it cannot be deemed to have given consent to the MAK Transfers.

The issue of deemed consent turns on whether Credit Suisse gave proper notice of the transfers. As explained above, the issue of proper notice is disputed and cannot be resolved at the summary judgment stage. Furthermore, the extent of seemingly contradictory evidence, the ambiguity of some of the communications and, most importantly, the need to assess the credibility of the parties involved forces the issue of consent to trial. Accordingly, the issue of whether Champion is deemed to have given consent is a disputed issue of material fact

that the Court cannot decide at the summary judgment stage.

      B.      <u>Waiver of Consent Through Course of Dealing</u>

Credit Suisse argues that the parties' course of dealing, specifically, Champion's failure to object to past assignments, modified the Credit Agreement by waiving Champion's right to object to certain assignments. The Committee argues that Champion never waived its contractual right to withhold consent of a transfer because section 12.1 of the Credit Agreement requires that any "amendment , modification or waiver is in writing and consented to by the Borrower and the Required Lenders."

The extrinsic evidence does not clearly show that Champion waived its right to consent through the parties' course of dealing. The record before the Court fails to demonstrate a mutual understanding between the parties. Accordingly, there is a genuine dispute over this material fact and summary judgment is not appropriate.

## III.    Effect of Champion's Alleged Default

Credit Suisse argues that, in the alternative, if the MAK Assignment in January 2009 was ineffective because Credit Suisse did not provide Champion with the required notice, then an Event of Default by Champion in July 2009 retroactively nullified the consent requirement and renders the MAK Assignment effective without the required notice and consent. Credit Suisse provided no legal support for this novel proposition and the Court does not accept the argument that an assignment which was invalid at its inception was revived retroactively by virtue of the default.

## IV. Waiver of Claims Through the Sixth Amendment to the Credit Agreement

Champion, the Lending Group, and Credit Suisse entered into "The Sixth Amendment and Waiver to Amended and Restated Credit Agreement" ("Amendment No. 6") on August 12, 2009, which provides, in part, that:

> [Champion] knowingly releases, waives and forever discharges (and further agrees not to allege, claim or pursue . . . all other claims, rights, causes of action, counterclaims or defenses of any kind whatsoever, in contract or in tort, in law or in equity . . . which [Champion] . . . may have against any Lender Party [including Credit Suisse] on account of any conduct, condition, act, omission, event, contract, liability, obligation . . . or matter of any kind whatsoever which existed, arose or occurred at any time prior to the Sixth Amendment Effective Date. . . .
>
> [Champion] further understand[s] and agree[s] that . . . the Administrative Agent [i.e., Credit Suisse] . . . shall [not] at any time . . . be liable or responsible for any special, consequential, punitive, incidental, exemplary or other similar damages or claims arising in any way out of the Loan Documents, the transactions contemplated thereby or any action taken or not taken in connection therewith.

In its Amended Complaint, the Committee discusses this release provision through the dealings between the parties, stating "the Sixth Amendment contained a release of claims. Champion resisted but was compelled to include the release by Credit Suisse and the Lending Group." (Amended Complaint at ¶ 140).

Credit Suisse moved to dismiss the Amended Complaint, but did not raise the Release Provision as an affirmative defense. Similarly, Credit Suisse also failed to raise the Sixth Amendment's release provision as a ground for summary judgment. Credit Suisse first raised the argument regarding the release provision in its Response to the Plaintiff's Motion.

14

Credit Suisse argues that Champion waived any claims against Credit Suisse through the Credit Agreement's release provision. The Committee responds with a procedural objection, asserting that waiver through the release provision is an affirmative defense to the breach of contract claim. Therefore, Credit Suisse waived the defense by not raising it sooner. The Committee contends that Credit Suisse's waiver argument is untimely and prejudicial to the Committee because it has not had the opportunity to develop an argument and take discovery related to economic duress.

Credit Suisse argues that it did not waive its right to plead the Release Provision, and points out that it was the Committee that first raised the issue of waiver. Credit Suisse further counters that the waiver provision of the Amendment No. 6 is not a surprise defense, because the Committee itself discussed it in its Amended Complaint. Notably, the release provision was referenced in the Amended Complaint as a fact, not as a legal argument.

The Committee's procedural objection and allegation that Champion was compelled by economic duress to include the release of claims in Amendment No. 6 raise triable issues of fact that the Court will not decide on summary judgment. Such issues must remain for trial. The Court will permit the Committee the opportunity to show on a full record at trial that it agreed to the release out of desperation to avoid a "free fall" bankruptcy.

## V. Causation & Damages

Credit Suisse argues that it should be awarded summary judgment on Champion's claim because the Committee can show neither breach nor damages resulting from a breach. The Committee argues that damages must be determined at trial. The Committee alleges that this breach deprived Champion of its contractual rights and was a proximate cause of the Debtors' bankruptcy filing and the sale of the Debtors' assets at a depressed price, thereby damaging Champion and its unsecured creditors.

In its opinion on the Motions to Dismiss, the Court outlined certain inferences that it could reasonably draw from the facts:

> The Committee asserts that the MAK Assignment was a proximate cause of the Debtors' bankruptcy filing and asset sale that allegedly damaged the Debtors and their creditors by forcing a sale of the Debtors' business at a depressed price. (Compl. ¶¶ 157, 163, 219). In addition, the Committee argues that Champion was harmed through the deprivation of its ability to exercise its bargained-for contract rights. (Compl. ¶ 155). Although causation and damages based on this theory may be difficult to prove at trial, the allegations are sufficient to surpass a motion to dismiss. The Court could infer from the facts alleged that Credit Suisse's failure to timely request Champion's consent to the MAK Assignment deprived Champion of its contractual rights and damaged Champion. In addition, the Court could infer that MAK's position as a lender under the Credit Agreement enabled it to pressure Champion into a bankruptcy sale process where its assets were sold at depressed prices, thereby damaging Champion and its unsecured creditors. Although these inferences may not be ultimately proven at trial, causation and damages are highly fact-intensive inquiries on which the Committee is entitled to discovery. Accordingly, the Court will not dismiss the Committee's breach of contract claim against Credit Suisse.

*Champion Ent.,* 2010 WL 3522132 at *17

16

The Court's position has not changed. Despite having additional evidence before it, the Court determines that sufficient disputed facts relating to causation and damages exist to preclude summary judgment.

**<u>Conclusion</u>**

For the reasons set forth above, the Court denies Defendant's and Plaintiff's Motion. An appropriate order follows. In addition, the Court directs the parties to discuss, prepare and submit a proposed Scheduling Order for trial in February 2012.

Dated: September 27, 2011

KEVIN GROSS, U.S.B.J.