## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| CHAMPION ENTERPRISES, INC., <u>et al.</u>, | : | |
| | : | Case No. 09-14019 (KG) |
| Debtors., | : | |
| | : | Jointly Administered |
| | : | |
| | : | |
| ------------------------------------------------------- x | | |
| THE OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS OF | : | |
| CHAMPION ENTERPRISES, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. No. 10-50514 (KG) |
| | : | |
| CREDIT SUISSE, INDIVIDUALLY AND | : | |
| AS AGENT AND CLASS | : | |
| REPRESENTATIVE FOR VARIOUS | : | |
| PARTICIPATING LENDERS IN THE | : | |
| DEBTORS' PREPETITION LENDING | : | |
| FACILITY; CREDIT SUISSE (USA) LLC; | : | |
| THE LENDERS LISTED IN EXHIBIT A; | : | |
| MAK CAPITAL FUND LP; and WELLS | : | |
| FARGO BANK, N.A., as collateral agent | : | |
| pursuant to a collateral trust agreement dated | : | |
| October 31, 2005, | : | |
| | : | |
| Defendants. | | |
| | | **Re: Dkt Nos. 436 & 447** |
| ------------------------------------------------------- x | | |

## <u>OPINION</u>

## COUNSEL

**PINCKNEY, HARRIS**
**& WEIDINGER, LLC**
Donna L. Harris
1220 North Market Street, Suite 950
Wilmington, Delaware 19801

**MILBERG LLP**
Jonathan M. Landers
Jerome M. Congress
Anna C. Dover
Henry J. Kelston
One Pennsylvania Plaza
New York, New York 10119

*Counsel for the Official Committee of Unsecured Creditors*

**YOUNG CONAWAY STARGATT**
**& TAYLOR, LLP**
Robert S. Brady
Matthew B. Lunn
Margaret Whiteman Greecher
Rodney Square
1000 King Street
Wilmington, DE 19801

**WILKIE FARR & GALLAGHER**
**LLP**
Joseph T. Baio
Stephen B. Vogel
Teri Seigal
787 Seventh Avenue
New York, NY 10019-6009

*Counsel to CSAG*

## INTRODUCTION[1]

The Court is issuing its Opinion following a brief trial with a voluminous record of documents and deposition designations. The adversary proceeding arises from the multi-debtor Chapter 11 bankruptcy cases of Champion Enterprises, Inc., Champion Home Builders Co., Inc., (together, "Champion") and affiliated entities. The plaintiff in the adversary proceedings is the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee").[2] The Committee claims that defendant Credit Suisse AG, Cayman Islands Branch ("CSAG")[3] breached provisions of the Credit Agreement between and among Champion, its Lenders and CSAG as Administrative Agent. The alleged breaches consisted of assignments of Champion's senior debt to MAK Capital Fund LP ("MAK"). The Committee further alleges that CSAG also breached its duty of good faith and fair dealing. The Committee seeks damages and the disallowance of any claims by CSAG.

CSAG disputes the Committee's claims, contending it did not breach the Credit Agreement, the Committee is estopped from asserting claims because of the conduct Champion, that Champion released its claims and, in any event the Committee is unable to prove the alleged breaches caused any damage.

---

[1] This Opinion constitutes the findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052.

[2] Pursuant to the confirmed Second Amended Joint Plan of Liquidation, a Creditor Trust was created and the Court granted the Creditor Trustee standing to prosecute this adversary proceeding.

[3] The Court previously dismissed the claims against all other defendants by Order, dated September 1, 2010 (D.I. 259).

## JURISDICTION

The parties are in agreement, and the Court agrees, that the Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## FINDINGS OF FACT

### CSAG'S BREACH

### The Lending Group Provides Financing For Champion.

1.      In 2005, a syndicated loan for Champion Home Builders Co. was established pursuant to a Credit Agreement, dated as of October 31, 2005, and a group of initial Lenders provided the funds sought by Champion.  (Trial Ex. 1001 at 1.)  CSAG served as the Administrative Agent under the Credit Agreement.  (*Id.*)  Champion's obligations to the Lenders were secured by first priority liens on substantially all of Champion's assets pursuant to a Pledge and Security Agreement, and by first priority liens on various real estate assets.  (Trial Ex. 3208 at § 2.1.)

2.      On April 7, 2006, the parties executed an Amended and Restated Credit Agreement (as amended, supplemented, or otherwise modified, the "Credit Agreement" or "Agreement.").  (Trial Ex. 1001 at 1.)  Ultimately, Champion was indebted to the Lenders under the Credit Agreement for an amount exceeding $187 million (the "Champion Loans" or "Loans").  (Statement of Undisputed Facts No. 400.)

2

3.       Section 12.11 of the Credit Agreement governs the sale and transfer of Champion Loans.  The Agreement provides that "[e]ach Lender may assign, or sell participations in, its Loans, Letters of Credit and Commitments to one or more other Persons," under specified terms and conditions.  (Trial Ex. 1001 at § 12.11.)

4.       There were two ways that a registered owner of Champion Loans (a Lender) could dispose of its interests:  (1) assign 100% of its interests in the Loans to an Eligible Assignee; or (2) "sell participations…in all or a portion of such Lender's rights and/or obligations under" the Credit Agreement to a "Participant."  (*Id.* at § 12.11(a), (b), (d).)

5.       Assignments of all rights and obligations under the Credit Agreement were permitted to "Eligible Assignees."   An Eligible Assignee was, "in the case of an assignment of a Term Loan or Synthetic Deposit, (I) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund or (iv) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed)."  (*Id.* at 12.)

6.       The Credit Agreement gave Champion the right to withhold consent to an assignment if it had a reasonable basis for doing so.  (*Id.*; Trial Tr., February 14, 2012 ("Feb. 14 Tr."), 157:25-158:10.)

7.     Section 12.11(b) provided Champion ten days after Champion received notice of the assignment or "Eligible Assignee," to reject the assignment after which point Champion's consent was "deemed" given:

> If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder . . . the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day.

(*Id.* at § 12.11(b).)

8.     As an alternative to an assignment, a Lender had the unfettered right to sell "participations" in Champion Loans to anyone.  (*Id.* at § 12.11(d) ("Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a 'Participant') in all or a portion of such Lender's rights and/or obligations under this Agreement.").)

9.     In the sale of a participation, unlike an assignment, the selling Lender retained "the sole right to enforce [the] Agreement and to approve any amendment, modification or waiver of any provision of [the] Agreement."  (*Id.*)

10.     Participants were permitted to agree with the selling Lender that the Lender would not agree to certain amendments, modifications, or waivers "without the consent of the Participant."  (*Id.*)  Thus, although only Lenders could formally vote on any modification or waiver to the Credit Agreement, Participants were able to protect their interests by determining how the Lender would vote.

4

11.     If notice and consent for an attempted assignment of a Lender's full interest to "any other Person" were not properly provided pursuant to § 12.11(b), the result was not a breach of the contract; rather, the assignment became the transfer of a Participation pursuant to § 12.11(d).  (*Id.* at § 12.11(b) ("any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with [§ 12.11(a) and (b)] shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d)").)

12.     Chief Financial Officer Phyllis Knight ("Knight") was the officer at Champion responsible for managing and overseeing the Credit Agreement.  (Feb. 14 Tr., 36:4-37:11.)

13.     From the time that the credit facility was established in 2005, CSAG regularly provided notice to Champion about changes in the holders of Champion's senior secured debt via Lenders' lists and variance lists.  (*Id.* at 146:21-147:7, 148:2-148:18.) Champion never complained about the parties' process of notice.  (*Id.* at 147:8-147:9.) Knight testified that "[t]here had never been any disagreement about that process."  (*Id.* at 58:9-59:9.)  Champion never objected to any entity becoming a Lender prior to February 2009.  (*Id.* at 155:9-155:11.)

## The Relevant Provisions of the Credit Agreement

14.    The Credit Agreement provides that any entity that is already a lender under the Credit Agreement (a "Lender") may, with the consent of CSAG, Administrative Agent, "assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement ..." Ex. 1001, §12.11(a) at CS12389-90.

15.    The Credit Agreement defines "Eligible Assignee" to mean:

> (a)    in the case of an assignment of a Term Loan or Synthetic Deposit, (I) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund or (iv) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed), and

> (b)    in the case of any assignment of the Revolving Loan Commitment, (I) a Revolving Loan Lender or, (ii) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed);

Ex. 1001 at CS12278.

16.    CSAG was the Administrative Agent.  CSAG would review the proposed documentation for assignments of interests in Champion bank debt, work with parties on both sides of the proposed transaction, provide its required consent to the assignment, and finalize the transaction.  Deposition of Philip Ibsen ("Ibsen Dep.") 8:8-9:3, 11:4-13:4; Ex. 1001 at §12.11(a), (b) and (c) (CS12389-91).

6

17.     Section 12.11(b) of the Credit Agreement states in relevant part "if the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder…the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent [*i.e.*, Credit Suisse] or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day."  Ex. 1001 at CS12391.

18.     The standard form of assignment agreement used by Champion and CSAG included a signature line for Champion. *See*, *e.g.*, Ex. 2239 at CS32399 (footnote to the signature line for Champion states:  "Consent of the Borrower is required for assignments unless an Event of Default (as defined in the Credit Agreement) has occurred and is continuing"); Ibsen Dep. 6:21-7:21.  If consent was not required, CSAG would typically inform the assignor to place "N/A" on Champion's signature line.  Ex. 2006 at CS29700-01; Ibsen Dep. 12:6-13:4.

19.     If Champion denied consent to the assignment, the assignment would convert to another form of ownership, typically a participation, if the proposed assignee was willing to accept a participation rather than an assignment.  Exs. 1001 at CS12391; 2029.  A participant would have economic ownership of the secured debt but would not have the voting rights that a Lender would have.  Trial Transcript ("Tr.") 2/14, 62:6-63:15.

7

## Assignments to MAK

20.      On or about January 26, 2009, CSAG received a proposed assignment of Champion bank debt from Bank of America to MAK (the "January 30 assignment").  Ex. 2005; Ibsen Dep. 11:4-8.

21.      No event of default had occurred and was continuing at that time (Ibsen Dep. 14:19-23) and the parties are in agreement that MAK was neither a Lender, an affiliate of a Lender, or an "Approved Fund" under the Credit Agreement.  Champion's consent was neither sought nor obtained by CSAG at that time. Ibsen Dep. 12:6-13:4; Tr. 2/14 37:22-38:24.

22.      Rather, CSAG informed Bank of America that Champion's consent was not required and the assignment was closed effective January 30, 2009.  Ex. 2005 at CS29700-01; Ex. 2006 at CS29700.

23.      On February 2, 2009, Knight, received a variance analysis from CSAG that listed MAK as a new holder of a very small percentage (approximately 1.1%) of the Champion senior secured debt.  Ex. 2007; Trial Tr. 2/14, 37:22-38:15.  CSAG did not request Champion's consent at this time and it did not occur to Knight that there might be some right to consent that had not been requested.  Tr. 2/14, 38:16-39:9.

24.      At the time Knight learned that MAK had become a Lender, MAK had been a significant equity holder of Champion for several years.   Tr. 2/14, 39:10-13.  Periodically MAK's representatives would contact Champion to obtain information about

the Company but, as of February 2009, Knight did not know what MAK's purpose was in buying Champion's senior secured debt.  Tr. 2/14, 39:14-24.

25.     CSAG processed a number of other assignments of Champion debt to MAK during March and April of 2009 without seeking or obtaining Champion's consent.  *See* Amended Proposed Pretrial Order, Statement of Facts which are Admitted and Require No Proof ("SOF") Nos. 32, 35, 39, 42; Tr. 2/14, 39:25-41:9.

26.     At the time these assignments were made to MAK, Knight continued to have no knowledge with respect to any plans or strategies that MAK might have with respect to its purchases of Champion debt.  Tr. 2/14, 40:24-41:3.  There is no evidence that anyone at Champion management began to focus on what MAK's strategy might be with respect to Champion until the end of April or early May, 2009.

27.     In its March 20, 2009 letter to shareholders, Champion announced its intention to sell certain of its operating assets to reduce its leverage.  *See* Ex. 2031 at CS03117.

28.     On April 17, 2009, MAK wrote to Champion's CEO, William Griffiths ("Griffiths), expressing concern about the asset sales strategy Champion had announced. Ex. 2011; Tr. 2/14, 41:23-43:2.  However, there is no evidence that Champion understood from this letter that MAK had the intent or the ability to actively challenge Champion's business plan.  Griffiths testified that on receiving the letter he was not concerned because historically MAK was not a company that had made anything difficult for Champion. Deposition of William Griffiths ("Griffiths Dep.") 13:21-17:4.

9

29.    On April 27, 2009, Champion received an updated Lender list from CSAG showing that MAK's ownership interest in Champion's senior secured debt had increased dramatically from the $2.4 million it owned in early February to approximately $17.9 million.    This represented approximately 9.9 percent of all the senior secured debt holdings.  Ex. 1010; Tr. 2/14, 43:5-21.

30.    Upon receiving that information about MAK's increased holdings, Knight became concerned as to what MAK's strategy might be with respect to Champion. Knight testified to a "growing concern" that MAK's dissatisfaction with Champion's asset sale strategy and the increase in MAK's holding of Champion's bank debt could eventually result in MAK's blocking Champion's planned asset sale  Tr. 2/14, 44:1-9; Ex. 3025.

31.    On May 8, 2009, MAK's counsel sent Champion a letter containing a more aggressive tone.  On behalf of MAK, the letter stated that Champion required "immediate and comprehensive restructuring" and that "it is critical that a restructuring of the company not be premised on distressed sales of significant assets."    Champion management then understood that MAK was pressing aggressively for a restructuring and opposing Champion's asset sale strategy.  Ex. 2015; Tr. 2/14, 45:13-46:25.

10

32.     Shortly thereafter, Champion management began focusing on the fact that CSAG had never sought Champion's consent with respect to the MAK assignments.  On May 11, 2009, Knight asked Tobias Jordan ("Jordan"), CSAG's relationship manager for the Champion credit facility, to:

> [P]lease tell me when MAK has picked up the pieces they hold…and why the company wasn't asked to sign the required borrower consent with respect to these trades.

Ex. 2017 at CS03369.  Knight had realized that consent had been required with respect to the MAK assignments.  Tr. 2/14, 47:7-48:8.

33.     In response to Knight's May 11, 2009 email, Phillip Ibsen ("Ibsen"), the CSAG operations analyst who oversaw, approved, and finalized the MAK assignments (Ibsen Dep. at 8:8-9:3, 11:4-13:4), was asked by his superiors to review the definition of "Eligible Assignee" in the Credit Agreement and to determine whether "this assignment sale was approved by the borrower or if the assignee qualified under one of the other sections of the "Eligible Assignee" definition."   Ex. 2017 at CS03368-69; Ibsen Dep. 16:10-18:19.

34.     After reviewing the definition of "Eligible Assignee" and, among other things, determining that MAK was not an affiliate of an existing Lender, Ibsen concluded that Champion's consent had been required for the MAK assignments.  Ibsen Dep. 18:20-23:20.  As a result, on May 12, 2009, Ibsen forwarded the January 30, 2009 Assignment Agreement between Bank of America and MAK to Champion's Treasurer, Kevin Goethals, together with an email in which he stated:

11

> This particular assignment would have been required to gain
> consent before closing but as previously mentioned there was
> an oversight on the wording per the [Credit Agreement].

Ex. 2023; Ibsen Dep. 24:3-25:18.

35.    Knight responded the very same day (May 12, 2009) in an email that expressly refused to consent.  Although the email did not contain the words "refuse to consent" Knight asserted in the email that it was unreasonable for CSAG to ask Champion in May to approve an assignment dated January 30, expressed concern as to whether the assignor was actually a Lender, and questioned whether the amount of Champion senior secured debt claimed by MAK or reported by CSAG could be correct because there was no prior request for consent.  Both Knight and Ibsen testified that, at a minimum, Knight had refused to consent based on the information made available to her at that time.  Tr. 2/14, 48:12-50:15; Ibsen Dep. at 26:4-28:15.

36.    In subsequent correspondence with CSAG, Knight stated that she had expressly refused consent on May 12, 2009 and continued to refuse consent thereafter. For example, she stated that "immediately (and unequivocally) upon notice, I informed Mr. Jordan that we were not prepared to consent to the assignment."  Ex. 2022 at CHAMPION0000904; Tr. 2/14, 55:11-57:9, 57:19-58:8.  *See also*, *e.g.*, Ex. 2031 at CS03117 and Tr. 2/14, 50:16-52:4, in which Knight again repeated her statement that she had promptly refused consent.

37.    Champion refused consent within 10 days of receiving notice from CSAG of its right to consent to the MAK assignments that occurred during the first two quarters of 2009.

38.    Ibsen reported Knight's response to others at CSAG, including Jordan, in emails that again repeated Ibsen's understanding that both the original and the subsequent assignments to MAK required consent from Champion.  Ex. 2023 at CS03317-18; Ibsen Dep. at 29:23-30:6.  Given Champion's refusal to consent, beginning May 14, 2009, additional assignments to MAK that CSAG received were put "on hold."  Ex. 2023 at CS03316.

39.    On May 27, 2009, Knight sent an email to Jordan and William O'Daly of CSAG with reasons why Champion had refused and was continuing to refuse to consent to the MAK assignments.  Ex. 2031.  In addition to referencing CSAG's May 12th request for Champion's consent to the initial MAK assignments and Champion's subsequent refusal, in this communication Knight placed CSAG on notice that MAK had begun aggressively opposing Champion's strategy of selling certain of its operating assets in order to reduce its leverage.  In addition, Knight informed CSAG that Champion was opposed to the in-court restructuring that MAK was recommending, and that Champion's management was concerned that if MAK held a substantial portion of Champion debt, it might be able to block the more than 50% vote that Champion would need from the Lenders in order to carry out its strategy for reducing its leverage.  Tr. 2/14, 52:5-55:10.

13

40.     Subsequently, Jordan, the most senior member of the CSAG team dealing with Champion, orally confirmed to Knight CSAG's agreement that Champion's consent was required for the January 30 assignment from Bank of America to MAK.   Ex. 2032; Tr. 2/14, 60:16-61:8, 61:21-62:3.

41.     Despite CSAG's acknowledgments between May 11 and early June 2009 that the MAK assignments had required consent, in the latter half of May 2009, CSAG's loan funding department continued to assign interests in Champion bank debt to MAK. Ibsen Dep. at 32:12-33:17; Ex. 2024 at CS03220.

42.     Subsequent to Champion's express refusal to consent, CSAG periodically disseminated interest and principal payments on Champion secured debt to MAK (*see, e.g.*, Ex. 2045; Ibsen Dep. at 65:12-67:15), even though MAK was refusing to accept the status of participant.  Ex. 2029.

43.     By early June 2009,  MAK held at least $20.4 million of the senior secured debt, making it the largest single holder of Champion bank debt.  Ex. 2069.

44.     No evidence was presented that Champion was in default with respect to any of its obligations under the Credit Agreement when the MAK assignments occurred during the first two quarters of 2009.

## CSAG's Reversal

45.     On June 19, 2009 CSAG changed its position on the consent issue.  On that date Ibsen sent an email to Champion's Treasurer, drafted by CSAG's counsel, stating that Borrower consent was not required because Champion had not expressly refused consent during the ten days following May 12, 2009.  Ex. 2022; Tr. 2/14, 55:11-56:6; Ibsen Dep. 50:14-52:4.  That communication stated in relevant part:

> On May 12, 2009 Credit Suisse requested that Champion
> consent to the assignment.  As we received no express refusal
> from Champion regarding the assignment during the ten-day
> notice period prescribed under Section 12.11(b) of the credit
> agreement, it is our position that the assignment is effective.
> Ex. 2036;

46.     For the reasons stated herein, the Court finds that CSAG's position that Champion did not expressly refuse consent within ten days of May 12, 2009 is erroneous.

47.     On June 23, 2009, Knight responded to Ibsen's June 19, 2009 email.  Ex. 2022 at CHAMPION0000904-05; Ex. 2039 at CS10822-23; Tr. 2/14, 55:17-57:9, 57:19-58:8.  In that letter Knight disagreed with Ibsen's statement that Champion had not refused consent within ten days of CSAG's May 12 notice of the need for Borrower consent.  Knight further stated that, "[i]f, however, CSAG is actually contending that the assignment is effective, please note our stance that CSAG is in breach of the party's agreement, and we will reserve our rights against CSAG."  *Id.* at CS10823.

48.     On June 25, 2009, Ibsen responded to Knight's June 23, 2009 letter in a communication drafted by CSAG's counsel.  Ibsen Dep. at 60:13-61:18; Ex. 2043.  In

that letter, CSAG again based its position that Borrower consent was not required solely on the alleged ground that Champion had not expressly refused consent within ten days of "Credit Suisse's May 12, 2009 notice."  Ex. 2043 at CS10816.

49.     During the latter part of June and throughout most of July 2009, CSAG and Champion continued to discuss their ongoing dispute over the consent issue.  During that timeframe, the written communications sent by CSAG and its lawyers to Champion and its lawyers continued to rely on the position that Champion had not expressly refused consent on a timely basis.  *See, e.g.,* Ex. 2096.

50.     In July 2009, CSAG also began to claim that Champion was now in default with respect to certain covenants set forth in the Credit Agreement and that, as a result, CSAG was entitled to finalize the disputed MAK assignments.

51.     On or about July 20, 2009, in response to a request from Knight for "the required documentation through which a consent for this transfer [to MAK] would be effective," counsel for CSAG stated:

> …CS does not believe Borrower consent is required and does not plan on seeking it. Rather, simply as an accommodation to Champion…CS is willing to delay closing on the assignment until Wednesday, barring some (currently) unforeseen event that would require CS to close the assignment earlier than that."

Ex. 2096 at CS24999-25000; *see also* Exs. 2097 (CSAG announced intention of finalizing MAK assignment without Champion's consent); 2117 (confirming that CSAG closed the MAK assignment without Champion's consent).

16

52.     CSAG's decision to finalize the MAK assignments regardless of Champion's consent occurred as MAK threatened to bring legal action against CSAG if it did not finalize those assignments. On July 22, 2009 Michael A. Kaufman, the Managing Member of MAK, sent CSAG a letter setting forth MAK's position that CSAG's "failure…to properly process the prior Assignment and Acceptances and any New Assignment Agreements has greatly diminished MAK Capital's ability to participate in certain decisions as a Lender and to otherwise influence the Borrower and has resulted in harm to MAK Capital's total investment in Champion beyond our inability to close these Loan transactions. CSAG must remedy this situation…." Ex. 2104 at MAK0000000712-13.

53.     Within a day of CSAG's receipt of MAK's letter, CSAG agreed to close the outstanding assignments to MAK. Ex. 2105.

54.     On learning that the disputed assignments had been closed, Knight emailed Champion's CEO and its counsel that "it is important that we confirm with Credit Suisse that despite Champion's not consenting to an assignment to MAK, CS has nonetheless effected the assignment, and they are now a lender rather than a participant." Ex. 2117; Tr. 2/14, 80:19-23; 82:6-17.

Champion's Default

55.     CSAG contends that at the end of the second quarter of fiscal 2009, Champion was in default under certain of the covenants in the Credit Agreement and that

as a result, an Event of Default had occurred and was continuing, and that under Section 12.11(b) of the Credit Agreement consent was no longer required as a prerequisite to closing the disputed assignments.

56.    CSAG also argues, alternatively, that regardless of whether an Event of Default validated what had previously been assignments that were defective for lack of consent, plaintiff is estopped from contesting that position because Champion and its lawyers ultimately agreed that CSAG was correct and affirmatively consented to CSAG's closing the disputed assignments in late July 2009.

57.    There is no provision in the Credit Agreement that validates a defective assignment retroactively if an Event of Default occurs and is continuing at a date subsequent to execution of the assignment agreement.

58.    The Credit Agreement provides that borrower consent is necessary "unless an event of default has occurred and is continuing."  Thus, the event of default must already have occurred at the time the parties execute the assignment agreement. Ex. 1001 at CS12278.

59.    Consistent with that contractual language, the standard form of assignment utilized by Champion/CSAG had a signature line for the borrower's consent, indicating that the effect of any Event of Default on the need for borrower consent was to be resolved at the time the assignment was fully executed. *See*, *e.g.*, Ex. 2239 at CS32399.

18

60.     The evidence is insufficient to support a finding that an Event of Default had occurred and was continuing at the time that CSAG finalized the disputed assignments on or about July 23, 2009. The Lender Presentation that Champion disseminated in final form on July 28, 2009 did not state that Champion was already in default, but only that "Champion is not expected to be in compliance with either the minimum LTM EBITDA or minimum total liquidity covenant for the second quarter of 2009." Ex. 1028 at CHAMPION0027277. Knight testified that Champion was not yet prepared to acknowledge that it was in default and that "you could make a case that … it isn't final until the numbers are published." Tr. 2/14, 87:4-88:25; 189:15-190:19.

61.     Both Knight and Griffiths testified that once Champion's second quarter ended, consent became a moot point because of the default issue. Tr. 2/14, 168:4-6; Griffiths Dep. 26:14-28:20. Such testimony conflicts with the contemporaneous conduct of Knight and Griffiths. When, after the disputed assignments were closed, CSAG demanded that Champion agree to sign a release that would relieve CSAG of any liability with respect to the MAK assignments, Knight expressed strong opposition to such a release. Ex. 2166; Tr. 137:13-139:20. Similarly, on August 3, 2009, Griffiths informed the Champion board that in order to obtain short-term covenant relief from the Lenders, "we will also be strong armed into signing a release with respect to the way CS let MAK into the lender group." Ex. 2154. It is clear that Knight and Griffiths continued to believe that Champion had a legitimate claim against CSAG concerning the MAK assignments

even if Champion was in default under the Credit Agreement.

62.     Knight's testimony was in stark conflict with her actions and statements at the time in issue.  The Court finds that Knight's trial testimony supporting CSAG was not credible.

63.     The evidence does not support a finding that Champion's lawyers told CSAG it could properly finalize the disputed assignments in July of 2009. Instead, when lawyers for CSAG opined that it was the custom within the lending industry that upon a borrower's default a participant immediately becomes a lender, Ronald Rose, a partner in the Dykema firm representing Champion ("Rose"), stated "this 'custom' is not contained in the Credit Agreement and seems to me to contradict it." Ex. 2056.

64.     On July 20, 2009 Roger Scholten, Champion's general counsel ("Scholten"), stated his understanding that CSAG was about to take unilateral action to close the disputed assignments regardless of Champion's position on the issue. Scholten recommended to Rose that in discussions with CSAG's lawyers concerning the consent issue he should take the position that "it appears increasingly to be moot point in that CS has announced its intent to proceed without Champion's consent." Ex. 2097.

65.     CSAG did not rely on any consent from Champion in proceeding to finalize the disputed assignments in July 2009, because CSAG clearly announced its intention to finalize those assignments regardless of whether or not Champion consented.

20

66.    On July 21, 2009 Rose informed CSAG's lawyers in an email that "we didn't disagree that the Loan Agreement, upon a default, allowed a conversion of participations to direct lender." Ex. 3063 at CHAMPION0032881. However, as Scholten testified, "there was still - in my mind, still a very good question regarding timing," so Champion and its lawyers recognized that it was an open question whether Champion would be in default until after the quarterly statements were required to be filed in mid-August. Deposition of Roger Scholten ("Scholten Dep."), 22:9-15, 18-24; 24:2-19; Tr. 2/14 87:4-88:25

67.    CSAG also relies on a July 8, 2009 memorandum relaying comments by Gerald Lievois, another lawyer with the Dykema firm representing Champion.  Mr. Lievois opined that the reference to an Event of Default in the Credit Agreement provision concerning borrower consent "clearly supports CS's position that once Champion is in default it could implement an assignment to MAK without Champion's approval." Ex. 3040. However, Mr. Lievois went on to state, as reported by Scholten, that he "agreed that the record regarding purported assignment is sufficiently clouded to continue to contest the assignment." *Id*.  There is no evidence that MAK entered into any new assignment agreements. Rather, the record suggests that CSAG simply proceeded to finalize agreements that had been executed prior to any default, at a time when Champion's consent was required.

68.     The evidence fails to support CSAG's contention that Champion affirmatively and voluntarily consented to CSAG's finalizing the disputed assignments during July 2009, or that Champion clearly expressed any agreement with CSAG that, given the facts as they existed in late July, the Credit Agreement permitted CSAG to immediately finalize those assignments.

69.     Furthermore, CSAG did not rely on any agreement with Champion concerning the default issue in deciding to finalize the disputed assignments. To the contrary, as the Court has found, CSAG's counsel stated that CSAG was going to finalize those assignments with or without Champion's consent.

<u>CSAG's Defenses of Waiver and Estoppel</u>

70.     Prior to the initial MAK assignment, there were 197 assignments of Champion senior secured debt.  (Stipulated Fact No. 19).   CSAG never notified Champion that it had the right to consent with respect to any of those assignments (Stipulated Fact No. 20), and Champion never raised any issue concerning the right to consent with respect to any of those assignments. Tr. 2/14, 38:25-39:3.

71.     There is no evidence that, after learning that those prior assignments had occurred, Champion management ever focused on whether there had been a right of consent with respect to any of those assignments. Therefore, there is no evidence that Champion ever formed an intent to waive the borrower consent provision with respect to any of those assignments.

22

72.     The record does not establish whether, or to what extent, any of those prior assignments were made to entities as to which Champion had a right of consent.

73.     At least 117 of the pre-MAK assignments were to affiliates of CSAG. Therefore, under the terms of the Credit Agreement, those assignments were made to eligible assignees and Champion would not have been entitled to exercise a right of consent.

74.     No evidence was presented to show that the parties ever entered into any written or oral agreement to modify the Credit Agreement by eliminating the borrower consent provisions at issue in this case.

75.     Prior to the MAK assignments, Champion and CSAG had engaged in a course of conduct through which, periodically, CSAG would send Champion an updated list of those entities holding Champion bank debt. It was through that process that CSAG would bring to Champion's attention any new holders of that debt. Tr. 2/14, 146:21-147:7.

76.     Such conduct did not apprise Champion whether a new holder was or was not an eligible assignee. The process did not apprise Champion whether any assignment was subject to borrower consent.

77.     Both under the Credit Agreement and in connection with the actual conduct of the parties, CSAG, not Champion, was the entity that was actively involved in reviewing the documentation on proposed assignments and was the entity which, under

the Credit Agreement, was to provide notice to Champion if the borrower consent provision was applicable to a proposed assignment.

78.     Given CSAG's failure to alert Champion to its right to consent in connection with any of the prior assignments, and given the lack of any evidence that the parties ever actually communicated to each other that the borrower consent provision was being waived, CSAG lacked any reasonable basis to rely on the prior course of conduct as indicating any intent by Champion to waive its rights under the borrower consent provision in the Credit Agreement.

79.     There was no evidence that at any time before the commencement of this litigation, CSAG took the position that Champion's rights under the borrower consent provision in the Credit Agreement had been waived by the prior course of conduct of the parties or that Champion was estopped from invoking its right to consent when CSAG belatedly requested consent on May 12, 2009.

80.     Knight testified that she had no objection to MAK becoming a new holder of Champion bank debt at the time that CSAG processed assignments to MAK during January, March, and April, 2009. Tr. 2/14 153:22-154:7; 157:9-21. She also testified that during that timeframe she had no knowledge as to what purpose or strategy MAK may have had with respect to its investments in Champion secured debt. Tr. 2/14 39:21-14; 40:24-41:3. Prior to May 2009, CSAG never alerted Champion to its entitlement to consent to any of the MAK trades, and Knight testified that she gave no thought to

24

whether there might be a right of consent at the time she learned MAK was a new holder. Tr. 2/14, 37:22-39:9; 39:25-41:9; 43:5-25.

81.     Champion never objected to any entity becoming a Lender prior to February 2009. (*Id.* at 155:9-155:11.)

82.     On or about July 9, 2009, Knight began speaking with various Lenders to let them know that management was preparing the proposed amendment. Tr. 2/14, 94:15-95:18. Beginning on or about July 16, 2009, Knight provided the then current version of the written Lender Presentation to those Lenders holding particularly substantial amounts of the bank debt, and spoke with all of the significant lenders and reviewed with them the details of the proposal the Company was planning to make to the Lending Group. Tr. 2/14, 94:15-95:17. According to Knight, the lenders she talked to were initially "cordial and listening" and she was "not unhappy … with the reaction that was coming through" regarding the Company's proposal for an 18-month amendment. Tr. 2/14, 98:8-98:14.

83.     Jay Jacquin ("Jacquin") of Morgan Joseph, who participated in most of the calls that Champion had with its lenders in July 2009 regarding the Company's plan to propose an 18-month amendment, Jacquin Dep. 57:4-58:7, testified that the Lenders were "in listening mode" during the initial calls. The only negative reaction he recalled was from Daniel Wallitt ("Wallitt") of GE Capital, who expressed his belief that the Company "needed to do something to bring down the balance of the senior debt." Jacquin Dep. 57:4-58:24.

84.     A number of the significant Lenders were initially supportive of the proposed amendment.  These included Credit Suisse Asset Management (Tr. 2/14, 248:12-15), Fifth Third Bank (Tr. 2/14, 239:9-240:12), and CSAG itself (Deposition of David Smith ("Smith Dep.") at 36:16-23, Tr. 2/14 248:16-21.)

85.     Wallitt of GE Capital, one of Champion's significant lenders, testified that although he opposed Champion's proposed amendment, "[i]t was still conceivable that the agent could find a way to cobble together a coalition of fifty-one percent yes votes." Tr. 2/14 235:24-236:7.

86.     By early July 2009, MAK had become the largest holder of Champion bank debt, (Tr. 2/14, 79:14-79:16), and the Company viewed MAK as a threat to the Company and to the best interests of the secured creditors.  Tr. 2/14, 97:20-98:7.

87.     At the same time that the Lenders were being informed of Champion's proposed amendment, they were also learning that MAK had become a large holder of Champion debt and was proposing a restructuring that would be an alternative to the 18 month amendment.  Knight was discussing this "MAK issue" with lenders as early as July 9, 2009.  Tr. 2/14, 97:15-98:7.

88.     GE Capital, one of Champion's largest lenders, learned of a potential MAK proposal on or before July 17, 2009 (Tr. 2/14, 229:12-230:14) *i.e.*, the day after he received a draft of the Lender Presentation.  Ex. 2081.

89.     Thus, at the same time that Champion's lenders were considering the Company's proposal for an amendment to the Credit Agreement, they also learned that MAK who owned approximately 50% of Champion's convertible debt and $20 million of Champion's senior secured debt, suggested that the Company undergo a restructuring which, according to the hedge fund, "could generate up to thirty million dollars of cash to reduce senior secured indebtedness." Tr. 2/14, 106:10-108:8; Ex. 2050 at Champion0019962; Jacquin Dep. 54:5-56:14.

90.     MAK's willingness to make a restructuring proposal for Champion was contingent on its becoming a Lender rather than remaining a participant. Ex. 2029, Smith Tr. 92:8-93:24.

91.     On May 22, 2009 CSAG informed MAK that Champion might not consent to the assignments and that "in the event that we not get consent, we will have to close via a participation." David Smith of MAK replied, "We are not interested in closing it on participation basis," a position that Smith confirmed at his deposition. Ex. 2029; Smith Dep. 2/14, 92:8-93:24.

92.     The importance MAK placed on being a Lender rather than a participant is evident from MAK's threat to sue CSAG unless it closed the disputed assignments. Ex. 2104 (CSAG's failure to properly process the assignments "has greatly diminished MAK Capital's ability to participate in certain decisions as a Lender and to otherwise influence

27

the Borrower and has resulted in harm to MAK Capital's total investment in Champion beyond our inability to close these Loan transactions.").

93.    There is no evidence that MAK mentioned its restructuring proposal to any of the Lenders until after CSAG finalized the disputed assignments.  CSAG took that step and declared MAK to be a member of the Lending Group on or about July 23, 2009. Ex. 2105. As soon as that happened, MAK began contacting the Lenders about its proposal. For example, it was on that same day, July 23, 2009, that MAK first informed GE Capital of its desire to inject capital into Champion "to pay the banks down."  Ex. 2018, Tr. 2/14, 231:9-232:3.   By July 24, 2009, MAK had contacted several of  Champion's lenders directly.  Tr. 2/14, 104:2-106:5.

94.    Wallitt of GE Capital undertook to generate and organize opposition to the proposed 18 month amendment. Exs. 2018, 2019; Tr. 2/14, 237:25-240:17. Wallitt emphasized that the MAK proposal was a "reason to slow the [amendment] process down" when it actively lobbied other significant lenders, including National City Bank and Comerica, to reject Champion's proposed amendment.  Exs. 2018, 2019; Tr. 2/14, 231:22-232:25.  On July 23, 2009, Wallitt's colleague at GE Capital, Brent Chase, wrote in an email to Highland Capital, another significant Lender, that the possibility of MAK infusing capital into Champion was "another potential option to consider before we continue down an LT [long-term] amendment path."  Ex. 2019; Tr. 2/14, 233:3-14.

28

95.    In communications with other Lenders, Wallitt also stressed the potential of a deal with MAK as a reason to vote against Champion's amendment request. Tr. 2/14, 248:22-249:8.

96.    On July 31, 2009, Wallitt wrote to Francine Fulton and Lucas Barnett at Fifth Third Bank, emphasizing the possibility of a deal with MAK as his principal argument in his effort to persuade them to change their position and vote against the 18-month amendment. Ex. 2151.

97.    Certain of Wallitt's emails confirm that MAK's status as a large holder of Champion debt, and not merely MAK's restructuring proposal, was impacting the Lender's consideration of Champion's proposed amendment.

98.    In one email, Wallitt noted that "MAK was saying they were over the voting hurdle with CS" and testified to his belief that MAK's vote against the amendment would strengthen the chances that the proposed amendment would be rejected.  Ex. 2112; Tr. 2/14 233:22-234:15.

99.    Similarly, in Exhibit 2126, Wallitt responded to Morgan Joseph's statement that it was unaware the largest holders were voting "no" by saying, "Come on, you think MAK is voting yes?  This process needs a reset."

100.    Wallitt also testified that a further reason why he opposed any amendment that was not short-term was a concern that a longer term amendment would give MAK time to build a "blocking position" in the debt.  Tr. 2/14, 44:10-45:12.

101.    Jacquin testified that Wallitt told him that Wallitt would vote against the 18-month amendment because he "definitely preferred that Champion go look at a transaction that would result in a paydown of the senior debt."  Jacquin Dep. 167:25-168:24.

102.    On July 30, 2009, MAK circulated to Champion and to many of the significant Lenders a term sheet for a proposed restructuring that involved a cash infusion by MAK of $50 million into Champion.  MAK's emails to significant Lenders attaching that term sheet represented that "our goal obviously is to make the banks whole" -- an economic outcome that would be very favorable to the banks.  In the same emails, MAK took the position that the banks should grant only a "4-8 week forbearance during which we get this taken care of," a position that clearly rejected Champion's proposed amendment.  Exs. 2135, 2136, 2137.  On July 31, 2009, referring to MAK's interest in investing $50 million in Champion, David Smith wrote: "We are not interested in entering into such discussions or making such an offer in conjunction with a six month extension." Ex. 2150.

103.    During the last week of July 2009, Champion management became concerned that the Lending Group would not agree to the proposed 18-month amendment, (Tr. 2/14, 108:24-109:2), and began to discuss with lenders the alternative possibilities of a twelve-month or six-month amendment.  Tr. 2/14, 110:10-111:11; Ex. 2133; Jacquin Dep. 81:20-82:11, Ex. 2168.

104.    On August 5, 2009, the Champion Board of Directors was told: "Champion and Morgan Joseph believe a dialogue with the senior lenders for medium-term relief is the best path for all stakeholders at present and provide the senior lenders with the optimal path to a par recovery in cash."  Jacquin Dep. 101:18-102:12, Ex. 2178 at 2188.

105.    Wallitt testified that if no deal was made with MAK, he was open to the idea of a long-term amendment as an alternative.  Tr. 2/14, 240:18-241:3.  However, with MAK's proposal on the table, Wallitt opposed even a six-month amendment.  On July 31, 2009, Wallitt wrote to several of members of the Lending Group, telling them that GE Capital "believe[d] strongly that [a six month amendment] is a mistake" because it would "undoubtedly kill" the possibility of a deal with MAK. Ex. 2158; Tr. 2/14, 241:4-22.

106.    Wallitt testified that determining whether the MAK deal was real or illusory was one of the three main reasons GE Capital objected to the 18-month amendment. Tr. 2/14, 247:11-248:4.

107.    Fraser Sullivan, another lender, also believed that it would be better to push Champion to make a deal with MAK than to give the Company a long-term amendment. Ex. 2158; Tr. 2/14, 242:6-22.

108.    Champion management understood that the Lenders would not support the Company's proposal for an amendment if it would chill negotiations with MAK.  A group of significant Lenders specifically told that to Knight.  Tr. 2/14, 114:2-115:3.

109.    Knight recognized in contemporaneous documentation that the potential availability of a transaction with MAK was adversely impacting the Lenders' willingness to support Champion's proposed amendment.

110.    For example, Knight testified that, prior to July 24, 2009, Ramin Kamali of Credit Suisse Alternative Capital Markets, one of Champion's largest lenders, had been "receptive" to the Company's proposal for an 18-month amendment, but that, in a conversation on July 24, she observed that Kamali "was sounding a bit different about it." Tr. 2/14, 105:17-105:21. Following that conversation, Knight wrote in an e-mail: "As I think about Ramin's change of heart today it's almost certain that MAK has gotten to them with the promise of new capital." Tr. 2/14, 105:6-106:5; Ex. 2111. Explaining this e-mail, Knight testified: "It's not news we were concerned that if MAK was having conversations with people and talking about the potential for them to raise capital and provide some amount of paydown to the senior lenders that there might be a preference to go down that path rather than the path that the company was advocating." Tr. 2/14, 105:25-106:5.

111.    The following day, again referring to Kamali, Knight wrote to Jordan at CSAG: "After further thought I strongly suspect his change of position has more to do with a discussion with MAK than with the upside potential. It seems they made the rounds and convinced lenders there is new capital that can come in. This is our fear and why we had hoped to keep them on the sidelines. If we'd had our way I think the

amendment would have gotten done, but as of now it seems quite unlikely." Tr. 2/14, 115:4-116:7; Ex. 2119; Tr. 2/14, 234:23-25.

112.    As Morgan Joseph summarized these events in a subsequent presentation to the Champion Board of Directors, "many of the senior lenders became very interested in the prospect of a cash paydown from MAK," Jacquin Dep. 66:16-67:24; Ex. 2152 at 4, and "[t]he allure of a principal reduction resulted in the senior lenders voting against the 18-month amendment." Jacquin Dep. 67:25-68:21; Ex. 2152 at 4.

113.    According to Jacquin, who was extensively involved in discussions with the Lenders on Champion's behalf, Jacquin Tr. 56:6-58:24, 181 :9-182: 11, the existence of a potential deal with MAK, including the possible reduction of loan principal, resulted in the senior lenders rejecting Champion's proposed 18-month amendment. Jacquin Dep. 70:5-71:2. While concerns about Champion's liquidity and the Company's declining financial performance also contributed to the Lenders' decision to reject Champion's request for an 18-month amendment, the potential for a cash paydown from MAK "had a significant impact" on that decision, (Jacquin Dep. 183:18-184:19), and had a similar impact on the Lenders' decision to reject the Company's proposal for a 6-month amendment. Jaquin Dep. 85:6-21, 71:21-2

114.    On August 19, 2009, James Decker ("Decker") of Morgan Joseph told the Champion Board that "the senior lenders had agreed to a 30-day waiver for the Company to pursue a transaction with MAK." Ex. 2202. Similarly, on August 7, 2009 Decker

stated in an email that the lenders had rejected the amendment "in order to have us pursue MAK." Ex. 2183.

115. Knight testified at trial that the desire of the Lenders not to chill the discussions with MAK was not the only reason they rejected the Company's proposed 18 month amendment but "that was one of their reasons and it was probably an important reason." Tr. 2/14, 193:3-24.

116. The impact that MAK's presence in the Lending Group had on the amendment process was foreseeable and was, in fact, foreseen by Champion management which expressly informed CSAG of its concerns.

117. On May 27, 2009, Knight sent an email to CSAG explaining the rationale for Champion's refusal to consent to the MAK assignments. The email stated, in relevant part:

> Further, we wanted to make you aware of certain recent correspondence with respect to MAK Capital's stated ownership positions in both Champion's Senior Secured Facility and Convertible Notes and its desire that the company complete an in-court restructuring rather than pursue a strategy to repay its Senior Secured Debt with cash generated from asset sales.

Ex. 2031 at CS03118.

118. Knight's May 27, 2009 email referenced a letter from MAK to Champion in April 2009, "stating that, among other things, they felt that management's plan to sell assets was 'perilous' to the interest of stakeholders." *Id.* Knight then referenced a subsequent conference call in which "MAK indicated a strong preference for an in-court

restructuring, and that they had interest in providing the company with debtor-in-possession financing." *Id*. While encouraging MAK to provide a written offer concerning such financing, Champion had informed MAK that "the company had no current intention to enter into discussions about any form of bankruptcy protection." *Id*. Indeed, during mid-2009 Champion's management repeatedly stated their position that an in-court restructuring (which would necessarily involve a bankruptcy) would be "value (and cash) destructive" to the Company. Tr. 94:8-14; Ex. 2049 at CS01058 and 01070.

119. Knight further informed CSAG that MAK's counsel had sent a letter to Champion on May 8, 2009, which Knight characterized as using "an increasingly aggressive tone," That letter reported that MAK had increased its holdings of Champion bank debt to approximately $29.4 million and stated:

> MAK Capital believes that the Companies require immediate and comprehensive restructuring to avert further deterioration of the Companies' on-going businesses and the erosion and forfeiture of value. …it is critical that a restructuring of the Companies not be premised on distressed sales of significant assets.

Ex. 2014 at CS10925. The position MAK took in this letter -- i.e., that a restructuring was critical and that a policy of asset sales was inappropriate -- was in direct opposition to the strategy that Champion was seeking to employ at the time, because Champion was seeking to sell assets and avoid an in-court restructuring. Griffiths Dep. 19; Knight at Tr. 2/14, 42:24-43:2.

120.   Furthermore, to implement that strategy, Champion would need an affirmative vote from Lenders representing more than 50% of total Lender interests in the credit facility.  Ex. 2031 at CS03118.  If MAK entered the Lending Group, it would be one of the largest holders of Champion bank debt, and could potentially use its voting power to block Champion from obtaining the required affirmative vote and, at minimum, was likely to have an influential voice among the other significant Lenders.  Thus, Knight wrote:

> We will require a period of time to consider any request for borrower consent to a MAK Capital assignment.  We have asked our counsel to review the company's interactions with MAK Capital to help us determine if the position that MAK has taken (i.e. that the company immediately commence an in-court restructuring rather than continue to pursue a plan for divestitures and debt retirement) constitutes a reasonable basis to withhold consent.  This determination will include consideration of the fact that the company expects to require a further amendment to the credit agreement in the coming months, and that it requires the consent of a majority of its lenders in order to complete its targeted asset sales and repay its senior secured indebtedness.  Until these issues are resolved, we will continue to withhold consent.

Ex. 2031 at CS0118.

121.   Based on the foregoing, the Court finds that:

a)   The Lenders were informed of a potential transaction with MAK throughout the time they were evaluating the Company's proposals for amendments to the Credit Agreement;

b)      The possibility of a transaction with MAK was a substantial factor in the decision of the Lending Group to reject the Company's requests for 18-month, 12-month and 6-month amendments and agree to only a 30-day amendment; and

c)      However, Plaintiff did not prove that the Lending Group would have accepted rejected Champion's requests for 18-month, 12-month and 6-month amendments in the absence of a potential transaction with MAK, or that MAK would not have made a similar proposal as a Participant had it been denied entry into the Lending Group.

<u>The Lenders' Decision to Reject Champion's Proposed Amendment</u>

122.    Champion management and Morgan Joseph believed that a decision by the Lenders to grant Champion only a 30-day amendment would have a negative impact on the company's liquidity. Tr. 2/14, 118:4-7. Morgan Joseph told the Champion Board of Directors that "the announcement of the company's second quarter results and the short-term waiver with the senior lenders, will undoubtedly exacerbate the company's liquidity position." Ex. 2152. Morgan Joseph believed the negative impact of an announcement concerning the Second Quarter results on the Company's vendors and customers would be reduced if the Company could "show outside constituencies that Champion had the support of the senior lender group," and that "all things being equal, a longer term amendment, whether 18 months or 6 months … would be better received by the public

than an amendment that's very short-term in nature." Jacquin Dep. 72:19-73:24; Ex. 2152 at 6

123.    Champion, Morgan Joseph and the Lenders understood that the granting only a short-term, *i.e.*, 30-day, amendment would likely result in the Company having to file for bankruptcy in the next 60-90 days.    Thus, on August 5, 2009, when Morgan Joseph recommended to the Board that the Company accept a short-term waiver rather than release financial results with no agreement in place, they also recommended that the Company begin working immediately to prepare for a Chapter 11 filing.    Tr. 2/14, 118:11-119:19.    Champion began planning for bankruptcy as soon as it realized it was going to obtain only a short-term waiver.    Tr. 2/14, 198:2-5.    By August 6, 2009, Loughlin Meghji + Company ("LM"), the Lenders' financial advisor, had been advised that Champion was talking about the need to begin planning for bankruptcy.    Tr. 2/15, 128:4-22.

124.    On August 12, 2009, Champion and the Lenders executed the Sixth Amendment to the Credit Agreement, providing for a 30-day waiver of default. Tr. 2/14, 121:1-4.    The following day, Champion announced the agreement in a press release.    Tr. 2/14, 121:5-23, Ex. 2287.

125.    On  August 19, 2009, Knight and Decker reported to the Board that the Company's liquidity forecast was deteriorating "[d]ue to anticipated further deterioration of the business resulting from the recent announcement concerning a potential

restructuring, additional costs associated with the waiver agreement, the potential loss of business due to the inability to obtain bonding for specific projects and the costs of preparing for a potential Chapter 11 filing."  As a result, there was a possibility that the Company might need to "take action within the next sixty days."  Tr. 2/14, 120:24-123:4; Ex. 2202.

126.  Knight testified at trial that "the lack of a long-term solution to the default was giving significant angst to the market, as -- as we knew it would."  Tr. 2/14, 125:15-20.

127.  On August 27, 2009, Knight wrote in an e-mail to Bryan Matthews of CSAG: "As expected, we are under considerable pressure from vendors and customers and this is already evident in the liquidity numbers."  Tr. 2/14, 126:10-21; Ex. 2207. Referring to this e-mail at trial, Knight explained: "[W]hat this e-mail to Bryan Matthews is about is we've -- we've announced a thirty-day waiver in the middle of August and our vendors and our customers want to know what happens at the end of the thirty days."  Tr. 2/14, 127:22-128:5.  Because of that problem, "[W]e were seeing fallout in orders, seeing customers move away from us, seeing our vendors tighten terms, things that are not unexpected, I guess, in a distress situation like this, and it was pressuring the liquidity of the company." Tr. 2/14, 144:7-19.

128.  On September 27, 2009, Knight again wrote to Matthews concerning Champion's worsening financial condition: "The deterioration in the [cash flow] was only

related to the UK and we continue to have projects held up as a result of the parent company's situation. Unfortunately, much of what we told the lenders would happen to the business absent a longer-term waiver/amendment is happening, and more is sure to happen if there is a 'take it or leave it' attitude that continues to ignore the best advice of the people closest to the situation." Ex. 2216.   Regarding this e-mail, Knight explained: "[I]t's exactly the type of thing we were talking about in seeking a longer-term amendment…. This is -- this is one of the effects that we knew we would see, absent a solution to the default, that was longer term in nature.  Absolutely."  Tr. 2/14, 129:2-130:5.

129.   In her September 27, 2009 e-mail, Knight wrote the following, referring to the potential deal with MAK:  "They may or may not be able to pull a deal off, but the imminent filing and the short-term waiver have destroyed value, and they would certainly expect to put up less than their original offer, given these events."  Ex. 2216.  Knight testified that "it's been very clear from the start that [her] view was a longer-term amendment could have protected value."  Tr. 2/14, 130:6-131:5.  She confirmed that the Company's inability to get more than a 30-day waiver from the Lenders was "a contributing factor" to loss of value in the Company. Tr. 2/14, 130:25-132:8.

130.   LM, the financial advisor the Lenders retained in August 2009, prepared reports to the Lenders that specifically highlight loss of revenue and additional expenses incurred by Champion as a result of its failure to obtain a longer term amendment and its

40

consequent need to plan a bankruptcy. Exs. 2206, 2214. Testimony was received at trial concerning these reports from Defendant's expert witness, James Loughlin ("Loughlin"), who also led the LM team that advised the Lenders during the Fall of 2009. Tr. 2/15, 127:8-25.

131.    In a report to the Lenders entitled "Initial Diligence Update as of August 26, 2009," LM informed the Lenders that Champion's August 11, 2009 cash flow forecast was vulnerable, in part because "the trade is concerned based on the recent waiver announcement." Ex. 2206 at CS13656. Loughlin confirmed at trial that his statement meant that Champion was concerned credit would tighten because of the short-term nature of the amendment. Tr. 2/15, 132:9-20. As a result of the trade's concern, LM adjusted Champion's projected cash balance down by $5.2 million for the period from August 24, 2009 through September 20, 2009. Tr. 129:23-134:13; Ex. 2206.

132.    The concerns set forth in LM's August 26, 2009 report became a reality; *i.e.*, vendors actually did reduce credit limits because of the short term waiver, as management feared they would. Tr. 2/15, 139:18-141:7; Ex. 2214 at LMCO0003773. As a result, in a report to the Lenders on September 18, 2009, LM adjusted Champion's cash flow projections down by an additional $3.6 million for October 2009, under the heading "loss of trade confidence." Ex. 2214 at LMCO0003774.

133.    In the same document, LM set forth a proposed DIP budget that was based on "the Company's forecast adjusted for the effects of bankruptcy." *Id*. at

LMCO0003776.   Among other things, that adjustment for the effects of bankruptcy reduced the Company's projected U.S. sales by 25% in weeks 1-2, 20% in weeks 3-4, 15% in weeks 5-6, 10% for the remainder of 2009 and 7.5% for 2010.   Id. at LMCO0003777.   LM also projected bankruptcy related professional fees in the amount of $9.6 million during the period of September 2009 through March 2010, including $6.7 million through 2009.   *Id*. at LMCO0003783.

<u>CAUSATION</u>

134.   The decline in business performance at Champion occurred well before July 2009.   (Trial. Ex. 1060 at 2-3; Trial Tr., February 15, 2012 ("Feb. 15 Tr."), 96:6-96:11, 99:3-101:17.)

135.   Champion's net sales declined 6.7% in 2007 and 18.9% in 2008.   This decline was driven by declining real estate values, lower demand for Champion's products, and a lack of financing for manufactured homes.   (Trial Ex. 1060 at 2.)   These revenue declines translated into lower profit margins and, by 2008, operating income was not sufficient to cover Champion's cash needs and Champion's operating activities became cash flow negative.   (*Id.*)

136.   As a result, Champion failed to meet various financial covenants in October 2008 and Champion's Lenders provided an amendment replacing the leverage and coverage ratios with less stringent minimum adjusted EBITDA and minimum liquidity covenants.   (*Id.* at 3, 5.)

42

137.   In the spring of 2009, Champion's financial distress accelerated dramatically when revenue fell by 60% compared to the prior year and cash flow from operations was negative $34.4 million. (*Id.* at 3.)

138.   By April 2009, Champion's senior debt and convertible notes were both trading at a significant discount. (Feb. 14 Tr., 182:21-183:4.)

139.   The total enterprise value ("TEV") of Champion calculated using the value of the Company's debt and equity securities never exceeded the par value of the prepetition senior debt at any time after December 31, 2008. (Feb. 15 Tr., 94:10-94:23, 95:11-95:20, 96:6-97:23; Trial Ex. 1060 at 1, 4, 15.)

140.   The market values of Champion's securities were (a) $908.8 million at December 29, 2007; (b) $480.4 million at January 3, 2009; and © $98 million at July 4, 2009. (Trial Ex. 1060 at 1, 4; Feb. 15. Tr., 99:13-100:11, 102:10-103:9.)

141.   Due to the further deterioration in the real estate and housing markets and despite prior amendments to the Credit Agreement, as of July 4, 2009, Champion was not in compliance with its amended minimum liquidity and minimum twelve-month adjusted EBITDA covenants under the Credit Agreement. (*See* Trial Exs. 3207, 3079 at CHAMPION 0035147.)

142.   After unsuccessfully attempting to sell Champion's Canadian operations and raise capital through other means, Champion sought an eighteen-month amendment waiving compliance with those covenants. (Trial Ex. 1028 at CHAMPION 0027277-84.)

143.    Knight began soliciting Lenders' opinions regarding a possible eighteen-month amendment on or about July 16, 2009 – at least eleven days after Champion's internal and external counsel had concluded that Champion would not be able to prevent MAK from becoming a Lender.  (*See, e.g.*, Trial Exs. 3048, 3049, 3055; *see also* Trial Ex. 3040; Scholten Tr., 48:25-49:22.)

144.    Champion did not formally request the eighteen-month amendment from the Lenders until July 29, 2009 (*see* Trial Ex. 3078) – eight days after Champion's counsel had agreed with CSAG's counsel that there was no contractual mechanism by which Champion could prevent MAK from becoming a Lender and after Champion consented to the propriety of recognizing MAK as a Lender.  (*See* Trial Exs. 3063, 1027.)

145.    Management understood from the outset that Champion's request for an eighteen-month amendment was an "unprecedented" and "aggressive" ask.  (Feb. 14 Tr., 85:18-85:23, 102:15-103:19, 168:7-168:17.)

146.    Knight testified that, at the time the Company's Lender presentation was disseminated (*see, e.g.*, Trial Exs. 1023, 3048, 3049), she knew that the forecasts contained within it may not be reliable.  (Feb. 14 Tr., 90:16-91:1 (describing Champion's U.S. business as having "almost zero visibility"), 197:2-197:12 (same).)

147.    Management's forecasts were historically unreliable and, in the summer of 2009, management was unable to accurately forecast Champion's short- or long-term prospects.  (Feb. 14 Tr., 197:2-197:12, 90:16-91:1 (Knight testimony); Feb. 15 Tr., 39:2-

40:16, 74:16-75:12, 75:18-76:2, 78:24-81:2 (testimony of Jason Frank); Feb. 15 Tr.,

114:17-114:19 (testimony of Loughlin); Trial Ex. 1060 at 5.)

148.   Wallitt of General Electric Capital Corp. – a member of the informal

Steering Committee of Lenders – testified that his review of Champion's financial

information quickly revealed that "the company had lost the ability to forecast.  The

company was at ground zero of, you know, the housing crisis which was enveloping the

entire U.S. economy."  (Feb. 14 Tr., 214:1-214:10.)  Champion's most recent forecasts

had been especially bad:

> So not only were year-over-year sales down by over fifty percent[,] in [the
> first quarter of 2009] that we were analyzing, they missed their budget by
> what looks to be roughly thirty-three million dollars in round numbers,
> that's twenty percent, which again major red flag.  You can't project or
> forecast your top line within twenty percent in the current quarter that
> you're in?  How on earth are you going to forecast out six quarters? ... [I]t
> led me to … draw the pretty fast conclusion that management could not
> project the business.

(*Id.* at 215:19-216:7.)

149.   Although Champion's management's projections expected Champion to

experience a "constant market share" in the months and years after July 2009,

management's projections regarding sales growth were more than 20 times that which

were predicted by IBIS, a prefabricated housing industry specialist.  (Feb. 15 Tr., 60:5-

63:21, 111:24-113:24.)  IBIS had predicted in its report for 2009 that industry sales were

expected to increase 3.9% over the next five years.  (*See* Trial Ex. 3210 at 11.)

Champion's management forecasted that its sales would grow by an average annual rate

of 22.4% over that same period.  (Feb. 15 Tr., 58:9-62:16.)

150.   As of July 2009, Champion had no options for raising either debt or equity capital and its attempts to sell various business operations to raise cash had failed.  (Feb. 14 Tr., 180:17-181:22; Trial Ex. 1060 at 5.)

151.   The proposed eighteen-month amendment was overwhelmingly rejected by the Lenders for a variety of reasons, including concerns about the Company's "struggling" financial condition and liquidity, historical inability to meet its forecasts, and the deteriorating housing market.  (Feb. 14 Tr., 193:13-193:24, 212:13-214:18, 218:24-219:20.)

152.   Wallitt testified that GECC was unwilling to provide a medium- or long-term waiver and amendment to Champion because of his analysis of Champion's worsening financial performance and his sole desire to maximize the value of GECC's position in the Champion loans.  (*Id.* at 211:14-211:20, 213:10-213:25.)  Wallitt was also very concerned about the Company's cash "burn rate," a "major red flag" that required him to further investigate the Company's financial condition before granting any kind of relief.  (*Id.* at 216:8-217:5; *see also id.* at 246:19-247:1 (advocating for a financial advisor to conduct diligence).)

153.   During this same time, in late July and August, MAK's discussions with Champion culminated in a term sheet proposing a restructuring transaction in which MAK would provide new money to the Company.  (*See* Trial Exs. 2071, 2134.)  Wallitt

testified that the term sheet was "attractive" in the sense that it offered the potential for a cash pay down to Lenders. However, it was non-binding – not a formal proposal – and he was concerned about MAK's ability to bring the contemplated transaction to fruition. (Feb. 14 Tr., 223:5-224:22; *see also* Feb. 14 Tr., 112:14-112:21, 234:16-234:25.)

154. The existence of the MAK term sheet was only one of many issues considered by the Lenders, but not a primary concern. Wallitt testified that MAK's term sheet did not affect his analysis of the liquidity or financial strength of the Company, or of management's ability to forecast its business. (*Id.* at 219:21-220:10.) There is no evidence from other Lenders to the contrary.

154. The Lenders, in rejecting the 18-month amendment, were not "doing MAK's bidding" or promoting or encouraging MAK, but rather attempting to keep MAK "in check." Additional time could enable MAK to build a "blocking position" which – because MAK was both a junior and senior debt holder – could harm independent first lien Lenders like GE in a subsequent restructuring. (*Id.* at 225:1-225:15, 251:22-252:6.)

155. Champion's significant Lenders were opposed to the request. (*See, e.g.*, *id.* at 171:18-171:22 (National City opposed the 18-month amendment); *id.* at 172:2-172:21(Citizens Bank opposed the 18-month amendment); *id.* at 222:5-222:15 (Raven Asset Management opposed the 18-month amendment); *id.* at 242:1-242:22 (Fraser Sullivan opposed the 18-month amendment).)

156.   After receiving this negative feedback, Champion opted to withdraw its request before ever drafting a formal amendment or putting it before the Lenders for a vote. (*Id.* at 193:6-193:12.)

<u>Sixth Amendment And Waiver To The Credit Agreement.</u>

157.   On August 12, 2009, Champion, CSAG, and certain of the Lenders entered into the Sixth Amendment and Waiver to the Credit Agreement (the "Sixth Amendment"). (Trial Ex. 1002.)  The Sixth Amendment waived Champion's compliance with certain provisions of the Credit Agreement for thirty days, until September 11, 2009. (*Id.*)

158.   The Sixth Amendment also contained a release which provides, in part, that Champion and its successors

> unconditionally, freely, voluntarily and, after consultation with counsel and becoming fully and adequately informed as to the relevant facts, circumstances and consequences, knowingly releases, waives and forever discharges (and further agrees not to allege, claim or pursue) … © any and all claims, whether known or unknown, under any oral or implied agreement with (or obligations or undertaking of any kind whatsoever of) any Lender Party which is different from or in addition to the express terms of this Amendment, the Credit Agreement and the other Loan Documents and (d) all other claims, rights, causes of action, counterclaims or defenses of any kind whatsoever, in contract or in tort, in law or in equity, whether known or unknown, direct of derivative, which [Champion]…might otherwise have or may have against any Lender Party [which definition includes CSAG] on account of any conduct, condition, act, omission, event, contract…claim, right, cause of action, suit, damage, defense, circumstances or matter of any kind whatsoever which

48

> existed, arose or occurred at any time prior to the Sixth Amendment.

(*Id.* at § 7.8.)

Champion, CSAG, and certain of the Lenders subsequently entered into additional amendment and waiver agreements, each of which contained an identical release. These agreements were: the Seventh Amendment and Waver, dated September 2, 2009 (Trial Ex. 3007); the Waiver and Forbearance Agreement, dated October 5, 2009 (Trial Ex. 3008); the Waiver and Forbearance Extension Agreement, dated October 30, 2009 (Trial Ex. 3009); and the Eighth Amendment, dated November 8, 2009. (Trial Ex. 3010). Champion's board approved each of these subsequent amendments, knowing that they also contained releases. (Feb. 14 Tr., 179:2-179:9.)

159. Champion and its attorneys entered into negotiations with CSAG and its counsel concerning the terms of the Sixth Amendment generally and, in particular, whether a release would be included. (Feb. 14 Tr., 139:10-139:16; Scholten Tr., 69:17-70:6.)

160. According to Knight, CSAG was never uncooperative in connection with the Sixth Amendment. (Feb. 14 Tr., 184:4-184:18; Trial Ex. 3041.)

161. Champion succeeded in obtaining certain changes that it bargained for during these negotiations. (Scholten Tr., 69:20-70:6.)

162. The issue of the release proved to be a sticking point in the negotiations. (*Id.* at 31:20-32:7.) Although Champion did not want to provide a release (*see* Feb. 14

Tr., 139:10-139:20), CSAG was equally adamant that a release be included, on the understanding that a release is commonplace when distressed companies seek a waiver or forbearance from their lenders. (*Id.* at 139:17-140:22, 174:7-175:4.)

163.    Champion's outside bankruptcy counsel concurred that releases are completely standard for distressed borrowers.  He testified:

> In distress situations, unless there was a very, very specific
> reason, one would always see a demand for a release….That it
> was true in virtually all either forbearance agreements and
> amendments in connection with distress[ed] loans…. both of
> those forms of agreements would contain release provisions
> [releasing] the lender [and the lending agent] from all liability
> for its past act[s].

(Rose Tr., 48:16-50:3; *see also* Trial Ex. 3094; Scholten Tr., 57:6-57:21, 62:14-62:24.)

164.    Upon receiving this advice from her counsel, Knight – who was initially resistant to a release – changed her position and conceded to the release.  (Trial Ex. 3100; Feb. 14 Tr., 139:17-140:22, 174:7-175:4, 185:2-185:12.)

165.    Champion's senior management and its board of directors considered and analyzed the proposed terms of the Sixth Amendment and other alternatives in detail and at length.  (Scholten Tr., 59:4-62:24; Trial Exs. 1037, 3116, 3117.)

166.    Champion's CEO, Mr. Griffiths, and CFO, Knight, were in favor of refusing to sign the Sixth Amendment containing the release and disclosing the default without having entered into a waiver agreement, while General Counsel Roger Scholten disagreed.  (Scholten Tr., 59:4-60:12, 61:23-62:4; *see also* Trial Exs. 1037, 3116.)

Knight testified that whether or not to accept the Sixth Amendment was a complex decision, not based solely on the release.  (Feb. 14 Tr., 195:17-196:9.)

167.   Champion's board of directors discussed the scope of the release and what the Company would be giving up by signing the Sixth Amendment; they concluded that the Company would be giving up little in exchange for a waiver of the default, and directed management to sign the Sixth Amendment.   (Trial Exs. 2176; 2211 at CHAMPION 0036914; Feb. 14 Tr., 177:4-178:14, 118:11-119:12; *see also* Scholten Tr., 62:14-62:21 ("[The board] had a strong view, I believe, of obtaining the amendment and, therefore, directing management to negotiate and finalize the amendment"), 60:4-60:9.)

168.   Champion's board of directors made this decision with full knowledge that, by executing the Sixth Amendment, Champion was waiving any and all claims that the Company may have had with respect to the MAK assignments.  (Feb. 14 Tr., 178:7-178:17; Scholten Tr., 61:1-61:14, 62:14-62:24, 70:7-70:16, 70:21-71:13.)

169.   At that time, Champion's board of directors also directed management to begin planning for bankruptcy as a result of the default.  (Feb. 14 Tr., 119:14-119:23.)

170.   In the second half of 2009, the "underpinnings" to management's forecasts set forth in the Lender presentation were proven wrong – the market had not stopped deteriorating.  (Feb. 14 Tr., 131:19-132:8.)

171.   The "terrible" housing market – not the short-term waiver granted in the Sixth Amendment – magnified Champion's financial distress, which had been in an

increasingly downward spiral for months. (*Id.* at 130:6-132:8; *see also* Trial Ex. 1060 at 1-6.)

172.    Even if the Lenders had granted the 18-month amendment that the Company sought, Champion would have fallen out of compliance with the revised covenants contained in that amendment long before the end of the 18-month period. (Feb. 14 Tr., 176:4-176:10, 176:20-177:3; Trial Ex. 1060 at 6.)

173.    Bankruptcy was necessary because the Company was running out of money as a result of deterioration in the housing market – not as a result of MAK's status as a Lender or the existence of MAK's term sheet. (Feb. 14 Tr., 226:24-227:17, 227:25-228:4, 257:14-258:4, 258:9-258:18; Trial Ex. 1060 at 7.)

174.    After months of planning, on November 15, 2009 (the "Petition Date"), Champion filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code and continued to operate and manage its businesses as debtors-in-possession. (Statement of Undisputed Facts No. 399.)

175.    Pursuant to an Interim DIP Financing Order dated November 17, 2009 and a Final DIP Order dated January 6, 2010 (collectively, the "DIP Orders"), this Court authorized the Debtors to obtain $40 million of post-petition financing under a DIP Credit Agreement dated as of November 15, 2009. (Case No. 09-14019 (KG), Docket Nos. 50, 244.) The DIP Orders further provided that the liens and security interests granted to the Lenders under and in connection with the prepetition Credit Agreement are valid,

binding, perfected, enforceable, first-priority liens and security interests in the personal and real property described as collateral under the Credit Agreement. The Court's DIP Orders also gave the Committee a deadline of February 18, 2010 to file claims challenging liens and interests under the prepetition Credit Agreement. (Case No. 09-14019 (KG), Docket No. 244, at ¶ 21.)

176.   With the Court's approval, the Debtors continued their prepetition efforts to locate buyers for their business, as they faced liquidation absent a sale. (*See* Case No. 09-14019 (KG), Docket No. 273, ¶¶ 8-9, 13-14, 21.)

177.   Morgan Joseph, the Company's financial advisors, had targeted 170 potential investors and received a total of twelve indications of interest in a sale process that spanned several months. (Jacquin Tr., 157:4-157:14.)   Champion, despite the strenuous efforts by management and Morgan Joseph, did not receive any viable offers to purchase the company prior to the § 363 sale. (*See* Feb. 14 Tr., 180:17-181:22.)

178.   At no time did any potential buyer express an interest in paying more than approximately $130 million for Champion. (Jacquin Tr., 113:3-114:5; Trial Ex. 1056.)

179.   Ultimately, the Court approved a "stalking horse" bid led by three Lenders, and no qualified competing bids were submitted by the February 24, 2010 deadline. (*See* Case No. 09-14019 (KG), Docket No. 385; *see also* Trial Ex. 3209, at 5-6.)

180.   On March 2, 2010, the Court held the sale hearing, approved the sale, and authorized the parties to consummate the transaction pursuant to the terms of the asset

purchase agreement, as amended, allowing certain of the Lenders to credit bid their prepetition claims against Debtors. (*See* Trial Ex. 3209; Case No. 09-14019 (KG), Docket No. 517, ¶¶ E, F, I, L, 3.)

181.    The sales process overseen by the Court was a thorough and arm's length market test, which represents the best evidence of Champion's fair market value at the time of the § 363 sale. (Feb. 15 Tr., 104:10-105:5; Trial Ex. 1060 at 11.)

182.    Morgan Joseph agreed that the sale "achieve[d the] objective of getting the highest and best value for Champion." (Jacquin Tr., 158:19-159:4.)

183.    The Lenders were entitled to recover the full amount of their secured claims – approximately $227 million (plus interest) – before the unsecured creditors stood to recover anything. The $227 million amount included approximately $187 million of Champion Loans and $40 million owed pursuant to the DIP Credit Agreement. (Statement of Undisputed Facts No. 400; Docket Nos. 50, 244.) Plaintiff has put forth no evidence that any potential buyer of Champion was willing to offer anything close to the value of the Lenders' claims.

## CONCLUSIONS OF LAW

The Court has found that CSAG breached the Credit Agreement in allowing the MAK assignments. However, the Court cannot find proof and therefore cannot conclude that CSAG's actions resulted in loss to Champion and its creditors. Such a finding and conclusion would require a leap to conclusions unsupported by the record.

A.    <u>CSAG Breached the Credit Agreement</u>

Under applicable New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Delta Mills, Inc. v. GMAC Commer. Fin. LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (*quoting First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998). CSAG breached the contract at issue, the Credit Agreement, by not obtaining consent for the MAK assignments prior to Champion's default.

1.    The Borrower Consent Provision

Section 12.11(a) of the Credit Agreement provides in relevant part that any entity that is already a lender under the Credit Agreement may, with the consent of the Administrative Agent (*i.e.*, CSAG), "assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement…" Ex. 1001 at CS12389-90. The Credit Agreement defines "Eligible Assignee" to mean, in relevant part:

> (a)    in the case of an assignment of a Term Loan or Synthetic Deposit, (I) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund or (iv) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed), and

> (b)    in the case of any assignment of the Revolving Loan Commitment, (i) a Revolving Loan Lender or, (ii) any other Person approved, unless an Event of Default has occurred and is continuing, by the Borrower (such approval of the Borrower not to be unreasonably withheld or delayed);

*Id.* at CS12278.

Section 12.11(b) further provides that "if the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder…the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent [*i.e.*, Credit Suisse] or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day." Ex. 1001 at CS12391.  Therefore, CSAG was required to provide notice to Champion that the proposed assignment required Champion's consent.  Notice that the assignment has occurred was not sufficient.

The Court interprets the Credit Agreement to mean that whether consent was reasonably withheld was to be decided when notice was provided to Champion of its right to consent. What Champion might have discovered or concluded about MAK if CSAG had timely alerted Champion to the fact that MAK was not an eligible assignee and that Champion had the right to consent is totally speculative at this point in time. CSAG, not Champion, failed to comply with the Credit Agreement.

The Credit Agreement also made CSAG responsible for determining whether MAK was an "Eligible Assignee."  Exs. 2017, 2023.   The form of the assignment agreement included a signature line for Champion, demonstrating that CSAG needed to determine whether borrower consent was necessary at the time the assignment agreement

was executed, not at a later date. *See*, *e.g.*, Ex. 2239 at CS32399. It was not sufficient that CSAG advised Champion that the assignment had occurred.

> 2.    Champion's Consent Was Required for the MAK Assignments Made in the First Two Quarters of 2009

On or about January 26, 2009, CSAG received a proposed assignment of Champion bank debt from Bank of America to MAK. Ex. 2005; Ibsen Dep. 11:4-8. MAK was not an "Eligible Assignee" under the Credit Agreement, and Champion was not in default. Ibsen Dep. 12:6-13:4, 14:19-23; Tr. 2/14, 38:16-23. CSAG, contrary to the Credit Agreement, told Bank of America that Champion's consent was not required, and closed the assignment on January 30, 2009. Ex. 2005 at CS29700-01. CSAG thereby breached the Credit Agreement by failing to obtain Champion's consent.

Between March and April 2009, CSAG processed other assignments of Champion debt to MAK without seeking or obtaining Champion's consent. Only after the transactions occurred did Champion send lender lists that included MAK. Findings of Fact ("FOF") No. 29, *supra*. On May 8, 2009, MAK claimed ownership of approximately $29.5 million in Champion bank debt and began aggressively opposing Champion's plan for reducing its leverage through asset sales. Tr. 2/14, 45:13-46:25; Ex. 2015 (FOF No. 31).

By May 11, 2009, Champion realized that CSAG had been required to obtain its consent for the MAK assignments, and asked CSAG why consent was not sought before the assignments were closed. Ex. 2017 at CS03369; Tr. 2/14, 47:18-48:8. The next day,

57

CSAG acknowledged that consent had been required and  asked Champion to consent. Champion refused.  Ex. 2023; Ibsen Dep. 23:21-25:18; 26:4-28:15.  Beginning May 14, 2009, additional assignments to MAK that CSAG received were put "on hold."  Ex. 2023 at CS03316.

On May 27, 2009, Champion wrote to CSAG with the reasons why Champion had refused and was continuing to refuse to consent to the MAK assignments.  Champion also placed CSAG on notice that MAK had begun aggressively opposing Champion's leverage reduction strategy, and that the MAK assignments would give MAK voting power it could use to block the amendment of the Credit Agreement Champion would need to implement its strategy.  Ex. 2031.

Nevertheless, CSAG continued to assign interests in Champion bank debt to MAK.  Ibsen Dep. 32:12-33:17; Ex. 2024 at CS03220.  According to CSAG's records, by early June 2009,  MAK held at least $20.4 million of the senior secured debt, not counting the amount CSAG had placed "on hold," making it the largest single holder of Champion bank debt.  Ex. 2069.

3.      CSAG Reversed its Position on Consent

On June 19, 2009, CSAG reversed its position on the consent issue.  It wrote to Champion that consent was not required because Champion had not expressly refused consent during the ten days following May 12, 2009.  Ex. 2022; Tr. 2/14, 55:11-56:6; Ibsen Dep. 50:14-52:4.  CSAG's new position was unjustified because Champion had

clearly refused its consent on May 12, 2009.  In addition, the notice of Champion's right to consent came far too late for CSAG to invoke the ten day limitation.  By May 12, 2009, the assignments at issue already had been recorded by CSAG as MAK holdings. CSAG had already violated the contract and had no right to insist that Champion respond to the belated notice, let alone within ten days.  On June 23, 2009, Champion promptly informed CSAG that it was in breach of the Credit Agreement.  Ex. 2022 at CHAMPION0000904-05; Ex. 2039 at CS10822-23; Tr. 2/14, 56:10-57:9, 57:19-58:8.

In late June and throughout most of July 2009, CSAG and Champion continued to discuss their ongoing dispute over the consent issue.  By July 20, 2009, CSAG unilaterally terminated discussions on the consent issue, informing Champion that it did "not believe Borrower consent is required and does not plan on seeking it" and would shortly finalize the assignments.  Ex. 2096 at CS24999-25000; *see also* Ex. 2097.  On July 22, 2009, MAK sent CSAG a letter which threatened legal action against CSAG if it did not finalize the "on hold" assignments.  Ex. 2102.  Within a day of CSAG's receipt of that letter, Defendant agreed to close the outstanding assignments to MAK and confirmed MAK's status as a Lender with respect to all the MAK assignments.  Ex. 2105.  On learning that the disputed assignments had been finalized, Knight emailed Champion's CEO and its counsel that "it is important that we confirm with CSAG that despite Champion's not consenting to an assignment to MAK, CSAG has nonetheless effected

the assignment, and they are now a lender rather than a participant." Ex. 2117; Tr. 2/14, 82:6-17.

      4.      Champion Was Not In Default and Performed Its Duties Under the Credit Agreement When the MAK Assignments Occurred During the First Two Quarters of 2009.

CSAG has offered no evidence whatsoever that Champion was not in compliance with its obligations under the Credit Agreement during the first two quarters of 2009. No one has raised any issue as to whether Champion was in default under the Credit Agreement until the second quarter of 2009 ended. Furthermore, there is evidence that Champion was making its required payments to the Lenders under the Credit Agreement. *See, e.g.*, Ex. 2045; Ibsen Dep. 65:12-67:15.

      5.      Champion Did not Unreasonably Refuse To Consent

Champion had valid business reason to withhold consent. MAK was aggressively seeking to oppose the business strategy through which Champion was seeking to improve its financial condition. In addition, by May 12, 2009, the assignments had caused MAK to become one of the largest holders of Champion bank debt and placed MAK in a position to block Champion's strategy for reducing its leverage. Exs. 2015, 3025; Tr. 2/14, 44:1-9.

      6.      As This Court Previously Ruled, a Default By Champion Would Not Retroactively Validate Defective Assignments

During CSAG's July 2009 negotiations with Champion, Defendant took the position that Champion was in default under the Credit Agreement as of the end of the

second quarter 2009, and that the effect of that alleged default was to validate the defective assignments because consent was no longer required. The Court previously ruled that an event of default under the Credit Agreement could not retroactively revive MAK assignments which were invalid at their inception under the Credit Agreement. *In re Champion Enters.*, No. 09-14019, 2011 Bankr. LEXIS 3607, at *21-22 (Bankr. D. Del. Sept. 27, 2011). That ruling stands.

7.  Champion Is Not Estopped From Taking the Position That CSAG Wrongfully Finalized the Disputed Assignments

CSAG argues that Champion is estopped from challenging CSAG's entitlement to finalize the assignments in July 2009 because Champion allegedly agreed with CSAG that Defendant was entitled to effectuate all the MAK assignments at that time. To the contrary, there is no basis for an estoppel. "Under New York law, equitable estoppel requires a showing of: (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoers; (4) reliance upon the misrepresentations which causes the innocent party to change its position to its substantial detriment." *Gen. Elec. Capital Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 1994).

Champion made no false representation to CSAG on which the Defendant relied. CSAG also made good on its intent to finalize the disputed assignments without Champion's consent (Exs. 2096, 2097). CSAG clearly did not rely on Champion's

61

consent.

Champion maintained that it had claims against CSAG arising from the MAK assignments.  FOF No. 47.  Champion also continued to insist that because it had not defaulted, MAK's status as a participant could not be immediately converted into that of a Lender.  FOF Nos. 32, 35, 60.

Champion, and therefore the Committee, is not estopped from claiming CSAG breached the Credit Agreement.  Champion's statements and actions evince its strenuous opposition to the assignments from MAK.

> C.    Champion did not Waive its Right to Consent

Champion did not waive its right to consent to the MAK assignments based on a prior course of dealing.  To prove a waiver based on conduct, there must be evidence "that the party charged with waiver relinquished a right with both knowledge of the existence of the right and an intention to relinquish it." *Christian Dior-N.Y., Inc. v. Koret, Inc.*, 792 F.2d 34, 40 (2d Cir. 1986) (*quoting Voest-Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983).  There is no evidence that before May 2009, Champion's management ever focused on the borrower consent provision at the time it learned of new holders and formed an intent to waive it.  Indeed, there is no evidence that consent would have been required for any of the assignments of interest in Champion's senior secured debt that occurred before January 30, 2009.  SOF Nos. 19-20.  117 of those assignments identified a Credit Suisse affiliate as Assignee.

SOF No. 21.  Because the Credit Agreement defines "Eligible Assignees" to include affiliates of existing Lenders, all those latter assignments were apparently to eligible assignees for which consent would not have been required.  In sum, there simply is no evidence that Champion and CSAG ever agreed orally or in writing to modify the Credit Agreement and therefore there was no waiver of consent on this basis.  *See Grandonico v. Consortium Commc'ns Int'l, Inc.*, 566 F. Supp. 1288, 1291 (S.D.N.Y. 1983) (when a written contract provides that it cannot be altered except in writing, it cannot be altered except in writing subject to a narrow exception).

      D.    <u>The Breach of the Credit Agreement Did Not Damage Champion</u>

      1.    The Implied Covenant of Good Faith and Fair Dealing.

Plaintiff alleges that CSAG breached the implied covenant of good faith and fair dealing by "coercing Champion to accept MAK as a member of the lending group, and later forcing Champion to release Champion's claims against CSAG relating to the improper MAK assignments."  (2d Am. Compl. ¶ 252.)  Plaintiff did not prove its allegations.

<u>Accepting MAK As A Lender</u>

CSAG did not need to coerce Champion to accept MAK's entry into the lending group because even if MAK had not become a Lender in February 2009, MAK was a Participant pursuant to the terms of the Credit Agreement.

Although Champion could block MAK's status as a Lender until it went into default at the end of its second fiscal quarter, Plaintiff did not prove that CSAG coerced or otherwise acted improperly in formally recognizing MAK as a Lender on July 27, 2009.  As the uncontroverted evidence establishes, Champion upon the advice of its counsel itself understood that MAK could become a Lender.  (*See, e.g.*, Trial Ex. 3040 (advice of outside counsel that the Credit Agreement "clearly supports CSAG's position that once Champion [was] in default, it could implement an assignment to MAK without Champion's approval"); Feb. 14 Tr., 162:25-163:8 (Knight and her counsel believed that Champion's approval of assignments to new Lenders was no longer needed after Champion was in default); Scholten Tr. 48:25-49:22 (Champion's General Counsel agreed with outside counsel's opinion); Trial Ex. 3041 (same); Griffiths Tr., 28:7-28:20 (Champion's CEO agreed that the issue was moot); Feb. 14 Tr., 79:23-80:18, 164:16-165:22 (testimony of Knight that Champion agreed with counsel's advice).)

Champion even expressly communicated its understanding to CSAG's counsel. (*See, e.g.*, Trial Ex. 3063 at CHAMPION 0032881 (Champion's outside counsel told CSAG that the Credit Agreement, "upon a default, allowed a conversion of participations to direct lender"); Feb. 14, Tr., 166:9-167:15 (Knight knew that outside counsel communicated this opinion to CSAG); Feb. 14 Tr. 167:12-167:17 (Knight testified that the parties had a "collective understanding" that this issue was "done" by July 21, 2009).)

Clearly, even without the assignment MAK as a Participant became a Lender following Champion's default.

CSAG did not coerce Champion into accepting this position. Champion accepted the independent advice of its outside counsel and General Counsel that Champion had no contractual or other right to block MAK from becoming a Lender and subsequently accepted MAK as a Lender upon receiving confirmation of MAK's status as a Lender from CSAG.

<u>The Release In The Sixth Amendment</u>

Plaintiff also alleges that CSAG "forced" Champion to include a release against CSAG in the Sixth Amendment and this action was a violation of the implied covenant. Plaintiff's allegations fail both as a matter of law and because Plaintiff has not proved its claim. Plaintiff complains that CSAG breached the implied covenant due to its decision whether, and on what terms, to enter into an amendment to the Credit Agreement that would waive Champion's default. The Credit Agreement contained no explicit or implicit provision requiring CSAG or the Lenders to enter into any amendment or wavier sought by Champion. Thus, there is no basis for Plaintiff's contention that the expectation of a future amendment or waiver was a benefit of the bargain obtained by Champion under the terms of the Credit Agreement.

New York law is clear that a party is not obligated to facilitate or enter into an amendment or waiver of an existing contract pursuant to the implied covenant of good

faith and fair dealing.  *See Citibank, N.A. v. United Subcontractors, Inc.*, 581 F. Supp. 2d

640, 646 (S.D.N.Y. 2008) (administrative agent did not breach the covenant of good faith

and fair dealing in terminating loan agreement because "[a] party to a contract is allowed

to act in its own self-interest consistent with its rights under the contract"); *Broughel v.*

*Battery Conservancy*, No. 07-CV-7755, 2009 WL 928280, *7 (S.D.N.Y. Mar. 30, 2009)

("the implied covenant of good faith and fair dealing. . .does not obligate the promisor to

make future promises or to renegotiate the contract"); *Resolution Trust Corp. v. Lesal*

*Assocs.*, No. 91 Civ. 2025, 1992 WL 98843, at *5 (S.D.N.Y. May 6, 1992) (covenant of

good faith and fair dealing "does not require. . . contrary to. . .economic interest such as

modifying the terms, or even negotiating the possible modification of the terms of, a risky

loan"); *John St. Leasehold LLC v. FDIC*, No. 95 Civ. 10174, 1996 WL 737196, at *9

(S.D.N.Y. Dec. 24, 1996) (refusal to grant waiver of certain provisions in parties' contract

not a breach of the covenant of good faith and fair dealing).

CSAG and the Lenders had the right to decide whether to negotiate or enter into

any amendment or waiver requested by Champion.  Nevertheless, Plaintiff has claimed

that CSAG breached the implied covenant by compelling Champion to accept the release

provision in the Sixth Amendment.  Plaintiff's claim fails because Champion was not

entitled to an amendment and waiver under the Credit Agreement.

The evidence shows that Champion agreed to the release after conducting arm's

length negotiations, in which all parties were represented by able, competent, and

66

experienced internal and external counsel.  The inclusion of a release was important to CSAG and the Lenders (and completely standard when lenders provide amendments to distressed borrowers – as recognized by Champion's bankruptcy counsel and, eventually, Champion's officers).  (*See, e.g.*, Rose Tr., 48:16-50:3; Scholten Tr., 57:6-57:21, 62:14-62:24; Trial Exs. 1031, 3094.)  CSAG and the Lenders agreed to include certain provisions of importance to Champion in the Sixth Amendment.  (Scholten Tr., 69:20-70:6.)  This was a good faith negotiation by the parties to the Credit Agreement to amend that agreement after the default by Champion.  Plaintiff has not proved a violation of the implied covenant of good faith and fair dealing.

> 2.      Champion Released Plaintiff's Claim Against CSAG.

The Sixth Amendment contains a release.  (Trial Ex. 1002 at § 7.8.)  There can be no dispute that this release, by its clear terms, releases any claim, including Plaintiff's claim, against CSAG relating to the Credit Agreement for conduct that occurred prior to August 12, 2009.  (*Id.*; *see also* Scholten Tr., 61:1-61:14, 62:14-62:24, 70:7-70:16, 70:21-71:13; Feb. 14 Tr., 178:7-178:17.)  Champion agreed to include the release in the Sixth Amendment after conducting extensive arm's length negotiations.  All parties were represented by able, competent, and experienced counsel.  (Scholten Tr., 69:17-70:6.)  Champion's management, its in-house and outside attorneys, and its board of directors were all aware that the release would apply to any claim relating to assignments to MAK and, specifically, to the claims brought by Plaintiff.  (Feb. 14 Tr., 178:7-178:17; Scholten

Tr., 61:1-61:14, 62:14-62:24, 70:7-70:16, 70:21-71:13.)   Champion's board of directors overruled the opinions of counsel, and entered into the amendment and release all claims against CSAG and the Lenders for past conduct, acts, or omissions.   (Trial Ex. 2176; Feb. 14 Tr., 177:4-178:14, 118:11-119:12; Scholten Tr., 60:4-60:9, 62:14-62:21 ("[The board of directors] had a strong view, I believe, of obtaining the amendment and, therefore, directing management to negotiate and finalize the amendment").)

To succeed on a duress theory, Champion is required to show it was compelled to agree to the terms of the release by means of a wrongful threat which precluded the exercise of his free will."   *Fruchthandler v. Green*, 649 N.Y.S.2d 694, 695-96 (App. Div. 1996).   Economic disadvantage is inadequate to support a claim of economic duress. *VKK Corp. v. NFL*, 244 F.3d 114, 123 (2d Cir. 2001); *See also Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 527 (S.D.N.Y. 2001) (finding no economic duress where plaintiff's "own difficult financial circumstances necessitated signing the agreements at issue").

Plaintiff cannot make a showing of economic duress under New York law.   See *In re MarketXT Holdings Corp.*, 361 B.R. 369, 401 (Bankr. S.D.N.Y. 2007) ("A sophisticated party must support a claim for economic duress by more than the claim that the defendant knew of and used the plaintiff's poor financial condition to obtain an advantage in negotiations.").   Here, Plaintiff alleges that CSAG and the Lenders were unyielding and refused to agree to waive the default provisions of the Credit Agreement

unless Champion agreed to a release. (*See* Trial Ex. 1015.)  CSAG and the Lenders had no obligation to waive Champion's default and their willingness to do so could rightfully be conditioned on Champion agreeing to terms desired by the Lenders.  The undisputed evidence, which Champion's bankruptcy counsel confirmed, is that releases are contained in "virtually all" forbearance agreements or amendments in connection with distressed loans.  (Rose Tr., 48:16-50:3; *see also* Trial Ex. 3094; Scholten Tr., 57:6-57:21.)

A borrower's free will is precluded when (1) it would have suffered 'irreparable harm' had the wrongful threat been carried out, and (2) it was bereft of alternatives to signing the contract."  *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08-11365, 2010 WL 1257300, at *10 (S.D.N.Y. Mar. 31, 2010), *aff'd*, No. 10-1801-CV, 655 F.3d 136 (2d Cir. 2011).  Champion cannot prove that it would have been irreparably harmed if it had not signed the Sixth Amendment or that Champion had no alternative to signing the Sixth Amendment.  Champion's senior management advocated disclosing the default without obtaining a waiver from the Lenders, but Champion's board of directors refused to support such an alternative.  Thus, Champion accepted the release rather than pursue other options.  Champion also had the option of filing for bankruptcy without obtaining a waiver from the Lenders.  Such an available alternative precludes a finding of economic duress.  *MarketXT*, 361 B.R. at 401 (finding no economic duress where debtor "could have chosen to file for bankruptcy at an earlier point"; *Interpharm*, WL 1257300 at *11

("Plaintiff's argument to the contrary – that bankruptcy does not count as an alternative – lacks citation to legal authority and is unpersuasive.").

Champion did not promptly repudiate the release and is thereby deemed to have ratified it. *VKK Corp.*, 244 F.3d at 122-23; *see also Fruchthandler*, 649 N.Y.S.2d at 695-96; *Liberty Marble, Inc. v. Elite Stone Setting Corp.*, 670 N.Y.S.2d 836, 838 (App. Div. 1998) (defendant ratified the release by accepting payment pursuant to the contract). Here, Champion accepted the benefits of the Sixth Amendment and the subsequent agreements containing releases and never objected until long after it executed the Sixth Amendment. Not even duress, which the Court finds was not present would nullify the acquiescence given Champions acceptance of the benefits and non-repudiation of the waiver.

3.    Failure to Prove CSAG's Breach Caused Any Damage to Champion.

The Committee claims that CSAG's breach was a proximate cause of Champion's bankruptcy which, in turn, resulted in Champion being compelled to sell its assets and its business in a fire sale at values that reflected the unusually depressed market values of Champion's assets. Courts can award damages only if they are a foreseeable consequence of the breach. Damages not directly traceable to the breach or that result from other intervening causes are not allowed. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004); *See also Dupont Flooring Sys., Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101, 2004 WL 1574629, at *5-7, *9 (S.D.N.Y. July 14, 2004)

70

(no liability for destruction of business because of pre-existing and ongoing business and financial problems).

Plaintiff did not establish that Champion's purported damages resulted from allowing MAK to become a Lender.  The Committee argues that the Lenders refused to provide Champion with an eighteen-month amendment and waiver that would have enabled  Champion to avoid bankruptcy and the resultant sale of its assets.

The Court received testimony from only one Lender – Wallitt of General Electric Capital Corp. ("GECC") – who provided unambiguous and undisputed testimony that GECC was unwilling to provide a medium or long-term waiver and amendment to Champion because of his analysis of Champion's worsening financial performance and his effort to maximize the value of GECC's position in the Champion loans.  (Feb. 14 Tr., 211:14-211:20, 213:10-213:25.)  Additionally, the undisputed evidentiary record clearly demonstrates that the Lenders' rejection of the proposed eighteen-month amendment was based on a variety of concerns, including concerns about the Company's deteriorating financial condition and liquidity, historical inability to meet its forecasts, and the worsening housing market.  (*Id*. at 212:13-214:18, 218:24-219:20; *see also id*. at 193:13-193:24.)  There is no evidence that the Lenders' views on the eighteen-month amendment would have been any different in the absence of MAK.  (*Id*. at 219:21-220:10.)  Instead, the only evidence on the subject establishes that GECC, a major Lender, was opposed to granting a long-term amendment to Champion independent of MAK's presence.  (*Id*. at

71

213:10-213:21.)  Other significant Lenders were likewise opposed.  (*Id.* at 171:18-171:22

(National City was opposed), 172:2-172:21 (Citizens Bank was opposed), 222:5-222:15

(Raven Asset Management was opposed), 242:1-242:22 (Fraser Sullivan was opposed).)

The evidentiary record does not support the Committee's claim that MAK's

involvement as a Lender led to Champion's bankruptcy.

1.  MAK's status was irrelevant until the Lenders were called upon to vote on a proposed amendment to the Credit Agreement.  No vote occurred until after Champion defaulted under the Credit Agreement and affirmatively recognized MAK's status as a Lender.  (Feb. 14 Tr., 180:11-180:16.)  As either a Lender or a Participant, MAK was free to negotiate with Champion and the Lenders as it saw fit.

2.  MAK could have proposed the term sheet that was presented to Champion as a Lender or otherwise.  Phyllis Knight testified that MAK was "a fifty percent holder of converts, at least a former shareholder, if not a current shareholder, and their right to have a voice, whether or not they're a lender, isn't something I can control as the CFO of the company…whether or not they're a lender they're a big stakeholder that has a right to make a proposal."  (*Id.* at 115:22-117:2.)

3.  If Champion had secured an 18-month forbearance from the Lending Group in July 2009, it nevertheless would have failed to meet the proposed amended covenants by the end of 2009.  (*Id.* at 176:4-176:10, 176:20-177:3; Trial Ex. 1060 at 6.)  Champion would have been in the same position by the end of 2009 – in default, unable to convince the Lenders to grant an extended waiver, and having no right to deny consent to MAK or any other entity seeking to become a Lender.  The breach of contract by CSAG did not create the financial problems of Champion.

72

4.      Plaintiff's expert provided no opinion regarding any causal connection between CSAG's alleged breach and the purported damage caused to Champion and its unsecured creditors.  (Feb. 15 Tr., 35:3-37:22.)  Mr. Frank ignored evidence that Champion's cash flow problems were completely unrelated to any issues involving MAK.  (*Id.* at 39:7-40:13.)  He made no attempt to determine whether Champion was going to run out of money at any point in time after July 2009.  (*Id.* at 42:1-42:10.)

There is no evidence whatsoever that Champion would have obtained a longer-term amendment and waiver if MAK had not been a Lender.  On the other hand there is substantial evidence that Champion would not have avoided bankruptcy regardless of any action that MAK took or did not take.  Plaintiff has not met its burden of proving that CSAG damaged Champion.

4.      Failure to Prove that Champion Suffered Any Non-Speculative Damages.

A plaintiff cannot prevail on a cause of action for breach of contract where the claimed damages are speculative or uncertain in nature.  *See Farash & Robbins, Inc. v. Fleet Bank*, 326 F. App'x 77, 82 (3d Cir. 2009); *see also Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 596-97 (D. Del. 2004).  Plaintiff failed to put forth any credible evidence that it suffered damages.

Market price is 'a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.'"  *Iridium Operating LLC v. Motorola, Inc.*, 373 B.R. 283, 347 (Bankr. S.D.N.Y. 2007) (*quoting VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007)).  At trial, the Court heard evidence of three different methods by which to determine the fair market value of Champion:  (1)  the objective

value generated through the sale of the Company pursuant to an open, fair, and extensive bidding process and auction process; (2) by calculating the objective total enterprise value ("TEV") of Champion using the publicly disclosed values of Champion's securities; and (3) estimating a subjective fair market value using mathematical analyses.  The first two of these methods rely on market data as determined by a market test in the case of the sale under Code Section 363 and the market price of Champion's securities.  These two methods each establish a fair market value of Champion substantially lower than the value of the Champion Loans, thus ensuring that there was never going to be recovery by any creditors other than the holders of the secured Champion Loans.

Plaintiff therefore relied on the "subjective estimate" of its expert witness, Jason Frank, who did not give sufficient consideration to market data concerning Champion in conducting his analysis.  The Court finds Plaintiff's subjective estimate unreliable and therefore it does not provide competent evidence of any damages suffered by Plaintiff.

a.    The Court-Supervised Section 363 Sale.

The value generated through a Court approved auction process pursuant to Section 363 reflects the market value of Champion's assets.  *See In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, at *12 (Bankr. D. Del. Apr. 2, 2001). The Third Circuit has held that sales pursuant to Section 363 are an efficient and reliable mechanism for valuing assets.  *Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys.*

*Corp.)*, 432 F.3d 448, 461 (3d Cir. 2006).   A market test is the best evidence of a company's value at a given point in time.

Here, Champion sold its assets under Court supervision, providing a true market test of the fair market value of Champion.  (*See* Trial Ex. 3209; Case No. 09-14019 (KG), Docket No. 517, ¶¶ E, F, I, L, 3.)  The sale process was thorough, conducted at arm's length, and took place over many months pre- and post-petition.  (*Id.*)  Morgan Joseph, Champion's financial advisors, targeted 170 potential investors and received a total of twelve indications of interest.  (Jacquin Tr. 157:4-157:14.)  At no time did any potential buyer express an interest in paying more than approximately $130 million for Champion. (*Id.* at 113:3-114:4; Trial Ex. 1056.)   Champion, despite the strenuous efforts by management and Morgan Joseph, did not receive any viable offers to purchase the company prior to the § 363 sale.  (*See* Feb. 14 Tr., 180:17-181:22.)  Ultimately, the Court approved a "stalking horse" bid by three Lenders, and Champion received no qualified competing bids by the February 24, 2010 deadline.  (*See* Case. No. 09-14019 (KG), Docket No. 385; *see also* Trial Ex. 3209, at 5-6.)  Morgan Joseph agreed that the sale "achieve[d the] objective of getting the highest and best value for Champion."  (Jacquin Tr., 158:19-159:4.)  There is no evidence that anyone was willing to offer anything close to the value of the Lenders' secured claims of approximately $227 million (plus interest).

Plaintiff's expert opined that the Section 363 sale did not provide a fair market value. (Feb. 15 Tr., 82:7-83:4.)  Mr. Frank admitted that he "didn't analyze the sale" or the "bankruptcy proceedings."  (*Id.* at 83:5-83:9, 84:3-84:10.)  In other words, according to Mr. Frank, the Champion sales process could not be evidence of Champion's fair market value even though he knew virtually nothing about the sales process.  Defendant's expert, on the other hand, appropriately identified the market test as the best evidence of Champion's fair market value.  (*See id.* at 103:13-105:14; *see also* Trial Ex. 1060 at 11.)

There is no evidence on the record that any actual potential purchaser of Champion – and approximately 170 were solicited – was willing to pay anywhere close to the value of the Champion Loans at any time during the pre- and post-petition sales process.  Plaintiff did not establish that the actual market-based value of Champion is greater than the value of the senior secured creditors' claims.  Plaintiff therefore has not established that it has suffered any damages as a result of the alleged breach.

b.    The Actual Value Of Champion's Securities.

In addition to the Section 363 sale, there was additional evidence of Champion's fair market value available based on the public disclosures of the value of Champion's securities.  The value that the markets placed on Champion's debt and equity securities is further evidence of the Company's value.  (Trial Ex. 1060, at 9.)

76

The market value of Champion's securities had declined rapidly since the beginning of 2008.  On December 29, 2007, Champion had a total enterprise valuation ("TEV") of $908.8 million.  (Trial Ex. 1060, at 1, 4; Feb. 15 Tr., 99:13-100:11, 102:10-103:9.)  This value declined by almost half by the beginning of 2009.  (*Id.* (Champion's TEV was $480.4 million at January 3, 2009).)  By July 4, 2009, the TEV of Champion's securities was only 20% of its value at the beginning of that year – $98 million.  (*Id.*)

Plaintiff, however, does not claim that the impact of CSAG's alleged breach began until after the Lenders declined to grant Champion an eighteen-month waiver and amendment to the Credit Agreement.  (*See* Pl.'s Pre-Trial Br. at 12-16).  Champion did not even circulate a proposed eighteen-month amendment to the Lenders until on or about July 16, 2009.  (*See* Trial Exs. 3048, 3049, 3055.)  Yet, the total value of Champion on July 4, 2009 was only $98 million – approximately $89 million below the value of the Champion Loans.  (Statement of Undisputed Facts No. 400.)  The market value of Champion was already lower than the value of the Champion Loans before the breach.  Therefore, unsecured creditors would not have received any recovery after the Lenders and other senior secured creditors were paid.

c.    Plaintiff's Calculations Of The Fair Market Value.

Plaintiff's expert conducted a fair market valuation of Champion using his subjective judgment.  Although such an analysis would be appropriate in the absence of market data, "subjective estimates" are inferior methods for determining value.  *VFB*

*LLC*, 482 F.3d at 624, 633; *Iridium*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007).  Mr. Frank also based his entire analysis on projections made by management that were known to be inaccurate and unreliable even at the time they were made.

Where a supposed valuation expert uses "untested, and unverified marketing projections [as] the foundation of a damages calculation," the expert's conclusions will be disregarded as unreliable, and plaintiff's claimed damages will be deemed too speculative for recovery.  *Chemipal Ltd.*, 350 F. Supp. 2d at 592, 597.  The projections Mr. Frank relied upon were issued by Champion to persuade the Lenders to provide a long-term amendment and wavier to the Credit Agreement and to solicit bids for the Company's sale.  (Feb. 15 Tr., 15:9-16:3, 29:18-29:24, 66:22-68:2.)  In fact, Mr. Frank admitted that the 2009 projections were estimates and were not a reliable indicator of Champion's future performance.  (*Id.* at 74:16-76:2, 78:24-81:2.)

While a prefabricated housing industry specialist predicted in its report for 2009 that industry sales were expected to increase 3.9% over the next five years (*see* Trial Ex. 3210 at 11), Champion's management forecasted, in the projections used by Mr. Frank, that its sales would grow by an average annual rate of 22.4% over that same period.  (Feb. 15 Tr., 58:9-62:16.)  Mr. Frank used these projections to determine Champion's fair market value.  Mr. Frank conducted no analysis to determine how Champion management calculated the projections or whether they were reasonable.

In contrast Knight knew, at the time the projections were created, that Champion's U.S. business had "no visibility" and that the projections, while made in good faith, were not likely predictive of future events. (Feb. 14 Tr., 197:2-197:12; *see also* Feb. 14 Tr., 90:16-91:1.) Champion had repeatedly proven itself unable to accurately forecast its results even in the very *short-term*. Wallitt testified that his review of Champion's financial information quickly revealed that "the company had lost the ability to forecast. The company was at ground zero of, you know, the housing crisis which was enveloping the entire U.S. economy." (*Id.* at 214:1-214:10.) Champion's most recent forecasts had been especially bad:

> So not only were year-over-year sales down by over fifty percent[,] in [the first quarter of 2009] that we were analyzing, they missed their budget by what looks to be roughly thirty-three million dollars in round numbers, that's twenty percent, which again major red flag. You can't project or forecast your top line within twenty percent in the current quarter that you're in? How on earth are you going to forecast out six quarters? ... [I]t led me to ... draw the pretty fast conclusion that management could not project the business.

(*Id.* at 215:19-216:7.) Nevertheless, Mr. Frank used Champion's *long-term* projections as the most important factor in determining his estimate of fair market value.

Defendant's expert, Loughlin, performed a valuation with non-market data (although continuing to believe that market data provides the best evidence of Champion's value) to point out the flaws in Mr. Frank's analysis. Loughlin used the more reliable industry projections to calculate fair market value rather than the "inflated, unreliable, and unattainable Company financial forecasts" used by Mr. Frank. (Trial Ex.

1060 at 12-13.)   Loughlin recognized, consistent with the testimony of Knight and Wallitt, that "[r]eliable and reasonably predictable cash flows were not available at Champion because the Company's operating results were deteriorating rapidly and there was little visibility as to future performance." (*Id.*)   Using these more reasonable projections, Loughlin calculated a TEV for Champion of $91.4 million at December 31, 2009 and $112.2 million at June 30, 2010. (*Id.* at 15.) These estimates are more credible than Mr. Frank's estimates because they are more consistent with the available market information.   Loughlin's fair market value analysis results in an estimate of Champion's value lower than the amount of the senior secured creditors' claims, again foreclosing the possibility that Plaintiff can establish any non-speculative damages.

## CONCLUSION

The Court has found that CSAG breached the Credit Agreement but that the Committee did not prove the breach caused Champion's bankruptcy or resulted in damages.   Accordingly, the Court will dismiss the claims against CSAG and enter judgment in favor of CSAG.

Dated: August 30, 2012

KEVIN GROSS, U.S.B.J.

80